Edward S. Weisfelner (*pro hac vice*)
Jeffrey L. Jonas (*pro hac vice*)
Bennett S. Silverberg (*pro hac vice*)
**BROWN RUDNICK LLP**
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

Phillip Lamberson – SBT #00794134
Rakhee V. Patel – SBT #00797213
Annmarie Chiarello – SBT #24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, TX 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390

*Counsel to the Official Committee*
*of Equity Security Holders of Adeptus Health Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ADPT DFW HOLDINGS LLC, *et al.*, | § | Case No. 17-31432 (SGJ) |
| | § | |
| Debtors. | § | Jointly Administered under Case No. 17-31432 |
| | § | |

**EMERGENCY MOTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITY
HOLDERS OF ADEPTUS HEALTH INC. FOR AN ORDER (I) APPOINTING
A TRUSTEE FOR THE CHAPTER 11 ESTATE OF ADEPTUS HEALTH INC.
PURSUANT TO BANKRUPTCY CODE SECTION 1104(a); OR,
ALTERNATIVELY, (II) APPOINTING AN EXAMINER PURSUANT
TO BANKRUPTCY CODE SECTION 1104(c) AND TERMINATING THE DEBTORS'
<u>EXCLUSIVITY PERIOD PURSUANT TO BANKRUPTCY CODE SECTION 1121(d)</u>**

The Official Committee of Equity Security Holders of Adeptus Health Inc. (the "**Equity**

**Committee**") appointed in the Chapter 11 cases (the "**Chapter 11 Cases**") of the above-

captioned debtors and debtors-in-possession (collectively, the "**Debtors**"), by and through its

undersigned counsel, hereby files this emergency motion (the "**Motion**")[1] for entry of an Order,

---

[1]     Contemporaneously with the filing of this Motion, the Equity Committee has filed its *Compendium of
Exhibits to the Emergency Motion of the Official Committee of Equity Security Holders of Adeptus Health Inc.
for an Order (I) Appointing a Trustee for the Chapter 11 Estate of Adeptus Health Inc. Pursuant to Bankruptcy
Code Section 1104(a); or, Alternatively, (II) Appointing an Examiner Pursuant to Bankruptcy Code Section
1104(c) and Terminating the Debtors' Exclusivity Period Pursuant to Bankruptcy Code Section 1121(d)* (the
"**Compendium**").   Except for the proposed plan term sheet attached hereto as **Exhibit A**, all Exhibits
referenced herein refer to the Exhibits set forth in the Compendium.

substantially in the form attached hereto as **Annex 1**:  (i) appointing a trustee for the Chapter 11

estate of Adeptus Health Inc. ("**AHI**") pursuant to Section 1104(a) of Chapter 11 of title 11 of

the United States Code (as amended, the "**Bankruptcy Code**"); or, alternatively, (ii) appointing

an examiner pursuant to Bankruptcy Code Section 1104(c) and terminating the Debtors'

exclusivity period pursuant to Bankruptcy Code Section 1121(d).[2]  In support of this Motion, the

Equity Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Equity Committee is painfully aware that the relief sought herein may be

considered drastic and it carefully weighed its options before this filing.  It is convinced that

present circumstances required this filing in order to preserve the integrity of the Chapter 11

process and prevent manifest injustice.  Stated simply, the Equity Committee firmly believes that

the appointment of a Chapter 11 trustee to act as an independent fiduciary for AHI's stakeholders

and prevent AHI's currently conflicted Board of Directors and management from further

squandering AHI's assets for the primary benefit of Deerfield is both necessary and proper and

fully supported by the evidence.

2.      From the beginning, these Chapter 11 Cases have been a carefully constructed

and orchestrated loan-to-own strategy by Deerfield, which has co-opted the Debtors' conflicted

Board and newly appointed management and disabled any opportunity for a value-maximizing

process.  Deerfield scooped up the Debtors' secured debt for pennies on the dollar (and is using

the full loan amount as currency and leverage in the Cases); imposed restrictive milestones

through the DIP Facility intended to stifle a competitive process; is requiring the Debtors to

---

[2]        Unless otherwise indicated, capitalized terms used in this Motion and not defined shall have the
meanings ascribed to them under the *Debtors' First Amended Joint Plan of Reorganization under Chapter 11
of the Bankruptcy Code* [Docket No. 451] (the "**Amended Proposed Plan**"), or the *Disclosure Statement for
Debtors' First Amended Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* [Docket No.
452] (the "**Amended Proposed Disclosure Statement**"), as applicable.

assume certain agreements that have been restructured (or likely will be restructured) by Deerfield, with the exclusive benefit of such restructured agreements inuring to Deerfield post-consummation; and is requiring the Debtors to reject other agreements where rejection may not be in the best interests of the Debtors' estates.  The sum total of these actions will result in Deerfield realizing a substantial "pop" in the Debtors' value post-consummation, while AHI and the other Debtors are saddled with the cost.

3.      But, there is an alternative.  The Equity Committee is prepared to propose a plan solely with respect to AHI (one of the 140 Debtors in these jointly administered Chapter 11 Cases) that maximizes value for the AHI estate and affords substantial cash recoveries to the innocent trade creditors, while ensuring that these Chapter 11 Cases move forward in a productive manner.  Attached hereto as **Exhibit A** is a term sheet contemplating the terms of such plan, which will provide a materially better outcome for AHI's stakeholders and trade creditors of its subsidiaries than the Deerfield-sponsored plan.  Pursuant to the proposed term sheet, if the Creditors' Committee consents to the relief requested in this Motion, then the "Litigation Trust Funders" (as defined in the term sheet) will offer to acquire "Allowed Eligible Subsidiary General Unsecured Claims" (as defined in the term sheet) at 50% of the face amount of such Allowed Eligible Subsidiary General Unsecured Claims up to a maximum consideration of $25 million.  The Litigation Trust Funders will also acquire any rights or interests that any holder of an Allowed Eligible Subsidiary General Unsecured Claim that accepts the GUC Claims Purchase may obtain on account of such Allowed Eligible Subsidiary General Unsecured Claims pursuant to any chapter 11 plan of reorganization confirmed and consummated by the obligor of such Allowed Eligible Subsidiary General Unsecured Claim, including any Litigation Trust interest.  The Equity Committee requires an honest broker working on behalf of AHI's estate for

3

any such plan to have a reasonable opportunity of moving forward.[3]  To be clear, the Equity Committee seeks appointment of a trustee only with respect to the Chapter 11 estate of AHI, and not with respect to the 139 other Debtor estates.

4.    Since their inception, these Chapter 11 Cases have been run at AHI's expense primarily for the benefit of Deerfield.  It bears emphasizing that Deerfield, in light of the significant deficiency claim that the Debtors are prepared to allow, is likely the single largest claimant of AHI's subsidiaries.  Given its willingness to support Deerfield's debt-for-equity plan as currently proposed, AHI's Board of Directors is prepared to subjugate AHI's creditors and equity holders to the interests of the subsidiary Debtors to reorganize.

5.    AHI's Board of Directors caused AHI, which was neither a borrower nor guarantor under the Prepetition Loan Agreement (and had no other material debt obligations prior to the Petition Date), to become obligated to Deerfield (over the objection of AHI equity holders[4]) for tens of millions of dollars (the latest DIP budget projects $71.1 million in

---

[3]    Assuming consummation of the Equity Committee's alternative plan, the Liquidating Trust created thereunder would own the membership interests of Adeptus Health LLC ("**AH LLC**").  Once in the position of owning AH LLC, the Liquidating Trust would be in the position to either continue to pursue a plan along the lines currently proposed by the Debtors or an alternative.  One such plan could include termination of the Joint Venture relationships (as discussed in the Amended Proposed Disclosure Statement Art. II(B)(2)-(5), reorganization of the Adeptus Enterprise around the non-Joint Venture locations, and reinstatement of the prepetition indebtedness asserted against the Debtors.  The remaining balance of the DIP Facility would be repaid in full and working capital raised through an equity rights offering.

[4]    *See, e.g.*, *Omnibus Objection of MatlinPatterson Global Opportunities Master Fund L.P. to (A) Debtors' Motion for Interim and Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing; (II) Granting Liens, Security Interests and Superpriority Status; (III) Authorizing Use of Cash Collateral; (IV) Affording Adequate Protection; (V) Scheduling a Final Hearing; and (VI) Modifying Automatic Stay and (B) Motion for Entry of Scheduling Order on Disclosure Statement and Valuation and to Limit Notice to Equity Security Holders* [Docket No. 166]; *Objection to Motion for Interim and Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing; (II) Granting Liens, Security Interests and Superpriority Status; (III) Authorizing Use of Cash Collateral; (IV) Affording Adequate Protection; (V) Scheduling a Final Hearing; and (VI) Modifying Automatic Stay* [Docket No. 193].

borrowing through mid-September[5]) under a DIP Facility that provides little, if any, cognizable benefit to AHI.[6]

6.     Approximately $39 million in projected DIP borrowing will be used to fund cash outflows to the Joint Ventures, which the Debtors have historically mismanaged.  As of the Petition Date, the Debtors had failed to collect more than $60 million in accrued management fees, expense reimbursements, and physician subsidies owed by the Joint Ventures.[7]  The Joint Ventures' historical failure to make required payments under the Joint Venture agreements likely constitutes a material breach of the agreements between the Debtors and the Joint Ventures, giving rise to termination rights and other remedies on behalf of the Debtors.  However, there is no indication that the Debtors, under effective control by Deerfield, took adequate (or any) action to enforce the Debtors' rights under the Joint Venture agreements.  Rather, under the Deerfield controlled DIP budget, the Debtors have been funding 100% of the Joint Ventures' massive expenses, despite repeated past representations to investors that they had only "limited contractual obligations to fund JV working capital needs."[8]  The Debtors' historical mismanagement of the Joint Ventures is continuing unabated post-petition, with material receivables due from the Joint Ventures continuing to increase and remaining uncollected.  Over the 14-week forecast period, the Debtors project receivables due from the Joint Ventures to increase by approximately $27 million (from $147 million as of June 16, 2017, to an outstanding

---

[5]     *See* Debtors' Weekly Cash Flow Forecast, dated June 28, 2017.

[6]     As an example, the most recent DIP budget includes a line item for aggregate fees of only $900,000 for all of the Equity Committee's professionals, which is a fraction of the fees budgeted for the Debtors' professionals ($7.2 million) and the Creditors'S Committee's professionals ($2.1 million), and provides for no budget for fees incurred by the Equity Committee's retained counsel during these Chapter 11 Cases.

[7]     *See Declaration of Andrew Hinkelman in Support of Chapter 11 Petitions and First Day Motions* (the "**Hinkelman Decl.**") [Docket No. 32], ¶¶ 37, 41, 45.

[8]     *See* Adeptus Health, Investor Presentation, November 2016, at 7, 34, attached hereto as **Exhibit B**.

balance of $175 million through September 15, 2017).[9]   Rejection of the Joint Venture agreements may be in the best interests of AHI's estate (and the other Debtors' estates). However, the Debtors/Deerfield appear not to have considered this obvious alternative.  If, as the Equity Committee suspects, the Debtors have left the Joint Venture agreements in place so that they can be renegotiated by Deerfield post-petition, thereby draining estate assets and contributing to the financial pressure that Deerfield is leveraging to create an artificial sense of urgency and compel a rapid resolution of these Chapter 11 Cases, such actions are in gross derogation of the Debtors' fiduciary duties.

7.     The recently proposed substantive consolidation of AHI and the other Debtors under the Amended Proposed Plan is further evidence of the Boards'/managements' gross mismanagement of AHI's estate for the benefit of Deerfield and others.[10]   The most significant assets belonging to the AHI estate are the potential claims and causes of action against Sterling Partners and the other pre-IPO owners of Adeptus Health LLC (including three of the four current members of AHI's Board) relating to the 2014 IPO and Secondary Offerings.  Through these transactions, AHI was entitled to receive approximately $570 million in net proceeds ($97 million in net proceeds in the IPO; $470 million in net proceeds in the Secondary Offerings), which it instead immediately paid to Sterling Partners and the other AH LLC owners in exchange for membership units in AH LLC.  The nature and circumstances of these transactions may give rise to valuable claims and causes of action sounding in the nature of fraudulent conveyance and breach of fiduciary duty.  Critically, because the equity issued in connection with the IPO/Secondary Offerings was AHI equity, because AHI was entitled to the net proceeds in the IPO/Secondary Offerings, and because those net proceeds were paid over to Sterling

---

[9]      *See* Debtors' Weekly Cash Flow Forecast, dated June 28, 2017.

[10]     Amended Proposed Plan §§ 3.2, 5.1.

Partners and the other AH LLC owners, these potential claims and causes of action belong exclusively to AHI.   The most pernicious aspect of the Debtors' proposed substantive consolidation would be the transfer of these valuable claims belonging to AHI to a litigation trust (controlled by Deerfield), and the distribution of any proceeds recovered on account of such claims to subsidiary creditors (including Deerfield) ahead of AHI's stakeholders.

8.      AHI may also possess breach of fiduciary duty claims against its directors and officers with respect to the historical and ongoing mismanagement of the Debtors' businesses. In this regard, it is important to note that the company's Board and officers exist at the AHI level, not at the subsidiary Debtor level, the substantially majority of which are member-managed LLCs.  Thus, the Equity Committee is skeptical that the subsidiary Debtors hold any breach of fiduciary duty claims against the AHI Board/management.  In any event, to the extent that any subsidiary Debtors (in addition to AHI) do possess breach of fiduciary duty claims against the AHI Board/management, substantive consolidation is neither necessary nor appropriate to resolve any potential dispute regarding allocation of recoveries on account of such claims.[11]  Rather, any applicable insurance recovery obtained in respect of such claims can be reasonably apportioned among the various Debtor entities under a plan or other agreement of the parties.

9.      Substantive consolidation of AHI's estate with the estates of its subsidiaries would materially harm AHI's equity holders by taking assets (potentially valuable litigation claims), which would otherwise be available to satisfy AHI's creditors and shareholders, and diverting recoveries on such assets to, principally, creditors of AHI's subsidiaries, including Deerfield.  As noted earlier, Deerfield is most likely the principal creditor of the subsidiaries.  In another example of the Debtors' bad faith, the Debtors make several inexplicable disclosures in

---

[11]        *See, e.g.*, *In re Ward*, 558 B.R. 771 (N.D. Tex. 2016).

the Amended Proposed Disclosure Statement that are not in AHI's interests, but rather appear intended to shield Sterling Partners and the Debtors' directors and officers from potential liability in respect of certain potentially valuable claims that AHI may hold (*e.g.*, claims related to the IPO and Secondary Offerings). [12]   The Board is still comprised largely of Sterling Partners' appointees, who themselves face potentially substantial avoidance action exposure in the aggregate amount of hundreds of millions of dollars.

10.    The Equity Committee further notes that the proposed substantive consolidation would remove the requirement of having at least one impaired accepting class of creditors at each Debtor entity, and, therefore, potentially dispense with the need for the Debtors/Deerfield to demonstrate pursuant to Bankruptcy Code Section 1129(a)(10), that there is an impaired accepting class at each Debtor without regard to how Deerfield voted as a potential insider.  As detailed herein, Deerfield has effectively been in control of the Debtors (and therefore an insider) by virtue of its prepetition secured claim (in default), as a DIP Lender (and the control features it enjoys under the DIP credit agreement), and with respect to its role in the restructuring, including but not limited to its role in developing the Debtors go-forward business plan and negotiating the restructuring of the MPT Agreements and the Joint Venture agreements.  Had it been disclosed to the Court that this was Deerfield's and the Debtors' ultimate plan, the Court may have reconsidered obligating AHI under the DIP Facility.

11.    Moreover, as will be set forth more fully in the Equity Committee's objection to the Amended Proposed Disclosure Statement, the Debtors' purported justifications for the extraordinary relief of substantive consolidation are either (a) erroneous (*e.g.*, all the D&O Claims are jointly owned by all the Debtors), (b) unsupported by any evidence (*e.g.*, creditors

---

[12]    For example, the Debtors state that AHI purportedly did not have the right to use the net proceeds from the Secondary Offerings for any purpose other than to acquire AH LLC's membership units.  *See* Amended Proposed Disclosure Statement Art. II(B)(I). Further, the Debtors allege that the net proceeds from the Secondary Offerings did not flow through AHI's bank accounts.  *Id.*

view the Debtors as a single economic unit), or (c) inadequate (*e.g.*, the Debtors are jointly liable under the DIP Facility and maintain consolidated books and records).[13]  Appointment of a trustee is necessary to provide objective oversight to the proposed substantive consolidation (and related plan issues) to ensure that AHI's interests are adequately represented.

12.    Further, the Board/management has completely ceded control of these cases to Deerfield.   The  Board/management  caused  the  Debtor-borrowers/guarantors  under  the Prepetition Loan Agreement (of which AHI was not party) to provide their consent to Deerfield's acquisition of approximately $212.7 million in aggregate principal amount outstanding under the Prepetition Loan Agreement for a mere fraction of the face amount of the debt,[14] despite marketing the Prepetition Term Loan at a materially higher price.   Deerfield leveraged this position to impose on the Debtors an onerous DIP Facility, with the Debtors alleging that alternatives to Deerfield's DIP proposal were "practically nonexistent."[15]  This statement was curious given that at least one equity holder offered to provide the same principal amount of DIP financing as Deerfield, but without the disabling milestones and other provisions of Deerfield's proposal.[16]  But, rather than engage this potential DIP lender, the Debtors largely ignored the proposal.[17]   Moreover, the Debtors' Board of Directors facilitated this transaction, which benefitted only Deerfield, and was potentially a breach of their fiduciary duties.

---

[13]     Amended Proposed Disclosure Statement Art. VIII(A)(2).

[14]     *See* Hinkelman Decl. ¶ 85; Adeptus Health Inc., Form 8-K, April 3, 2017, attached hereto as **Exhibit C**.

[15]     *See Debtors' Motion for Interim and Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing; (II) Granting Liens, Security Interests and Superpriority Status; (III) Authorizing Use of Cash Collateral; (IV) Affording Adequate Protection; (V) Scheduling a Final Hearing; and (VI) Modifying Automatic Stay* [Docket No. 17], ¶ 29.

[16]     *See In re ADPT DFW Holdings LLC, et al.*, June 5, 2017 Hr'g Tr. at 213:5-214:3, attached hereto as **Exhibit D**; *see also* Adeptus Health Inc., Schedule 13D, Adeptus Health Inc., filed by Wexford Capital LP, dated April 11, 2017, attached hereto as **Exhibit E**.

[17]     *See In re ADPT DFW Holdings LLC, et al.*, June 5, 2017 Hr'g Tr. at 215:14-216:6.

13.    The Board/management has completely abdicated its fiduciary duties with respect to critical aspects of the Chapter 11 process.  For instance, as described in the Amended Proposed Disclosure Statement, certain of AHI's subsidiary debtors are parties to certain funding and lease agreements with MPT (the "**MPT Agreements**").[18]  Following the completion of construction of new locations, an AHI subsidiary debtor will lease the facilities from MPT.  As such, MPT is the Debtors' single largest landlord.  MPT also has significant leverage over the Debtors' ability to shrink its footprint since many of the leased locations are subject to a master lease.  This arrangement may hinder the Debtors' ability to reject unfavorable lease locations on a "one-off" basis.  Although Deerfield has negotiated a path forward with MPT through the so-called "Deerfield-MPT Agreement",[19] the Debtors have not and instead have wedded themselves to a Deerfield-sponsored solution to shed unfavorable lease locations.  The net result of the Deerfield-MPT Agreement is that Deerfield alone may realize all the benefits of a restructured arrangement with MPT going forward.  The Debtors have not even explored whether a similar opportunity with MPT is available if they were to restructure on a standalone basis or with an alternative plan sponsor.

14.    The Debtors' abdication to Deerfield is all the more troubling given Deerfield's history of bad faith and misconduct in the healthcare space.[20]  In the recent Chapter 11 case of Nuo Therapeutics, Inc.,[21] Deerfield attempted a similar loan-to-own scheme, seeking to acquire that company's assets through a sale process that was to be tightly controlled by Deerfield's proposed DIP credit agreement, and a credit bid of Deerfield's prepetition secured debt.  Judge

---

[18]    MPT shall have the meaning ascribed to such term in the Amended Proposed Plan.

[19]    *See* Hinkelman Decl. ¶ 89.

[20]    Among the many instances of bad faith exhibited by Deerfield in these Chapter 11 Cases, in connection with certain sales of AHI equity by Deerfield, Deerfield required the purchaser of such equity not to support directly or indirectly the appointment of an Equity Committee.  *See* Schedule 13D, Adeptus Health Inc., filed by Deerfield Mgmt, L.P., dated May 12, 2017 (Ex. 99.2, at 2), attached hereto as **Exhibit F**.

[21]    *In re Nuo Therapeutics, Inc.*, Case No. 16-10192 (MFW) (Bankr D. Del.).

Walrath ultimately denied approval of Deerfield's proposed DIP financing and the company's bid procedures motion, and held that, for cause under Bankruptcy Code Section 363(k), Deerfield was prohibited from credit bidding at the auction for the company's assets.[22] Deerfield partners' misconduct in the healthcare space has also been the subject of a recent criminal complaint filed by the Assistant United States Attorney for the Southern District of New York.  In May 2017, two Deerfield partners and a Deerfield analyst were arrested and charged in connection with an alleged insider-trading scheme to defraud the United States government of millions of dollars in connection with Medicare and Medicaid reimbursements.[23]  Another former Deerfield partner has reportedly pled guilty and is cooperating with the government's investigation.

15.    The Debtors' proposed treatment of two agreements with McKesson Company ("**McKesson**") is another example of the Debtors kowtowing to Deerfield at the Debtors' expense and further illustrates why AHI requires an independent fiduciary to review transactions directly impacting the AHI estate.[24]   Rather than seeking to terminate the agreements for McKesson's material breach (which a trustee may recommend),[25] the Debtors propose to reject the agreements, which could potentially burden the estates with additional rejection damages claims.[26]  Critically, AHI is not party to either McKesson agreement.  But, as a result of the

---

[22]     *In re Nuo Therapeutics, Inc.*, Feb. 22, 2016 Hr'g Tr. at 246:18-247:9, attached hereto as **Exhibit G**.

[23]     *See* Sealed Superseding Indictment, *U.S. v. Blaszczak*, S.D.N.Y., No. 17-cr-308 (DLC), filed May 24, 2017, attached hereto as **Exhibit H**.

[24]     *See Expedited Motion of Debtors for Entry of Order Authorizing the Rejection of Executory Contract with PST Services (a McKesson Company) Pursuant to Section 365 of the Bankruptcy Code* [Docket No. 449].

[25]     As set forth in the Hinkelman Declaration, after retaining McKesson in 2015, the Debtors learned that key aspects of its revenue cycle management process were not being performed, resulting in accounts receivable collections falling from approximately 87% to 74% as of September 30, 2016.  As a result, the Debtors sustained a significant loss of revenue and will need to write off uncollectible receivables in excess of $27.0 million related to accounts receivable from 2015 and 2016.  In addition, the Joint Ventures have written of approximately $54.9 million in accounts receivable from 2015 and 2016.  Hinkelman Decl. ¶ 98.

[26]     To the extent that the Bankruptcy Court approves the rejection of the McKesson agreements, the Equity Committee reserves all rights with respect to any alleged rejection damages arising therefrom.

proposed substantive consolidation, any rejection damages claims resulting from the requested rejection would put AHI's equity holders even further behind in the proposed waterfall recovery. The treatment of the McKesson contract is also an example of the material conflicts of interest present in these Chapter 11 Cases (discussed further below). Debtors' counsel is conflicted with respect to McKesson (listed in retention applications as a current client of Norton Rose and a current/former client of DLA[27]) and not in a position to provide independent advice to the Debtors with respect to rejection versus termination of the agreement. Under the circumstances, Deerfield's relationship with McKesson needs to be explored by an independent fiduciary, as rejection may result in a deliberate windfall to McKesson.

16.     Additionally, the Debtors indicate that they intend to reject the Tax Receivables Agreement, dated as of June 25, 2014 (the "**TRA**").[28] The TRA was entered into in connection with the 2014 IPO and imposes on AHI an obligation to make certain payments to the pre-IPO owners of AH LLC, but only to the extent that AHI actually realizes "Net Tax Benefits" resulting from certain acquisitions by AHI of AH LLC's membership units.[29] Thus, if AHI does not actually realize any "Net Tax Benefits" from such acquisitions going forward, no payments should be due under the TRA. The TRA, however, provides for an acceleration of obligations in the event of an early termination or breach (purportedly including rejection in Chapter 11),[30] which Sterling Partners, the Debtors' former equity sponsor, has alleged would total

---

[27]     *See Declaration and Statement of Louis R. Strubeck, Jr. in Support of Application of Debtors for Entry of an Order Pursuant to 11 U.S.C. §§ 327(a), 328 and 1107(d), Fed. R. Bankr. P. 2014 and 2016, and Bankruptcy Local Rule 2014-1 Authorizing Retention and Employment of Norton Rose Fulbright US LLP as Counsel to the Debtors, Nunc Pro Tunc to the Petition Date* [Docket No. 84-B]; *Declaration of Thomas R. Califano in Support of the Application for Order Authorizing and Approving Retention of DLA Piper LLP (US) as Special Counsel for the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 88-B].

[28]     Amended Proposed Disclosure Statement Art. XI(E).

[29]     "Net Tax Benefits" is defined in TRA § 3.1(b).

[30]     The Equity Committee reserves all rights with respect to the TRA, including, without limitation, with respect to the validity and enforceability of the early termination and acceleration provisions thereof and any other purported obligations thereunder.

approximately $133.8 million.[31]  But, according to Sterling Partners, cure costs in respect of the

TRA would total only approximately $1.9 million, which, when coupled with the possibility that

the Debtors may owe nothing under the TRA going forward, means that assumption of the TRA

may be in the best interests of the Debtors, rather than rejection.  No analysis has been provided

nor, to the knowledge of the Equity Committee, completed, that compares the economic impact

of rejection of the TRA to assumption of the TRA.  And, of course, certain current or former

Board members are potential beneficiaries of future dealings regarding the TRA.  A trustee is

required to review transactions such as these to ensure the appropriate outcome for AHI's estate.

17.     The TRA also illustrates the myriad conflicts of interest that have plagued these

Chapter 11 Cases.  Claims under the TRA (to the extent allowed) may represent the largest

creditor claims against AHI's estate.[32]  Three of the current four Board members are party to the

TRA and would stand to be holders of any allowed rejection damages claim resulting from the

rejection of the TRA.[33]  Moreover, these three Board members were formerly directors of and

owned membership units in AH LLC.[34]  AHI may hold valuable claims and causes of action

(including, without limitation, claims for fraudulent conveyance and claw-back) against the pre-

IPO owners of AH LLC membership units (including members of the Board) related to, among

other things, the initial public offering in 2014, and the three subsequent capital raises

---

[31]     *See* Proof of Claim Nos. 1372 and 1374.  The Equity Committee reserves all rights with respect to the aforementioned proofs of claim, including, without limitation, with respect to the allowance, amount, and validity thereof, and whether the estates may hold any offsetting claims or counter-claims against the holders thereof.

[32]     Further illustrating the pervasive conflicts of interest in these Chapter 11 Cases, the Debtors and Debtors' counsel appear to have facilitated the filing of proofs of claim by TRA counter-parties against AHI. *See, e.g.*, Proofs of Claim Nos. 825, 826, 828, 833, 834, and 835, all of which appear to have been submitted by Debtors' counsel.

[33]     Board members Gregory W. Scott (chairman and Interim CEO), Ronald L. Taylor, and Jeffrey S. Vender are signatories to the TRA.

[34]     *See* Adeptus Health Inc. Prospectus, dated June 24, 2014, at 9-10, attached hereto as **Exhibit I**.

aggregating $470 million in net proceeds.[35]   In securities filings, AHI has stated that "the Company did not receive benefit" from the $470 million in net proceeds raised through the Secondary Offerings.[36]   However, pursuant to the Amended Proposed Plan, all such claims, which the Equity Committee believes may be asserted only by AHI, would be transferred to the Litigation Trust (controlled by Deerfield) for the benefit of the consolidated estates' creditors (including Deerfield, to the extent of its allowed deficiency claim).   AHI also has independent claims against its Board for breaches of fiduciary duties related to these transactions.   A trustee is needed to ensure that such potentially valuable claims are preserved for the benefit of AHI stakeholders.

18.     As the Court is well aware, a fifth board member, Steven Napolitano, recently resigned (but only after the Court suggested such resignation upon consideration of the objection interposed by Wexford Spectrum Investors, LLC and Debello Investors, LLC to the Debtors' retention of DLA Piper LLP (US) ("**DLA**"))[37] because of professional conflicts resulting from the Debtors' proposed retention of DLA, which has a long history representing Sterling Partners.[38]   The Debtors' and their professionals' disregard for material professional conflicts,[39] particularly with respect to the Debtors' retention by DLA and Norton Rose Fulbright US LLP ("**Norton Rose**"), have damaged the estates and require careful review by an independent fiduciary.   Norton Rose's and DLA's "problematic" representation of Sterling Partners—which

---

[35]      *See* Adeptus Health Inc., Form 10-Q for the Quarter ended September 30, 2016, at 34-35, attached hereto as **Exhibit J**.

[36]      *Id*. at 35.

[37]      *See Objection to Application for Order Authorizing and Approving Retention of DLA Piper (US) LLP as Special Counsel for the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 142].

[38]      *See In re ADPT DFW Holdings, LLC, et al.*, May 16, 2017 Hr'g Tr. at 16:18-23; 58:23-59:4, attached hereto as **Exhibit K**.

[39]      In a case before the Bankruptcy Court for the Southern District of New York, the court observed that "DLA Piper's attorneys have … shown that they are tone-deaf when it comes to conflicts issues."   *In re Project Orange Associates, LLC*, 431 B.R. 363, n.4 (Bankr. S.D.N.Y. 2010).

has already caused the Court concern—precludes those firms from investigating or pursuing potentially valuable estate claims against Sterling Partners (and others) on behalf of the Debtors' estates.

19.    Appointment of a trustee is now essential as the Debtors appear to have completely lost sight of their fiduciary responsibilities to the Debtors' estates on a one-off basis. The Debtors have surrendered their impartiality and independence in favor of allowing the outcome and timing of these Chapter 11 Cases to be dictated by Deerfield.[40]

20.    Alternatively, an independent examiner should be appointed.  Appointment of an examiner is in the best interest of AHI's estate and thereby justified under Bankruptcy Code Section 1104(c)(1).  An independent examiner would be able to conduct an investigation into Deerfield's control over the Debtors, including AHI, and mitigate the lack of transparency that has infected these matters to date.  To ensure that the examiner can carry out this mandate, the Court should direct the Debtors and Deerfield to cooperate fully with the examiner, including the ability to review communications subject to the Debtors' and Deerfield's privileges and to retain outside counsel and any other advisors necessary to complete the investigation.

21.    Although an examiner will go a long way to ensure transparency and mitigate the substantial conflicts of interest that beset these proceedings, the unique and unfortunate circumstances of these cases also necessitate termination of the Debtors' exclusivity period at this stage of the proceedings, if an examiner rather than a trustee is appointed, to enable the Equity Committee to put forth its proposed plan.  The Debtors refuse to work constructively with the Equity Committee, and the Equity Committee has no faith that the Debtors have even considered, let alone protected, the interests of AHI.

---

[40]    The Equity Committee does not file this motion lightly; it attempted to engage in settlement discussions with Deerfield, but Deerfield did not engage in good faith negotiations.

## JURISDICTION, VENUE, STATUTORY PREDICATES

22.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§157

and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper

in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief

requested in this Motion are Bankruptcy Code Sections 1104(a), 1104(c), 1106(a), 1106(b),

1121(c), and 1121(d).

## RELEVANT FACTUAL BACKGROUND

**A.      Deerfield Acquires Prepetition Secured
Debt At Steep Discount; Becomes DIP Lender.**

23.     The Debtors' prepetition capital structure consisted principally of borrowings

under the Prepetition Loan Agreement.  AHI was neither a borrower nor obligor under the

Prepetition Loan Agreement.  Rather, First Choice ER was the borrower, with obligations

guaranteed by AH LLC, certain of First Choice ER's subsidiaries, and, pursuant to the $7.5

million Bridge Loan entered into in March 2017, certain additional subsidiaries of AHI.[41]

24.     On or about March 29, 2017, the Debtors' Chief Restructuring Office, Andrew

Hinkelman, informed Deerfield that the lenders under the Prepetition Loan Agreement may be

interested in selling the debt issued under the Prepetition Loan Agreement.[42]  On April 3, 2017,

with the consent of the Debtors, the lenders under the Prepetition Loan Agreement sold their

claims and interests to Deerfield.  Deerfield acquired the approximately $212.7 million in

aggregate principal amount outstanding under the Prepetition Loan Agreement for a nominal

amount.

25.     In connection with the Sale Agreement, Deerfield negotiated to be the Debtors'

DIP lender.  Pursuant to the DIP Facility, Deerfield agreed to provide postpetition financing in

---

[41]     Hinkelman Decl. ¶¶ 66, 81.

[42]     *In re ADPT DFW Holdings LLC, et al.*, June 5, 2017 Hr'g Tr. at 139:12-16.

the initial principal amount of up to $45 million (subsequently upsized to $70 million). [43]  AHI is the borrower and obligor under the DIP Facility, and obligations thereunder are secured by a first priority senior security interest in and lien on substantially all of the Debtors' assets (including AHI's previously unencumbered assets). [44]  The DIP Facility includes, among other things, an agreement by the Debtors that the secured portion of obligations under the Prepetition Loan Agreement and the entirety of obligations under the DIP Facility would be exchanged for 100% of the equity interests in the Reorganized Debtors.

26.    On information and belief, when the Debtors initially marketed the lenders' claims under the Prepetition Loan Agreement, the purchase price was in the 70 cent range.  At that level, there was limited interest in acquiring the debt and providing DIP financing.  Had other interested parties been given the opportunity, subsequently given to Deerfield, to acquire the loan claims at a fraction of the face amount, there might well have been active interest from entities other than Deerfield.  Indeed, prior to the Petition Date, the Debtors were advised that an AHI equity holder was prepared to provide DIP financing to the Debtors. [45]  That equity holder subsequently submitted a term sheet to the Debtors offering to provide the same principal amount of DIP financing as Deerfield's initial proposal, but without the onerous case milestones and other provisions of the Deerfield DIP Facility.  However, the Debtors failed to engage the equity holder in any meaningful way with respect to the alternative DIP proposal. [46]

---

[43]    *See In re ADPT DFW Holdings LLC, et al.*, July 10 Hr'g Tr., 19:10-17, attached hereto as **Exhibit L**.

[44]    *See Debtors' Motion for Interim and Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing; (II) Granting Liens, Security Interests and Superpriority Status; (III) Authorizing Use of Cash Collateral; (IV) Affording Adequate Protection; (V) Scheduling Final Hearing; and (VI) Modifying Automatic Stay* [Docket No. 17] (the "DIP Motion") at ¶ 5.

[45]    *See* Adeptus Health Inc., Schedule 13D, Adeptus Health Inc., filed by Wexford Capital LP, dated April 11, 2017.

[46]    *See In re ADPT DFW Holdings LLC, et al.*, June 5, 2017 Hr'g Tr. at 213:5-214:3.

B.      **Debtors' Mismanagement Of Joint Ventures.**

27.      Prior to the Petition Date, the Debtors entered into joint venture agreements to develop and manage hospitals and certain freestanding emergency rooms with hospital outpatient department status.[47]   As of the Petition Date, certain Debtor subsidiaries were party to Joint Venture agreements with Dignity Health in Arizona; University of Colorado Health in Colorado Springs and Denver, Colorado; Texas Health Resources in Dallas, Texas; and Mount Carmel Health Systems in Ohio.[48]   Under the Joint Venture agreements, the Debtors and Joint Venture partner agreed to split the profits of the Joint Venture based on equity ownership percentages, after payment of the outstanding cash obligations of the Joint Venture, including management fees and other obligations owing to the Debtors.[49]   The Joint Venture's obligation to pay the management fees and certain other amounts was not conditioned on the profitability of the Joint Venture.

28.      Leading up to the commencement of these Chapter 11 Cases, the Debtors' operating performance had been in decline.   The Debtors reported adjusted EBITDA of $9.7 million for the third quarter of FYE 2016, versus $22.5 million in the second quarter of FYE 2016, and $18.6 million in the third quarter of FYE 2015.[50]   A principal cause of the Debtors' deteriorating financial condition was the Joint Ventures' cash burn and the Debtors' continued performance under the Joint Venture agreements, notwithstanding the Joint Ventures' failure to comply with their payment obligations under the management agreements.   As of the Petition Date, the Debtors had unexplainably failed to collect more than $60 million in accrued management fees, expense reimbursements, and physician subsidies owed by the Joint

---

[47]      Adeptus November 2016 Investor Presentation, at 24.

[48]      Hinkelman Decl. ¶ 31.

[49]      Adeptus November 2016 Investor Presentation, at 24.

[50]      *See id.* at 45.

Ventures.[51]  Meanwhile, the Debtors were funding 100% of the Joint Ventures' working capital

expenses, which totaled $54 million for the nine months ended September 30, 2016.[52]

**C.    Amended Proposed Plan and Proposed Disclosure
Statement; Debtors Now Seek Substantive Consolidation Of Estates.**

29.    On July 19, 2017, the Debtors filed their Amended Proposed Plan and Amended

Proposed Disclosure Statement.   Unlike the first plan filed by the Debtors and Deerfield, the

Amended Proposed Plan now seeks to substantively consolidate each of the Debtors' estates.[53]

Through the proposed substantive consolidation, the Amended Proposed Plan merges together all

Litigation Trust Assets and the liabilities of each Debtor, while also eliminating all intercompany

claims.[54]   According to AHI's amended schedules of assets and liabilities, AHI holds an

outstanding intercompany receivable of approximately $119 million.[55]   AHI's schedules do not

show any material intercompany obligations owing from AHI to any other Debtor entity.

Moreover, AHI's amended schedules list no prepetition secured claims, and aggregate

prepetition unsecured claims of only $7.03 million, of which, approximately $6.08 million is on

account of purported prepetition amounts owing to Sterling Partners under the TRA, which is

inconsistent with the proof of claim filed by Sterling Partners, which asserts prepetition amounts

owing under the TRA of only $1.9 million.[56]   Absent substantive consolidation, the AHI estate

assets would be available to satisfy exclusively its creditors' claims and equity interest holders.

By all accounts, substantive consolidation is skewed against the AHI estate.

---

[51]    See Hinkelman Decl. ¶¶ 37, 41, 45.

[52]    Adeptus November 2016 Investor Presentation, at 34, 39.

[53]    Amended Proposed Plan §§ 3.2, 5.1; Amended Proposed Disclosure Statement Art. VIII(A)(2).

[54]    Amended Proposed Disclosure Statement Art. VIII(A)(2).

[55]    See AHI Schedule A/B: Assets – Real and Personal Property (Docket No. 11; Case No. 17-31434), at 18.

[56]    See AHI Schedule E/F:  Creditors Who Have Unsecured Claims; Proof of Claim No. 1374 (Docket No. 11; Case No. 17-31434).

30.     The Amended Proposed Plan provides that Deerfield will receive all of the equity interests of the Reorganized Debtors on account if its claims under the DIP Facility and Prepetition Loan Agreement.[57]

31.     Under the Amended Proposed Plan, all Litigation Trust Beneficiaries will receive distributions from a merged trust, to be controlled by Deerfield (Deerfield selects the Litigation Trustee and dominates the Litigation Trust Oversight Board), comprising the proceeds of claims held by the Debtors.  Pursuant to the waterfall analysis contained in the Amended Proposed Plan, distributions from the Litigation Trust will be made in the following order:

    (1)    the fees and expenses of the Litigation Trust, in full;

    (2)    the Deerfield Trust Repayment Distributions;

    (3)    the Deerfield Parties, in an amount equal to the fees and expenses incurred by the Equity Committee and the Creditors' Committee from August 18, 2017 through the Effective Date;

    (4)    $7.5 million to holders of Allowed General Unsecured Claims (excluding Deerfield's deficiency claim);

    (5)    $17.5 million to Deerfield on account of the Deerfield Deficiency Claims;

    (6)    *pro rata* distributions to the holders of Allowed General Unsecured Claims, including Deerfield as the holder of the Deerfield Deficiency Claims, plus interest; and

    (7)    residual value (if any) distributed *pro rata* to equity holders (first to holders of preferred stock, then to holders of common stock).[58]

32.     Bizarrely, the Debtors have also agreed that a portion of the professional fees of the Creditors' Committee and Equity Committee come out of the Litigation Trust.  If Deerfield is benefitting from such a surcharge waiver pursuant to the Final DIP Order and converting the DIP Facility into the reorganized Debtors' equity, the surcharge of the Litigation Trust is particularly improper.

---

[57]     Amended Proposed Disclosure Statement Art. VII.

[58]     *Id.*

**D.    Debtors Abdicate Critical Decision Making To Deerfield;
Other Decisions Made Benefitting Deerfield At AHI's Expense.**

33.    One of the Debtors' most important relationships is with MPT, with which the

Debtors have entered into (a) a master funding and development agreement, pursuant to which

MPT agreed to provide $100 million to fund future facility development and construction, and

(b) master lease agreements covering 55 facilities (more than half of the Debtors' facilities),

pursuant to which the Debtors make monthly payments of $3.4 million to MPT.[59]   On April 4,

2017, MPT announced in a press release that it had reached an agreement with Deerfield for,

among other things, the assumption of approximately 80% of facility leases at the current rate,

the re-leasing of approximately 5% of the facilities to a former joint venture partner, and the sale

or re-leasing of certain Texas facilities to new operators.[60]   Deerfield and MPT further agreed to

sever certain properties from the MPT agreements post-confirmation.[61]

34.    On July 19, 2017, the Debtors filed a motion seeking authority to reject the

McKesson agreements,[62] rather than terminate the agreements for cause on account of

McKesson's material breach thereof.   Additionally, as set forth in the Amended Proposed

Disclosure Statement, the Debtors intend to reject the TRA, which Sterling Partners alleges

could trigger a rejection damages claim in excess of $130 million.[63]

---

[59]        *See* Hinkleman Decl. ¶ 52.

[60]        Press Release, "Medical Properties Trust, Inc. Describes Plans for Restructuring of Adeptus Health, Inc. Leases Deerfield Management Company L.P. Managed Funds to Recapitalize Adeptus and MPT Master Leases to be Assumed: Louisiana Facilities Re-Leased Directly to Ochsner Clinic Foundation," April 4, 2017, attached hereto as **Exhibit M**.

[61]        *Id.*

[62]        *See Expedited Motion of Debtors for Entry of Order Authorizing the Rejection of Executory Contract with PST Services (a McKesson Company) Pursuant to Section 365 of the Bankruptcy Code* [Docket No. 449].

[63]        *See* Proof of Claim No. 1374.   The Equity Committee reserves all rights with respect to the aforementioned proofs of claim, including, without limitation, with respect to the allowance, amount, and validity thereof, and whether the estates may hold any offsetting claims or counter-claims against the holders thereof.

**E.     Debtors' Abdication To Deerfield Is Particularly Troubling
In Light Of Deerfield's History Of Bad Faith And Misconduct.**

35.     Deerfield and its employees have a history of bad faith and misconduct in the
healthcare space, as evidenced by the recent arrest of two Deerfield partners in connection with a
criminal investigation for insider trading and fraud and Deerfield's conduct in the Chapter 11
case of Nuo Therapeutics, Inc.

36.     On May 24, 2017, the Acting United States Attorney for the Southern District of
New York and the Assistant Director-in-Charge of the New York Field Office of the Federal
Bureau of Investigation announced the arrests of two Deerfield partners (Theodore Huber and
Robert Olan), as well as a Deerfield analyst, in connection with various alleged securities and
fraud crimes relating to trading on material nonpublic information from the Centers for Medicare
and Medicaid Services ("**CMS**") and using it to execute profitable trades at Deerfield.[64]   A
former Deerfield partner, Jordan Fogel, has pled guilty in connection with the investigation and
is cooperating with the government.

37.     At least one bankruptcy court has taken issue with Deerfield's conduct in a
healthcare-related chapter 11 case.  On January 26, 2016, Nuo Therapeutics, Inc., a biomedical
company involved in leading-edge biodynamic therapies, filed a Chapter 11 bankruptcy petition
for relief in the Bankruptcy Court for the District of Delaware.  Nuo Therapeutics cited a low
reimbursement rate for its flagship product—Aurix—as a key event precipitating its bankruptcy.
For most of 2015, CMS had reimbursed Aurix at a national average of $430.  In October 2016,
CMS announced its final rules for Hospital Outpatient Prospective Payment System rates, after
which the national average reimbursement rate for Aurix increased from $430 to $1,411 per
treatment.   After the dramatic increase in reimbursement rates, Deerfield, which held a

---

[64]     *See* Sealed Superseding Indictment, *U.S. v. Blaszczak*, S.D.N.Y, No. 17-cr-308 (DLC), filed May 24,
2017.

substantial majority of Nuo Therapeutics' prepetition debt, terminated negotiations regarding certain technical defaults under the credit agreement governing Nuo Therapeutics' prepetition debt, demanded that Nuo Therapeutics file for Chapter 11 relief, and proposed to serve as DIP lender and stalking horse purchaser for the company's assets through a credit bid of its prepetition debt and proposed DIP loan.  However, the Delaware Bankruptcy Court was deeply troubled by Deerfield's strong-arm tactics in the case, and ultimately denied the proposed DIP loan and bidding procedures, and ruled that, for cause under Bankruptcy Code Section 363(k), Deerfield was prohibited from credit bidding at the auction of the company's assets.[65]

**F.     The Chapter 11 Cases Have Been Mired By Conflicts of Interest.**

38.     These Chapter 11 Cases are plagued by conflicts of interest.  The Debtors may hold valuable claims and causes of action (including, without limitation, fraudulent conveyance and claw-back actions) against three of the four members of the board relating to AHI's acquisition of AH LLC.  However, pursuant to the Amended Proposed Plan, all such claims, which belong solely to AHI, would be transferred to the Litigation Trust (to be controlled by Deerfield) for the benefit of the consolidated estates' creditors (including Deerfield).  Further, the same three board members are signatories to the TRA and, therefore, would hold potential rejection damages claims against the Debtors in the event that the TRA were rejected and benefit through distributions from the Litigation Trust.  The Debtors have also ignored professional conflicts, including Norton Rose's and DLA's representation of Sterling Partners, that have harmed the estates, as Debtors' counsel cannot investigate or prosecute potentially valuable claims and causes of action against Sterling Partners and caused significant "reinventing of the wheel" once DLA bowed out and Norton Rose stepped in.

---

[65]     *In re Nuo Therapeutics, Inc.*, Feb. 22, 2016 Hr'g Tr. at 246:18-247:9.

## RELIEF REQUESTED

39.     The Equity Committee respectfully requests that the Court enter an Order, substantially in the form attached hereto as **Annex 1**, appointing a trustee for the Chapter 11 estate of AHI pursuant to Bankruptcy Code Section 1104(a), or, alternatively, appointing an examiner pursuant to Bankruptcy Code Section 1104(c) and terminating the Debtors' exclusivity period pursuant to Bankruptcy Code Section 1121(d).

## ARGUMENT

**I.     The Court Should Appoint A Trustee
        Pursuant To Bankruptcy Code Section 1104(a).**

**i.     Legal Standard.**

40.     Bankruptcy Code Section 1104(a) provides as follows:

At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities; or

> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor. [66]

41.     Accordingly, under Bankruptcy Code Section 1104(a), a court is required to appoint a trustee:  (i) at the request of a party in interest; (ii) at any time prior to plan confirmation; and (ii) when *either* cause exists, including fraud, dishonesty, incompetence, or gross mismanagement, *or* such appointment is in the best interests of any equity security

---

[66]     11 U.S.C. § 1104(a).

24

holders.[67]   The requirements for the appointment of a trustee are satisfied here.   The Equity

Committee is a party in interest and no plan has been confirmed.   Further, as set forth below,

sufficient cause exists to appoint a trustee and such appointment is in the best interest of AHI's

estate.

> ### ii.   The Debtors' Mismanagement And
> ### Derogation Of Their Fiduciary Duties To AHI
> ### Provides Sufficient Cause To Justify The Appointment Of A Trustee.

42.     A finding of "cause" under Bankruptcy Code Section 1104(a)(1) mandates the

appointment of a trustee.[68]   Section 1104(a)(1) expressly identifies four bases upon which

"cause" may be found—fraud, dishonesty, incompetence, and gross mismanagement.   These

factors are not exhaustive,[69] and other factors that have been found to support a finding of

"cause" include misuse of estate assets, conflict of interests, and inappropriate relations between

corporate parents and subsidiaries.[70]

43.     As set forth in this Motion, substantial "cause" exists to appoint a trustee for the

AHI estate under Bankruptcy Code Section 1104(a).   *First*, the Board and management have

---

[67]     *See id.*

[68]     *See Oklahoma Refinancing Co. v. Blaik (In re Oklahoma Refinancing Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989).

[69]     *See e.g., In re New Towne Dev., LLC*, 404 B.R. 140, 149 (Bankr. M.D. La. 2009) (finding that cause can consist of other factors) (citing *In re Cajun Electric Power Co-op., Inc.*, 191 B.R. 659, 661 (M.D. La. 1995), *aff'd, Matter of Cajun Electric Power Co-op., Inc.*, 74 F.3d 599 (5th Cir. 1996)); *see also In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 472 (3d Cir. 1998) (additional factors for determining cause can exist).

[70]     *See, e.g., In re Ashley River Consulting, LLC*, 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015) ("[F]actors relevant to the appointment of a trustee under § 1104(a)(1) include: conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; various instances of conduct found to establish fraud or dishonesty; and lack of credibility and creditor confidence.") (internal quotations omitted); *In re LHC, LLC*, 497 B.R. 281, 292 (Bankr. N.D. Ill. 2013) ("In examining whether a particular set of circumstances amounts to 'cause' under § 1104(a)(1), courts may also take into account whether: (1) the alleged misconduct was material; (2) the debtor treated insiders and affiliated entities better or worse than other creditors or customers; (3) the debtor made pre-petition voidable preferences or fraudulent transfers; (4) the debtor was unwilling or unable to pursue causes of action belonging to the estate; (5) conflicts of interest on the part of management interfered with its ability to fulfill its fiduciary duties to the debtor; and (6) management engaged in self-dealing or squandering of corporate assets.").

exhibited an inability or unwillingness to comply with their basic fiduciary duties to AHI.[71]

Congress has mandated that debtors-in-possession act as honest brokers exercising their

fiduciary duties to the estate.[72]  The Debtors invited Deerfield into these Chapter 11 Cases and

consented to their acquisition of the Prepetition Loan Agreement for cents on the dollar,

notwithstanding Deerfield's history of bad faith and association with alleged criminal

misconduct.  Thereafter, the Board and management completely abdicated their fiduciary duties

to AHI, ceding control of the Chapter 11 Cases, and key aspects of the Debtors' businesses, to

Deerfield.

44.    *Second*, the Board and management have misused and depleted AHI's assets,[73] as

evidenced by:

  (a)    The Debtors' decision to encumber the assets of AHI—which was not
         obligated under the Prepetition Loan Agreement and had no material
         prepetition debt obligations—under the DIP Facility;

  (b)    The Debtors' decision to substantively consolidate all of the Debtors'
         estates, thereby transferring all of AHI's assets to a Litigation Trust for the
         benefit of Deerfield and the subsidiary Debtors' creditors; and

  (c)    The Debtors' apparent willingness to allow a significant deficiency claim
         for Deerfield in respect of the Prepetition Loan Agreement, which, in light
         of the proposed substantive consolidation, would further erode any
         opportunity for AHI equity holders to obtain a recovery.

---

[71]    *See In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525-26 (Bankr. E.D.N.Y. 1989) (noting that
when the debtor-in-possession "defaults" on its fiduciary duties "[s]ection 1104(a)(1) [of the Bankruptcy
Code] commands that stewardship of the reorganization effort must be turned over to an independent
trustee."); *see also In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995) (to fulfill its fiduciary duties, a
debtor in possession must "avoid self-dealing, conflicts of interest and the appearance of impropriety[.]"); *In re
Ionosphere Clubs, Inc.*, 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990) (the debtor-in-possession should "refrain
from acting in a manner which could damage the estate. . . .") (citations omitted).

[72]    *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he willingness
of courts to leave debtors in possession is premised upon an assurance that the officers and managing
employees can be depended upon to carry out the fiduciary responsibilities of a trustee.").

[73]    *In re Orbit Petroleum, Inc.*, 2009 WL 2233104, at *6 (B.A.P. 10th Cir. 2009) (affirming appointment
of chapter 11 trustee "to provide guidance and oversight to ensure that [the debtor's] assets are maintained
adequately and for the benefit of creditors and the estate") (internal citations omitted); *see also In re
Humphreys Pest Control Franchises, Inc.*, 40 B.R. 174, 177 (Bankr. E.D. Pa. 1984).

45.     *Finally*, as detailed above, these Chapter 11 Cases are plagued by conflicts of interest that have harmed AHI's estate.[74]   Courts in the Fifth Circuit recognize that where conflicts of interest exist in connection with a proposed plan of reorganization, "the proper remedy [is] to come to the Court and ask that a trustee be appointed."[75]

### iii.   Appointment Of A Trustee Is In The Best Interests of AHI's Equity Holders.

46.     Even absent cause, Bankruptcy Code Section 1104(a)(2) allows for the appointment of a trustee "if such appointment is in the best interests of creditors, equity security holders, and other interests of the estate."[76]   Courts have considered several factors when determining whether the appointment of a trustee is in the best interests of the estate, including: (i) the debtor's trustworthiness; (ii) the lack of confidence in the debtor's management; and (iii) the relative benefits of appointing a trustee versus the costs.[77]   Here, the Equity Committee has no trust in the board or management to protect the interests of AHI, and no confidence that the board or management will exercise their fiduciary duties to AHI's estate.   AHI submits that the cost of appointing a trustee solely for the AHI estate, to protect the interests of AHI, substantially outweigh any costs associated with such appointment.

---

[74]     *See In re Patman Drilling Int'l, Inc.*, No. 07-34622, 2008 WL 724086, at *6 (N.D. Tex. Mar. 14, 2008) (noting that cause exists, among other reasons, "because of the overwhelming conflicts of interest of the Debtors' management"); *see also Marvel Entm't Grp.*, 140 F.3d at 473 (3d Cir. 1998) (finding that the district court did not err in determining that a conflict of interest and acrimony between the debtor-in-possession and creditors rose to a level of "cause" necessitating the appointment of a trustee).

[75]     *See In re Kelso*, 196 B.R. 363, 371 (Bankr. N.D. Tex. 1996).

[76]     11 U.S.C. § 1104(a)(2); *see e.g., Matter of Tahkenicht Tree Farm Partnership*, 156 B.R. 525, 528 (Bankr. E.D. La. 1993) (finding that where a board of directors of a corporation is deadlocked, appointment of a trustee is in the best interest of the estate because in such "chaotic circumstances[,]" a disinterested trustee can impartially assess the situation) (citing *In re Petralex Stainless, Ltd.*, 78 B.R. 738, 745 (Bankr. E.D. Pa. 1989)).

[77]     *See Euro-America Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007) (citing *In re Ionosphere Clubs, Inc.*, 113 B.R. at 168).   This often results in a balancing test whereby the court seeks to determine whether "the benefits to all interests of the estate to be derived from a trustee outweigh the detriment to the estate." *In re W. Virginia High Tech. Consortium Found.*, 2017 WL 1437067, at *2 (Bankr. N.D.W. Va. Apr. 21, 2017) (internal citations omitted).

II.     **Alternatively, The Court Should Appoint An
        Examiner In AHI's Chapter 11 Case Under Bankruptcy Code Section 1104(c).**

   i.     <u>Legal Standard.</u>

47.     If the Court does not appoint a trustee, the Equity Committee respectfully requests

that the Court enter an order appointing an examiner to investigate and report on the critical

matters relating to these Chapter 11 Cases identified below.   Bankruptcy Code Section 1104(c)

requires the Court to order the appointment of an examiner:   (i) at the request of a party in

interest; (ii) at any time prior to plan confirmation; (ii) when a trustee has not been appointed;

and (iv) when *either* such appointment is in the best interest of creditors *or* the debtor's fixed,

liquidated, or unsecured debts other than debts for goods, services, taxes, or insider debts exceed

$5 million.[78]

   ii.    **Appointment Of An Examiner Is Necessary,
          <u>Appropriate, And In The Best Interest Of AHI's Estate.</u>**

48.     Bankruptcy Code Section 1401(c)(1) provides that the Court "shall" appoint an

examiner where such an appointment is in the "interests of creditors, any equity security holders,

and other interests of the estate."[79]   As described herein, given the extent of the Debtors'

abdication of their fiduciary duties to AHI, mismanagement of AHI's assets, and the thicket of

conflicts of interests at play, appointment of an examiner is in the best interest of AHI's equity

holders.

   iii.   **The Proposed Scope Of The Examiner's
          <u>Investigation Is Reasonable And Appropriate.</u>**

49.     The Equity Committee proposes that the scope of the examiner's investigation

include:

---

[78]     *See* 11 U.S.C. § 1104(c) (emphasis supplied); *Morgenstern v. Revco D.S., Inc. (In re Revco D.S. Inc.)*,
898 F.2d 498, 500-01 (6th Cir. 1990).

[79]     *See* 11 U.S.C. § 1104(c)(1).

28

(a)     Deerfield's role in these Chapter 11 Cases;

(b)     The proposed substantive consolidation of AHI and the other Debtors' estates;

(c)     Identification of the potential claims and causes of action held by the AHI estate and the subsidiary Debtors' estates;

(d)     Deerfield's purported deficiency claim;

(e)     The Debtors' management of the Joint Venture agreements;

(f)     The Debtors' decision to encumber the AHI estate under the DIP Facility;

(g)     The negotiation of the Deerfield-MPT Agreement and the Debtors' decisions to reject the McKesson agreements, TRA, and any other relevant agreements impacting AHI's estate; and

(h)     The conflicts of interest described in this Motion.

50.     The scope of the proposed investigation falls well within the statutory authority granted under Bankruptcy Code Section 1106(b), which provides for an examiner to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor..." and "file a statement of any investigation conducted ..., including any facts ascertained pertaining to fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor, or to a cause of action available to the estate...."[80]   Additionally, courts have recognized the need to be flexible and provide examiners with sufficient powers as circumstances warrant.[81]

---

[80]     *See* 11 U.S.C. § 1106(b), (a)(3)-(4); *see also In re Gilman Servs.*, 46 B.R. 322, 327 (Bankr. D. Mass. 1985) (the primary function of an examiner is to "investigate the debtor's actions, financial condition, as is appropriate under the particular circumstances of the case including any allegations of fraud, dishonesty or gross mismanagement of the debtor by current or former managers.").

[81]     *See In re Int'l Distrib. Ctrs.*, 74 B.R. 221, 224 (S.D.N.Y. 1987); *In re Carnegie Int'l Corp.*, 51 B.R. 252, 256 (Bankr. S.D. Ind. 1984).   The scope of the proposed investigation is warranted under the circumstances and falls well within this flexible standard.

**III.    In Addition To Appointing An Examiner, The Court Should Terminate
The Debtor's Exclusivity Pursuant To Bankruptcy Code Section 1121(d).**

      **i.    Legal Standard.**

51.    Although Bankruptcy Code Section 1121(b) grants a debtor the exclusive right to

file a plan during the first 120 days following the petition date, Bankruptcy Code Section

1121(d)(1) provides that "the court may for cause reduce or increase" the debtor's exclusivity

period.[82]  Bankruptcy Code Section 1121(d)(1) "grants great latitude to the Bankruptcy Judge in

deciding, on a case-specific basis, whether to modify the exclusivity period on a showing of

'cause.'"[83]

52.    The Bankruptcy Code does not define "cause" for modifying the exclusivity

period.[84]  Congress gave the courts the power to reduce the exclusivity period in order to (a)

democratize the plan process, and (b) prevent a debtor from monopolizing the plan process.[85]  In

determining whether cause exists to terminate exclusivity, courts have identified a variety of

factors to consider, including, among others: (1) whether the debtor has made progress in

negotiations with stakeholders; (2) whether the debtors have demonstrated the reasonable

prospect for the filing of a viable plan; (3) whether terminating exclusivity will move the case

---

[82]    *See* 11 U.S.C. §§ 1121(d)(1) and 1121(b).

[83]    *Geriatrics Nursing Home, Inc. v. First Fidelity Bank, N.A. (In re Geriatrics Nursing Home, Inc.)*, 187
B.R. 128, 132 (D. N.J. 1995) (citations omitted); *see also In re Lehigh Valley Prof'l Sports Club, Inc.*, No. 00–
11296, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000) (relief under §1121(d) is committed to the
sound discretion of the bankruptcy judge); *In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr.
S.D.N.Y. 2006) ("A decision to extend or terminate exclusivity for cause is within the discretion of the
bankruptcy court, and is fact-specific.").

[84]    *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996).

[85]    *See In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987) (en banc) (courts
assessing "whether 'cause' exists should be mindful of the legislative goal behind § 1121 . . . [it] must avoid
reinstituting the imbalance between the debtor and its creditors that characterized proceedings under the old
Chapter XI," which gave the debtor "undue bargaining leverage, because by delay he c[ould] force a
settlement out of otherwise unwilling creditors.") (internal citations and quotations omitted), *aff'd*, 484 U.S.
365 (1988).

forward; and (4) the "principal parties' acrimonious relations," and whether stakeholders have lost confidence in the debtors. [86]

    **ii.**    **Abundant Cause Exists Under Bankruptcy Code
Section 1121(d) To Terminate Exclusivity As To AHI.**

        *a.*    *Deerfield And The Debtors' Negotiations
With The Equity Committee Have Been Unsuccessful.*

53.    Both Deerfield (the true plan proponent in these cases) and the Debtors have failed to make good faith progress in resolving certain fundamental issues that the Equity Committee has with the Amended Proposed Plan.

        *b.*    *The Debtors And Deerfield Have Failed To
Demonstrate Reasonable Prospects Of Filing A Viable Plan.*

54.    The Debtors have not put forth a viable Chapter 11 plan.  As will be set forth more fully in the Equity Committee' objection to the Amended Proposed Disclosure Statement, the Amended Proposed Plan is patently unconfirmable based on, among other things, the Debtors having failed to provide an adequate basis for the extraordinary remedy of substantive consolidation of all of the Debtors' estates.

        *c.*    *Terminating Exclusivity Will Move This Chapter 11 Case Forward.*

55.    In assessing whether "cause" exists to terminate exclusivity, "the primary consideration should be whether or not doing so would facilitate moving the case forward." [87] The Equity Committee firmly believes that a Chapter 11 plan in respect of AHI, that provides a

---

[86]    *See, e.g., In re Texas Extrusion Corp.,* 68 B.R. 712, 725 (N.D. Tex. 1986), *aff'd sub nom. Matter of Texas Extrusion Corp.,* 836 F.2d 217 (5th Cir. 1988), *and aff'd sub nom. Matter of Texas Extrusion Corp.,* 844 F.2d 1142 (5th Cir. 1988)*; Express One Int'l,* 194 B.R. at 100 (citing *In re Grand Traverse Dev. Co.,* 147 B.R. 418 (Bankr. W.D. Mich. 1992)); *In re McLean Indus., Inc.,* 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987); *In re Wisconsin Barge Line, Inc.,* 78 B.R. 946, 948 (Bankr. E.D. Mo. 1987).

[87]    *In re Dow Corning,* 208 B.R. 661, 670 (Bankr. E.D. Mich. 1997); *see also In re Henry Mayo Newhall Mem'l Hosp.,* 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002) ("[A] transcendent consideration is whether adjustment of exclusivity will facilitate moving the case forward toward a fair and equitable resolution."); *Adelphia,* 352 B.R. at 590 (the court should look at "whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case.").

materially better outcome for AHI's stakeholders, can be structured and financed in a relatively short period of time.  In this regard, attached hereto as **Exhibit A** is a term sheet prepared by the Equity Committee regarding a Chapter 11 plan in respect of the AHI estate.  Such a plan is unburdened by the thicket of issues implicated by the Amended Proposed Plan and provides a materially better outcome for AHI's stakeholders.  Moreover, terminating the Debtors' exclusivity does not prejudice the Debtors because it does not prevent them from prosecuting the Amended Proposed Plan; instead, it simply opens up the process for the Equity Committee to propose an alternative plan for AHI, thereby leveling the playing field.[88]

> d.   *Stakeholders Have Lost Confidence In the Debtors'
> Ability To Manage AHI's Assets And Guide These Cases.*

56.   The Equity Committee has lost faith in the Debtors' ability to discharge their fiduciary duties to the AHI estate and guide these cases to a reasonable resolution, and, as set forth herein, discussions between Deerfield, the Debtors, and the Equity Committee have reached an impasse.  As set forth in this Motion, appointment of a trustee is necessary to install an independent, honest broker to move these cases forward.  Alternatively, an examiner is warranted to investigate, among other things, the extent of Deerfield's control over the Debtors and to evaluate which Debtors hold claims against third parties and the nature and merits of such claims.  In short, the Equity Committee does not believe that the Debtors are capable of abiding by their fiduciary duties to the AHI estate.

## NO PRIOR REQUEST

57.   No prior motion for the relief requested herein has been made to this Court or any other court.

---

[88]   *See In re R.G. Pharm., Inc.*, 374 B.R. 484, 488 (Bankr. D. Conn. 2007) ("The fact that the debtor no longer has the exclusive right to file a plan does not affect its concurrent right to file a plan.") (internal citations omitted); *Matter of All Seasons Indus.*, 121 B.R. at 1002, 1005 (Bankr. N.D. Ind. 1990) (denial of request for extension is not the "death knell" for a debtor's reorganization; "debtor remains free to take as long as it wishes or feels appropriate to develop and propose its own plan.").

32

**NOTICE**

58.     Notice of this Motion has been given to:  (i) counsel to the Debtors; (ii) counsel to Deerfield; (iii) counsel to the Official Committee of Unsecured Creditors; (iv) the Office of the United States Trustee; (v) parties who have filed notices of appearance; and (vi) all parties required to be served pursuant to Order Establishing Notice Procedures Pursuant to 11 U.S.C. §§ 102 and 105(a) and Bankruptcy Rules 2002 and 9007 [Docket No. 57].  The Equity Committee respectfully submits that no other or further notice need be given.

*[Remainder of page intentionally left blank.]*

## CONCLUSION

**WHEREFORE**, the Equity Committee respectfully request entry of an order: (i) appointing a Chapter 11 trustee for the Chapter 11 estate of AHI pursuant to Bankruptcy Code Section 1104(a): or, alternatively, (ii) appointing an examiner pursuant to Bankruptcy Code Section 1104(c) and terminating the Debtors' exclusivity period pursuant to Bankruptcy Code Section 1121(d); and (iii) granting such other relief as the Court may deem appropriate.

Dated: July 27, 2017
         Dallas, Texas,

Respectfully submitted,

**BROWN RUDNICK LLP**

By: */s/ Edward S. Weisfelner*
Edward S. Weisfelner
Jeffrey L. Jonas
Bennett S. Silverberg
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801


- and -

**WINSTEAD PC**
Phillip Lamberson – SBT #00794134
Rakhee V. Patel – SBT #00797213
Annmarie Chiarello – SBT #24097496
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Telephone)
(214) 745-5390 (Facsimile)


*Counsel to the Official Committee*
*of Equity Security Holders of Adeptus Health Inc.*

34