Louis R. Strubeck, Jr. (SBT 19425600)
Scott P. Drake (SBT 24026812)
John N. Schwartz (SBT 00797397)
Liz Boydston (SBT 24053684)
Timothy S. Springer (SBT 24088460)
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| ADPT DFW HOLDINGS LLC, *et al.*,[1] | § | Case No. 17-31432 |
| | § | |
| Debtors. | § | Jointly Administered under Case No. 17-31432 |
| | § | |

## DEBTORS' BRIEF IN SUPPORT OF, AND OMNIBUS
## RESPONSE TO OBJECTIONS TO, CONFIRMATION OF DEBTORS'
## THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
[Related to Dkt. Nos. 719, 750, 756, 763]

COME NOW the above-captioned debtors and debtors in possession (collectively, the "Debtors") and hereby file this brief (this "Brief") in support of confirmation of the *Debtors' Third Amended Joint Chapter 11 Plan of Reorganization* (Dkt. No. 719, the "Third Amended Plan," or, as modified, amended, or supplemented from time to time, the "Plan").[2] In support of confirmation of the Plan, and in response to objections thereto (collectively, the "Objections"), the Debtors respectfully state as follows:

---

[1]    The Debtors include all of the affiliated entities that are listed on the Appendix, attached hereto.

[2]    Capitalized terms not otherwise defined herein shall have the same meaning ascribed in the Plan.

# TABLE OF CONTENTS

I. Preliminary Statement ................................................................................. 1

II. Background ................................................................................................... 2

    A. Procedural History .................................................................................. 2

    B. Restructuring Transactions. ................................................................... 3

    C. Valuation of the Adeptus Enterprise. ..................................................... 4

    D. Confirmation Solicitation and Notification Process. .............................. 4

    E. Voting Results. ........................................................................................ 6

    F. Objections to Confirmation and Related Plan Modifications. ............... 7

III. Arguments & Authorities ............................................................................ 9

    A. The Stipulated Value of the Adeptus Enterprise Set Forth in the Plan Is Appropriate and Is Confirmed by the Debtors' Valuation Expert Testimony. ................. 9

    B. Substantive Consolidation of the Debtors' Estates for Plan Voting and Distribution Is Appropriate Under the Facts and Circumstances Here. .......................... 12

    C. The Plan Satisfies Each Requirement for Confirmation Under 11 U.S.C. § 1129. .......... 17

        1. *The Plan Complies Fully with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).* ............................................................... 17

        2. *The Debtors Have Complied with the Applicable Provisions § 1129(a)(2).* ............... 24

        3. *The Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law, Thereby Satisfying § 1129(a)(3).* ............................................... 26

        4. *The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval, Satisfying § 1129(a)(4).* ........................... 27

        5. *The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement as Required by Section 1129(a)(5).* ................................. 28

        6. *The Plan Does Not Require Any Government Regulatory Approval of Rate Changes, So § 1129(a)(6) Does Not Apply.* ................................................ 30

        7. *The Plan Satisfies the Best Interests Test for Holders of Claims and Interests, Complying with the Requirements of § 1129(a)(7).* ................................... 30

# TABLE OF CONTENTS
### (continued)

8. *The Plan Can Be Confirmed Notwithstanding § 1129(a)(8).* ....................................34

9. *The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims Required under § 1129(a)(9).* ............................................35

10. *At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders, Thereby Satisfying § 1129(a)(10).* ..............................35

11. *The Plan Satisfies the Feasibility Requirements under § 1129(a)(11).* ....................37

12. *The Plan Ensures Payment of All Bankruptcy Fees Per § 1129(a)(12).* ...................39

13. *Sections 1129(a)(13)-(16) Do Not Apply Here.* .......................................................39

14. *The Plan Complies with the Requirements in § 1129(c)-(e).* ...................................40

D. The Plan Is Fair and Equitable and Does Not Unfairly Discriminate Against Non-Accepting Impaired Classes, Thereby Satisfying the Requirements of § 1129(b)(1). ......40

E. The Other Discretionary Contents of the Plan Are Appropriate. ....................................49

1. *The Debtor Releases in the Plan Are Appropriate.* ...................................................49

2. *The Third-Party Releases in the Plan Are Appropriate* .............................................52

3. *The Plan's Exculpation Provisions Are Appropriate.* ...............................................56

4. *The Plan Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained in the Plan.* .......................................................................58

IV. Omnibus Response .............................................................................................................59

A. Section 1129(a)(10) Should Be Determined by Plan, not by Debtor .............................59

B. PST's Has Admitted Substantive Consolidation Is Appropriate. ....................................61

C. PST Asserts Incorrect Facts to Allege Voting Manipulation. .........................................62

V. Waiver of Bankruptcy Rule 3020(e) .................................................................................64

VI. Conclusion .........................................................................................................................65

# TABLE OF AUTHORITIES

## Constitution, Statutes & Rules

11 U.S.C. § 101 (2012) ...............................................................................30, 42

11 U.S.C. § 105 (2012) .........................................................................................13

11 U.S.C. § 1107 (2012) .........................................................................................2

11 U.S.C. § 1108 (2012) .........................................................................................2

11 U.S.C. § 1114 (2012) .......................................................................................41

11 U.S.C. § 1122 (2012) ...........................................................................17, 18, 19

11 U.S.C. § 1123 (2012) .................................................................................passim

11 U.S.C. § 1125 (2012) .................................................................................passim

11 U.S.C. § 1126 (2012) ...........................................................24, 26, 27, 36

11 U.S.C. § 1127 (2012) .........................................................................................8

11 U.S.C. § 1129 (2012) .................................................................................passim

11 U.S.C. § 328 (2012) .........................................................................................29

11 U.S.C. § 330 (2012) .........................................................................................29

11 U.S.C. § 365 (2012) ...................................................................................23, 68

11 U.S.C. § 503 (2012) .........................................................................................36

11 U.S.C. § 506 (2012) .........................................................................................4

11 U.S.C. § 507 (2012) .........................................................................................36

11 U.S.C. § 510 (2012) ...................................................................................18, 44

28 U.S.C. § 1930 (2012) .......................................................................................41

Fed. R. Bankr. P. 3012...........................................................................................4

Fed. R. Bankr. P. 3019...........................................................................................8

Fed. R. Bankr. P. 3023.........................................................................................68

Fed. R. Bankr. P. 6004.........................................................................................68

## TABLE OF AUTHORITIES
(continued)

Fed. R. Bankr. P. 6006 ................................................................................................68

Fed. R. Bankr. P. 7030 ................................................................................................66

Fed. R. Bankr. P. 7032 ................................................................................................66

Fed. R. Bankr. P. 9019 ...........................................................................................46, 53

Fed. R. Civ. P. 30 ........................................................................................................66

Fed. R. Civ. P. 32 ........................................................................................................66

### U.S. Supreme Court

*Bank of Am. Nat'l Tr. & Sav. Assoc. v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999) .......................................................................................passim

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. __, 137 S. Ct. 973 (2017) .............................................................................46

*Law v. Siegel*,
    134 S. Ct. 1188 (2014) ....................................................................................13

*Toibb v. Radloff*,
    501 U.S. 157 (1991) .........................................................................................26

### U.S. Courts of Appeals

*Acequia, Inc. v. Clinton (In re Acequia, Inc.)*,
    787 F.2d 1352 (9th Cir. 1986) ...................................................................20

*Am. Can Co. v. Herpel (In re Jackson Brewing Co.)*,
    624 F.2d 599 (5th Cir. 1980) ......................................................................49

*Bank of N.Y. Tr. Co., NA v. Official Unsecured Creditors'*
    *Comm. (In re Pac. Lumber Co.)*,
    584 F.3d 229 (5th Cir. 2009) .....................................................51, 56, 57, 59

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
    764 F.2d 406 (5th Cir. 1985) .....................................................................26

*Cantu v. Schmidt (In re Cantu)*,
    784 F.3d 253 (5th Cir. 2015) .................................................................29, 30

*Cent. Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*,
    208 F.3d 498 (5th Cir. 2000) .....................................................................59

## TABLE OF AUTHORITIES
### (continued)

*DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*,
  634 F.3d 79 (2d Cir. 2010) ............................................................45, 46

*Eastgroup Props. v. S. Motel Ass'n, Ltd.*,
  935 F.2d 245 (11th Cir. 1991) .......................................................13, 14

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship
  (In re T-H New Orleans Ltd. P'ship)*,
  116 F.3d 790 (5th Cir. 1997) .........................................................16, 36

*FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*,
  255 F. App'x 909 (5th Cir. 2007) ...................................................51, 53

*Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*,
  402 F.3d 416 (3d Cir. 2005) ..............................................................12

*Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II
  (In re Briscoe Enters., Ltd., II)*,
  994 F.2d 1160 (5th Cir. 1993) ............................................................36

*In re Armstrong World Indus., Inc.*,
  432 F.3d 507 (3d Cir. 2005) ..............................................................43

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) .........................................................55, 56

*In re SPM Mfg. Corp.*,
  984 F.2d 1305 (1st Cir. 1993)........................................................44, 45

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013) ..............................................................37

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
  150 F.3d 503 (5th Cir. 1998) ...................................................27, 49, 50

*Phx. Mut. Life Ins. Co. v. Greystone III Joint Venture
  (In re Greystone III Joint Venture)*,
  995 F.2d 1274 (5th Cir. 1991) .......................................................17, 18

*Pub. Fin. Corp. v. Freeman*,
  712 F.2d 219 (5th Cir. 1983) ..............................................................26

*Rep. Supply Co. v. Shoaf*,
  815 F.2d 1046 (5th Cir. 1987) ............................................................51

# TABLE OF AUTHORITIES
### (continued)

*Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, L.L.C.*
  *(In re Save Our Springs (S.O.S.) Alliance, Inc.),*
  632 F.3d 168 (5th Cir. 2011) ........................................................37

*Sec. & Exchange Comm'n v. Drexel Burnham Lambert Grp., Inc.*
  *(In re Drexel Burnham Lambert Grp., Inc.),*
  960 F.2d 285 (2d Cir. 1992) .........................................................57

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.),*
  844 F.2d 1142 (5th Cir. 1988) ......................................................24

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.*
  *(In re Augie/Restivo Baking Co., Ltd.),*
  860 F.2d 515 (2d Cir. 1988) ....................................................13, 15

## U.S. District Courts

*ACC Bondholders Grp. v. Adelphia Commc'ns Corp.*
  *(In re Adelphia Commc'ns Corp.),*
  361 B.R. 337 (S.D.N.Y. 2007).......................................................30

*Computer Task Grp., Inc. v. Brotby (In re Brotby),*
  303 B.R. 177 (B.A.P. 9th Cir. 2003) ..............................................36

*In re Coastal Broad. Sys., Inc.,* No. CIV. 12-5682 (RMB),
  2013 WL 3285936 (D.N.J. June 28, 2013) ......................................37

*In re G-I Holdings Inc.,*
  420 B.R. 216 (D.N.J. 2009) ..........................................................37

*In re MCorp Fin., Inc.,*
  160 B.R. 941 (S.D. Tex. 1993) ...........................................45, 46, 47

*In re Nuverra Envtl. Sols., Inc.,*
  No. 17-10949-KJC, 2017 WL 3326453 (D. Del. Aug. 3, 2017)............45

*JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest*
  *Resort Props., Inc. (In re Transwest Resort Props., Inc.),*
  554 B.R. 894 (D. Ariz. 2016) ..............................................34, 35, 36, 59

*Mercury Capital Corp. v. Milford Conn. Assocs., L.P.,*
  354 B.R. 1 (D. Conn. 2006)...........................................................36

*Packaging Indus. Grp., Inc. v. Dennison Mfg. Co., Inc.*
  *(In re Sentinel Prods. Corp., PI),*
  192 B.R. 41 (N.D.N.Y. 1996) ........................................................12

### TABLE OF AUTHORITIES
(continued)

### U.S. Bankruptcy Courts

*In re Am. Solar King Corp.*,
   90 B.R. 808 (Bankr. W.D. Tex. 1988) ................................................................................... 8

*In re Best Prods. Co., Inc.*,
   168 B.R. 38 (Bankr. S.D.N.Y. 1994) ................................................................................... 59

*In re Bigler*,
   442 B.R. 537 (Bankr. S.D. Tex. 2010) ................................................................................ 51

*In re Camp Arrowhead, Ltd.*,
   451 B.R. 678 (Bankr. W.D. Tex. 2011) ........................................................................ 51, 57

*In re CHC Grp. Ltd.*,
   No. 16-31854, 2017 Bankr. LEXIS 1016 (Bankr. N.D. Tex. Mar. 3, 2017) ......................... 18

*In re Couture Hotel Corp.*,
   536 B.R. 712 (Bankr. N.D. Tex. 2015) ........................................................................ passim

*In re Cypresswood Land Partners, I*,
   409 B.R. 396 (Bankr. S.D. Tex. 2009) ................................................................. 23, 29, 40

*In re Dow Corning Corp.*,
   237 B.R. 374 (Bankr. E.D. Mich. 1999) ............................................................................... 8

*In re Drexel Burnham Lambert Grp., Inc.*,
   138 B.R. 723 (Bankr. S.D.N.Y. 1992) ................................................................................ 49

*In re Energy & Expl. Partners, Inc.*,
   No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016) ...................................................... 52

*In re Enron Corp.*,
   No. 01-16034, 2004 WL 6075307 (Bankr. S.D.N.Y. July 15, 2004) ............................. 35, 58

*In re Genesis Health Ventures, Inc.*,
   280 B.R. 95 (Bankr. D. Del. 2002) ..................................................................................... 12

*In re Giejsel*,
   480 B.R. 238 (Bankr. N.D. Tex. 2012) ............................................................................... 37

*In re Granite Broad. Corp.*,
   369 B.R. 120 (Bankr. S.D.N.Y. 2007) ........................................................................... 26, 42

*In re Hingham Campus, LLC*,
   No. 11-33912, 2011 WL 3679057 (Bankr. N.D. Tex. Aug. 23, 2011) .................................. 52

## TABLE OF AUTHORITIES
(continued)

*In re Idearc Inc.*,
    423 B.R. 138 (Bankr. N.D. Tex. 2009) ...............................................................40, 42, 44, 46

*In re Idearc Inc.*,
    No. 09-31828 (Bankr. N.D. Tex. 2009) ...............................................................12

*In re Kolton*,
    No. 89-53425-C, 1990 WL 87007 (Bankr. W.D. Tex. Apr. 4, 1990) ....................................40

*In re Lakeside Global II, Ltd.*,
    116 B.R. 499 (Bankr. S.D. Tex. 1989) ...............................................................36

*In re Landing Assocs., Ltd.*,
    157 B.R. 791 (Bankr. W.D. Tex. 1993) ...............................................................28, 36

*In re Lincolnshire Campus, LLC*,
    441 B.R. 524 (Bankr. N.D. Tex. 2010) ...............................................................52

*In re Magnatrax Corp.*,
    No. 03-11402 (Bankr. D. Del. Nov. 17, 2003) ......................................................12

*In re Mangia Pizza Invs., LP*,
    480 B.R. 669 (Bankr. W.D. Tex. 2012) ...............................................................8, 48

*In re Milford Conn. Assocs., L.P.*,
    No. 04-30511, 2008 WL 687266 (Bankr. D. Conn. Mar. 10, 2008) ...................................36

*In re Mirant Corp.*,
    No. 03-46590 (Bankr. N.D. Tex. Dec. 9, 2005) ...................................................18

*In re Mirant Corp.*,
    No. 03-46590, 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007) ...................................29

*In re Mortg. Inv. Co. of El Paso, Tex.*,
    111 B.R. 604 (Bankr. W.D. Tex. 1990) ...............................................................48

*In re Pilgrim's Pride Corp.*,
    No. 08-45664, 2010 WL 200000 (Bankr. N.D. Tex. Jan 14, 2010) .................................51, 57

*In re R.E. Loans, LLC*,
    No. 11-35865 (BJH), 2012 WL 2411877 (Bankr. N.D. Tex. June 26, 2012) ..........................8

*In re RAAM Global Energy Co.*,
    No. 15-35615 (MI) (Bankr. S.D. Tex. Jan. 28, 2016) .............................................52

*In re Rhead*,
    179 B.R. 169 (Bankr. D. Ariz. 1995) ...............................................................35

## TABLE OF AUTHORITIES
(continued)

*In re Riggel*,
142 B.R. 199 (Bankr. S.D. Ohio 1992) ...............................................................17

*In re Sears Methodist Ret. Sys., Inc.*,
No. 14-32821-11, 2015 WL 1066882 (Bankr. N.D. Tex. Mar. 6, 2015)..................................56

*In re Sentry Operating Co. of Tex., Inc.*,
264 B.R. 850 (Bankr. S.D. Tex. 2001) ................................................... 17, 40, 47

*In re Smith*,
357 B.R. 60 (Bankr. M.D.N.C. 2006) ...............................................................30

*In re SPGA, Inc.*,
No. 1-01-02609, 2001 WL 34750646 (Bankr. M.D. Pa. Sept. 28, 2001).........................35, 59

*In re Star Ambulance Serv., LLC*,
540 B.R. 251 (Bankr. S.D. Tex. 2015) ...........................................................29, 30

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011)......................................................... 35, 58, 59

*In re WCI Cable, Inc.*,
282 B.R. 457 (Bankr. D. Ore. 2002) ...............................................................49

*In re Wool Growers Cent. Storage, Co.*,
371 B.R. 768 (Bankr. N.D. Tex. 2007) .........................................................51, 52

*In re World Health Alts., Inc.*,
344 B.R. 291 (Bankr. D. Del. 2006)...........................................................44, 47

*In re Worldcom, Inc.*,
No. 02-13533 (AJG), 2003 WL 23861928 (Bankr. S.D.N.Y. Oct. 31, 2003) ........................23

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns
Operating, LLC (In re Charter Commc'ns)*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009)..................................................34, 35, 36, 59

### Other Authorities

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 ........................16

Harvey R. Miller & Ronit J. Berkovich, *The Implications of the Third Circuit's
Armstrong Decision on Creative Corporate Restructuring: Will Strict Construction
of the Absolute Priority Rule Make Chapter 11 Consensus Less Likely?*,
55 Am. U. L. Rev. 1345 (2006) ...............................................................46

## TABLE OF AUTHORITIES
(continued)

Leah M. Eisenberg, *Gifting and Asset Reallocation in Chapter 11
    Proceedings: A Synthesized Approach*,
    29 Am. Bankr. Inst. J. 50 (2010) ........................................................................45

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787 ...........................................16

## I.     PRELIMINARY STATEMENT

1.     The Plan is a victory for the Debtors' Estates. The Plan is also a victory for the almost 4,000 individuals the Debtors employ, the over 400,000 patients for whom they care annually, and the local communities they serve, many of whom, without the Debtors, would not have convenient access to affordable, top quality medical services the Debtors provide. It allows the Debtors to (i) significantly deleverage their balance sheet, (ii) secure the financial commitments necessary to fund distributions under the Plan and the Reorganized Debtors' go-forward business needs, and (iii) obtain the "fresh start" for which chapter 11 is intended. The Plan is the result of hard work, transparent restructuring negotiations, and the Debtors' efforts to maximize the value of their estates for the benefit of as many stakeholders as possible. The Plan embodies the global resolutions and settlements between the Debtors, their senior lenders, the Creditors' Committee, the Equity Committee, and other key stakeholders, forming the Plan's final structure. As more fully described in this Brief, the Plan complies with the confirmation provisions of the Bankruptcy Code and all applicable law.

2.     Presenting this Plan on a consensual basis among the two official committees, Deerfield, and the Debtors is remarkable achievement. As of the date hereof, only three Plan Objections (defined below) remain outstanding, and the Debtors anticipate the remaining Cure Objections have been, or will be, resolved or adjourned for a future hearing. The Debtors submit that objections that have been resolved should be deemed withdrawn. The Debtors also worked with many other parties in interest to resolve informal objections.

3.     The remaining objections fall roughly into one of three categories: (1) objections to the 9019 Settlement (as defined below) and the related consideration; (2) the proposed substantive consolidation of the Debtors for Plan voting and distribution purposes and related tabulation of votes; and (3) the proposed releases and exculpations provided under the Plan. The

Debtors will address each of these remaining objections in addition to the confirmation requirements under 11 U.S.C. § 1129. For the reasons set forth in this Brief and at the Confirmation Hearing, the Court should confirm the Plan.

## II. BACKGROUND

### A. Procedural History.

4. On April 19, 2017 (the "Petition Date"), the Debtors commenced these chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors remain in possession of their assets and continue to manage their businesses as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108. No trustee or examiner has been appointed in these Chapter 11 Cases. On May 1, 2017, the United States Trustee appointed creditors to the Official Unsecured Creditors' Committee (the "Creditors' Committee"), and on June 7, 2017, this Court ordered the appointment of an official committee for equity security holders' of Adeptus Health Inc. On June 19, 2017, the U.S. Trustee appointed certain holders of the common stock issued by Adeptus Health Inc. to an official committee (the "Equity Committee").

5. Since being formed in 2002, the Debtors (and, together with their non-debtor affiliates, collectively, the "Adeptus Enterprise"),[1] have operated a patient-centered healthcare organization that provides emergency care through freestanding emergency rooms. For further background on the Debtors' businesses, this Brief incorporates by reference the facts set forth in the *Declaration of Andrew Hinkelman in Support of Chapter 11 Petitions and First Day Motions* (Dkt. No. 18) as if fully set forth herein.

---

[1] There are sixty-three (63) non-debtor affiliates in the Adeptus Enterprise.

B.      **Restructuring Transactions.**

6.      Since filing the Chapter 11 Cases, the Debtors and their advisors have engaged with the Debtors' key stakeholders regarding restructuring alternatives to create a sustainable capital structure and to provide the fairest and most equitable return to Creditors and Interest holders that the circumstances permit. The Plan—which includes both the settlement reached between the Debtors and the Creditors' Committee and the 9019 Settlement—provides (a) Administrative Expense Claims, Fee Claims, and Priority Tax Claims will be paid in full;[2] (b) Holders of DIP Facility Claims and holders of the Deerfield Security Claims will receive New Equity Interests in the Designated Debtors in satisfaction of the DIP Facility Claims, and Deerfield will recapitalize the Reorganized Debtors as their new owners;[3] (c) Other Secured Claims will be Unimpaired under the Plan;[4] (d) a Litigation Trust will be established to investigate and pursue Causes of Action transferred to the Litigation Trust and to distribute the proceeds of any recovery thereupon;[5] (e) the Litigation Trust will be adequately funded to pursue the Causes of Action allocated to the Litigation Trust;[6] (f) the Reorganized Debtors will guarantee $8 million in distributions to unsecured creditors;[7] (g) proceeds of the Litigation Trust shall be distributed in accordance with the Litigation Trust Waterfall; and (h) Eligible Holders will release their claims and causes of action against the Deerfield Parties in exchange for the opportunity to receive settlement consideration from the Deerfield Parties as and when the Deerfield Parties realize value on the Deerfield Deficiency Claims.[8]

---

[2]     Plan §§ 2.1, 2.2, 2.4.

[3]     *Id.* §§ 2.3, 4.3.

[4]     *Id.* § 4.2.

[5]     *Id.* §§ 5.2, 6.1-6.9.

[6]     *Id.* § 5.2.

[7]     *Id.* at 11 (definition of "Litigation Trust Waterfall Guarantee and Subrogation").

[8]     *Id.* §§ 4.5, 4.7-4.9.

C. **Valuation of the Adeptus Enterprise.**

7. On June 27, 2017, the Debtors filed the *Motion of Debtors for Valuation of Security* (Dkt. No. 367, the "Motion to Value"), by which the Debtors sought a hearing to value the Adeptus Enterprise and the Prepetition Secured Parties' collateral pursuant to 11 U.S.C. § 506 and Fed. R. Bankr. P. 3012. On July 26, 2017, the Debtors filed their *Designation of Expert Witness* (Dkt. No. 746). Later, on September 21, 2017, the Debtors filed their *Amended Designation of Expert Witness* (Dkt. No. 746).

8. Only the Equity Committee objected to the Motion to Value, which objection addressed procedural concerns that have been either settled, overruled, or mooted. None of the remaining Plan Objections address the Debtors' proposed valuation, and no party has designated an expert witness in connection with the Motion to Value. Accordingly, the Motion to Value is uncontested.

D. **Confirmation Solicitation and Notification Process.**

9. On August 1, 2017, the Court entered the *Order (I) Approving Disclosure Statement, (II) Establishing Procedures for the Solicitation and Tabulation of Votes to Accept or Reject the Debtors' Chapter 11 Plan, (III) Scheduling a Confirmation Hearing, and (IV) Approving Related Notice Procedures* (Dkt. No. 515, the "Disclosure Statement Order"). The Disclosure Statement Order approved, among other things, the proposed procedures for solicitation of the Plan and related notices, forms, and ballots (collectively, the "Creditor Solicitation Package").

10. The Plan sent to stakeholders as part of the Creditor Solicitation Package was the *Debtors' Second Amended Joint Chapter 11 Plan of Reorganization* (Dkt. No. 513, the "Second Amended Plan"). Intermediate plan modifications were also approved by the Bankruptcy Court regarding the sizing of the Deerfield Deficiency Claims and other items. Subsequently, on

September 14, 2017, the Court entered the *Order Granting Debtors' Motion to (I) Approve Plan Modifications, (II) Allow Debtors to File Third Amended Plan, and (III Set Confirmation Hearings and Related Deadlines* (Dkt. No. 720), by which the Debtors were authorized to file the Third Amended Plan now submitted for confirmation.

11.     On August 21, 2017, in accordance with the Disclosure Statement Order, the Debtors filed a Plan Supplement (Dkt. No. 589, together with all modifications, the "Plan Supplement").   The Debtors subsequently modified the Plan Supplement and provided notice of such modifications.   Dkt. Nos. 632, 678, 771.

12.     The deadline for all holders of Claims and Interests entitled to vote on the Plan to cast their ballots was originally September 5, 2017 at 5:00 p.m. prevailing Central Time.   The Court subsequently extended that deadline to September 11, 2017, at 5:00 p.m. prevailing Central Time (the "Initial Voting Deadline"), and, following the modifications that led to the filing of the Third Amended Plan, the Debtors agreed to accept late ballots for all parties[9] on the Plan up to September 21, 2017, at 12:00 p.m. (the "Voting Deadline").

13.     The deadline to file objections to the Plan was September 11, 2017, at 5:00 p.m. prevailing Central Time and, also in connection with entry of the order authorizing the Debtors to file the Third Amended Plan, the Court extended the objection deadline for stakeholders potentially affected by the modifications that led to the filing of Third Amended Plan to September 22, 2017 at 5:00 p.m. prevailing Central Time (the "Objection Deadline").   The continued hearing to consider Confirmation of the Plan (the "Confirmation Hearing") is scheduled to commence on September 26, 2017 at 9:30 a.m. prevailing Central Time. Concurrently with the filing of this Brief, the Debtors have submitted a proposed version of the

---

[9]     The Debtors did accept the votes of Claims both accepting *and* rejecting the Plan after the Initial Voting Deadline as set forth in the Voting Report and described in detail herein. *Infra* ¶¶ 133-135.

order confirming the Plan (the "<u>Confirmation Order</u>") and proposed findings of fact and conclusions of law (the "<u>Findings and Conclusions</u>").

**E.     Voting Results.**

14.     In accordance with the Bankruptcy Code, only holders of Claims in Impaired Classes receiving property on account of such Claims were entitled to vote on the Plan.  In addition, holders of Claims were not entitled to vote if their rights are: (a) Unimpaired by the Plan; or (b) Impaired by the Plan such that they will receive no distribution of property under the Plan.  As a result, the following Classes of Claims were not entitled to vote on the Plan, and the Debtors did not solicit votes from holders of such Claims:

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| --- | Administrative Expense Claims | Unimpaired; Deemed to Accept |
| --- | Fee Claims | Unimpaired; Deemed to Accept |
| --- | DIP Facility Claims | Unimpaired; Deemed to Accept |
| --- | Priority Tax Claims | Unimpaired; Deemed to Accept |
| 1 | Priority Non-Tax Claims | Unimpaired; Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired; Deemed to Accept |

15.     Accordingly, the Debtors only solicited votes on the Plan from holders of Claims or Interests in Impaired Classes receiving or retaining property on account of such Claims or Interests.  The voting results are reflected in the *Amended Declaration of Jane Sullivan of Epiq Bankruptcy Solutions, LLC, Regarding Voting and Tabulation of Ballots Cast on the Debtors' Second Amended Joint Plan of Reorganized Pursuant to Chapter 11 of the Bankruptcy Code* (Dkt. No. 745, the "<u>Voting Report</u>").

16.     As set forth in the Voting Report, no holders of Claims in Classes 4 (Medical Malpractice Claims) or 7(a) (TRA Claims) voted on the Plan.  No holders of Claims in Classes 4 or 7(a) voted on the Plan, although Class 4 shares in recoveries with holders of Allowed Class 5 Claims for the Debtors' liability, if any, in excess of applicable insurance coverage.

Additionally, as set forth in the Voting Report, holders of Claims in Classes 3 (Deerfield Secured Claims), 5 (General Unsecured Claims), and 6 (Convenience Class Claims) voted to accept the Plan, and Classes 7(b) (Securities Plaintiffs), 8 (Existing Preferred Equity Interests), and 9 (Existing Common Equity Interests) rejected the Plan. Notwithstanding the rejection of the Plan by these Classes, the Plan satisfies all requirements for confirmation under 11 U.S.C. § 1129(b) and is therefore confirmable.

### F. Objections to Confirmation and Related Plan Modifications.

17. The Debtors received formal and informal objections to the Plan (the "Plan Objections"), including objections to the proposed cure amounts for executory contracts and unexpired leases to be assumed in connection with the Plan (the "Cure Objections," together with the Plan Objections, the "Objections"). On September 22, 2017, following the expiration of the Objection Deadline, the Debtors filed the *Third Notice of Modifications to the Plan Supplement* (Dkt. No. 771), which included further revisions to the Schedule of Rejected Contracts and the Schedule of Cure Amounts. These revisions resolve many of the Objections involving proposed cure amounts such that these objections may be deemed withdrawn. The Debtors will continue to work to resolve Cure Objections prior to the conclusion of the Confirmation Hearing.[10]

18. The Debtors submit that none of the Plan modifications will materially and adversely affect the treatment of those Classes of Claims that voted to accept the Plan.[11] Only

---

[10] The Debtors have reached agreements with many contract counterparties and lessors to adjourn hearings on the Cure Objections to a later omnibus hearing date to afford the parties additional time to reconcile disputed cure amounts. These agreements will be memorialized as stipulations that will be filed on the Court's docket adjourning such hearings; reserving all parties' rights as to disputed cure amounts; and withdrawing any objections to Plan confirmation, to adequate assurances of future performance, or to the assumption of the applicable contract. *See* Dkt. Nos. 775-77.

[11] *See* 11 U.S.C. § 1127(a); Fed. R. Bankr. P. 3019(a).

those modifications that are "material" require resolicitation.[12]  A plan modification is not material unless it "so affects a creditor or interest holder who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance."[13]  Thus, an improvement to the position of the creditors affected by the modification will not require resolicitation of a modified plan.[14]  Nor will a modification that is determined to be immaterial require resolicitation.[15]  Therefore, such modifications will not require the Debtors to resolicit acceptances for the Plan.[16]

19.  At present, three Plan Objections remain, including:

- *United States Trustee's (1) Objection to Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and (2) Brief in Support of United States Trustee's Objection* [Dkt. No. 664] and *United States Trustee's (1) Objection to Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code and (2) Brief in Support of United States Trustee's Objection* [Dkt. No. 750] (collectively, the "UST Objection");

- *Objection by PST Services, LLC to Confirmation of Debtor's Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 690] and *Opposition by PST Services, LLC to Confirmation of Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 756] (collectively, the "PST Objection"); and

- *Lead Plaintiffs' Limited Objection and Reservation of Rights with Respect to Confirmation of the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 694] and *Lead Plaintiffs' Supplemental Objection to Confirmation of the Debtors' Third Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Dkt. No. 763]

---

[12]  *See In re Am. Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (approving plan modification with de minimis effect on creditor recoveries pursuant to Bankruptcy Rule 3019); *In re Couture Hotel Corp.*, 536 B.R. 712, 733 (Bankr. N.D. Tex. 2015) (finding that none of the modifications adversely changed the treatment of the claim of any creditor or the interest of any equity security holder so as to require resolicitation pursuant to Bankruptcy Rule 3019); *In re R.E. Loans, LLC*, No. 11-35865 (BJH), 2012 WL 2411877, at *10 (Bankr. N.D. Tex. June 26, 2012) (same).

[13]  *In re Am. Solar King*, 90 B.R. at 824.

[14]  *See In re Mangia Pizza Invs., LP*, 480 B.R. 669, 689 (Bankr. W.D. Tex. 2012) ("[A]nyone who voted to accept the previous plan will be deemed to have accepted the modified plan if the modified plan 'does not adversely change the treatment of [that creditor's] claim.'") (citing *In re Dow Corning Corp.*, 237 B.R. 374, 378 (Bankr. E.D. Mich. 1999)).

[15]  11 U.S.C. § 1127(a).

[16]  *See* Fed. R. Bankr. P. 3019(a).

(collectively, the "Securities Plaintiffs Objection") filed by the Alameda County Employees' Retirement Association ("ACERA") and Arkansas Teacher Retirement System ("Arkansas Teacher," together with ACERA, the "Securities Plaintiffs"), as lead plaintiffs in the consolidated securities class action styled as *Oklahoma Law Enforcement Retirement System v. Adeptus Health Inc.*, No. 17-cv-00449-ALM (E.D. Tex.).

## III.   ARGUMENTS & AUTHORITIES

20.     The Debtors submit that the remaining Plan Objections should be overruled for the reasons set forth herein and the evidence and testimony to be offered at the Confirmation Hearing. Accordingly, the Debtors request that the Court confirm the Plan and enter the proposed Findings of Fact and Conclusions of Law and the Confirmation Order.

**A.    The Stipulated Value of the Adeptus Enterprise Set Forth in the Plan Is Appropriate and Is Confirmed by the Debtors' Valuation Expert Testimony.**

21.     The Plan is based on a stipulated value of the Deerfield Secured Claims. The valuation was subsequently confirmed by a formal valuation of the Adeptus Enterprise prepared by the Debtors' investment banker, Houlihan Lokey Capital, Inc. ("Houlihan").

22.     In connection with the Second Amended Plan, Houlihan provided an expert report setting forth its comprehensive valuation of the Adeptus Enterprise, as contemplated by the scheduling order entered by this Court. *See Debtors' Designation of Expert Witness* (Dkt. No. 477, the "Initial Report").[17]   In preparation of its valuation of the Adeptus Enterprise, Houlihan performed an extensive review of various facets of the Debtors' business, based upon information available to and analyses undertaken by Houlihan as of July 26, 2017. Houlihan's

---

[17]     The Initial Report further set forth a number of assumptions upon which Houlihan relied, including: (a) a successfully reorganization of the Debtors' business and finances in a timely manner; (b) the achievement of the forecasts reflected in the Debtors' Financial Projections; (c) the amount of available cash; (d) market conditions; (e) the availability of certain tax attributes; (f) the Plan becoming effective in accordance with its terms on a basis consistent with the estimates and other assumptions discussed in the Plan and Disclosure Statement; (g) that the Financial Projections provided to Houlihan were reasonably prepared and reflect the best currently-available estimates of the future financial results and condition of the Debtors; and (h) that there has been no material change in the assets, financial condition, business, or prospects of the Debtors since the date such financials were made available to Houlihan.

---

Initial Report estimated the going concern value for the Debtors' enterprise (the "Enterprise Value") on a prospective basis as of October 1, 2017 (the "Valuation Effective Date") to be between approximately $150 million to $180 million, with a midpoint of $165 million. To arrive at its projected total enterprise value as of October 1, 2017, Houlihan considered various indicators of value and used its professional judgment in arriving at its overall valuation conclusion. Houlihan's conclusion of the implied range of the Enterprise Value was derived primarily from a Discounted Cash Flow Analysis, though to a lesser degree Houlihan also considered Comparable Public Company Analysis and Precedent Transaction Analysis.

23. Since the filing of the Initial Report, which reflected uncertainty as to the status of the Debtors' negotiations with their various joint venture partners, the Debtors have made considerable progress in these negotiations. As a result, the Debtors prepared a revised business plan (the "Revised Business Plan") that reflected further-refined, anticipated resolutions with one or more of the Debtors' joint venture partners and certain other updates not previously available at the time of the Initial Report. Given the increased clarity that now exists regarding the ongoing business operations of the Debtors, Houlihan and the Debtors concluded that updating the Initial Report was necessary.

24. Accordingly, the Debtors requested that Houlihan revisit its analysis, which led to Houlihan providing a revised report (the "Revised Report"). *See Debtors' Revised Designation of Expert Witness* (Dkt. No. 746). Houlihan's Revised Report estimated the going concern value for the Debtors' enterprise (the "Revised Enterprise Value") as of the Valuation Effective Date to be between approximately $113 million to $137 million, with a midpoint of $125 million, based upon information available to and analyses undertaken by Houlihan as of September 22, 2017.

25. The Revised Report reflects the increased clarity regarding the ongoing business operations relative to the Debtors' joint venture operations. Accordingly, for the purposes of calculating the total enterprise value of the Adeptus Enterprise in the Revised Report, Houlihan segmented and evaluated the Adeptus Enterprise in three distinct segments:

- The facilities wholly-owned by the Adeptus Enterprise (facilities in the Texas markets of Austin, Houston and San Antonio) and its economic interest in and relationship with the Texas Health Resources JV (the "Texas / Other Segment");

- The Adeptus Enterprise's economic interest in and relationship with the Dignity Health JV (the "Dignity Health JV Segment"); and,

- The Adeptus Enterprise's economic interest in and relationship with the UCHealth JV (the "UCHealth JV Segment").

26. The Dignity Health JV Segment was evaluated separately in light of the uncertainty associated with the restructuring terms pending continued negotiations between the Adeptus Enterprise and the Dignity Health JV partner. By comparison, the restructuring terms of the Texas Health Resources JV and UCHealth JV have been agreed upon by the respective parties (although remain subject to legal documentation).

27. The UCHealth JV Segment was also evaluated separately because the agreed-upon terms of the entity's restructuring contemplate a finite duration of future royalty payments to the Adeptus Enterprise. By comparison, the operations of the Texas / Other segment and Dignity Health JV segment are assumed to exist into perpetuity.

28. As with the Initial Report, Houlihan relied primarily on a discounted cash flow analysis to arrive at the Revised Enterprise Value, but also gave appropriate consideration to the comparable public company analysis and the precedent transaction analysis, as in the Initial Report. Further, the discount rates used for purposes of the DCF Analysis of the Texas / Other Segment, the Dignity Health JV Segment, and the UCHealth JV Segment each consider the weighted average cost of capital ("WACC") of comparably situated companies, adjusted to

consider certain Adeptus Enterprise-specific factors applicable to the respective cash flow streams of these segments.

29. As will be presented in the testimony of Andrew Turnbull at the Confirmation Hearing, Houlihan relied upon what it understands to be the best, then-available estimates of the future financial results and condition of the Debtors and prepared the Initial and Revised Reports to reflect such estimates, and there has been no material change in the assets, financial condition, business, or prospects of the Debtors since the date such financials were made available to Houlihan. As a result, the stipulated value of the Debtors' enterprise as set forth in the Plan falls within Houlihan's the range set forth in the Revised Report. That agreed upon valuation results in Deerfield Deficiency Claims in the aggregate amount of $191.8 million. Accordingly, the Debtors' valuation provides a sound basis for the distributions under the Plan and should be accepted by the Court.

## B. Substantive Consolidation of the Debtors' Estates for Plan Voting and Distribution Is Appropriate Under the Facts and Circumstances Here

30. Substantive consolidation as proposed in the Plan is not unusual; many courts have confirmed plans that consolidated debtors for purposes of voting and distributions under a chapter 11 plan of reorganization while providing for the continued separate existence of the debtors following substantial consummation of the Plan.[18] A bankruptcy court's power to substantively consolidate entities is premised on the broad language of § 105(a), which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to

---

[18] *See, e.g.*, *In re Idearc Inc.*, No. 09-31828 (Bankr. N.D. Tex. 2009); *In re Magnatrax Corp.*, No. 03-11402 (Bankr. D. Del. Nov. 17, 2003); *In re Genesis Health Ventures, Inc.*, 280 B.R. 95, 98 (Bankr. D. Del. 2002) (noting that the plan, by consolidating two debtor groups for purposes of voting and distribution under the plan, "did not change the legal and organizational structure of the individual debtors"), *aff'd sub nom.*, *Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416 (3d Cir. 2005); *Packaging Indus. Grp., Inc. v. Dennison Mfg. Co., Inc. (In re Sentinel Prods. Corp., PI)*, 192 B.R. 41, 46 (N.D.N.Y. 1996) (noting that plan confirmed by bankruptcy court provided for the substantive consolidation of the debtors for purposes of the treatment of claims under the plan while providing that the debtors would continue to maintain their separate corporate existences).

carry out the provisions of this Title."[19]   By using § 105(a), a bankruptcy court has discretion to fashion equitable remedies otherwise permissible under the Code.[20]

31.     The leading tests for substantive consolidation come out of the Second and Eleventh Circuits.[21]   The Second Circuit articulated a "balancing test," and the Eleventh Circuit uses a factor test.   Under any test, the substantive consolidation proposed in the Plan is appropriate.   First, the Second Circuit in *Augie/Restivo* set forth the balancing "*Augie/Restivo Test*."   The *Augie/Restivo* Test is disjunctive, such that substantive consolidation is warranted where either (1) "creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit," or (2) "the affairs of the debtors are so entangled that consolidation will benefit all creditors . . . ."[22]   As described in detail below, and as will be shown through evidence and testimony at the Confirmation Hearing, the Debtors satisfy the *Augie/Restivo* Test because nearly, if not all, creditors and vendors of the Debtors saw the Debtors simply as Adeptus.   The creditors did not know that the Debtors are comprised of 140 entities.   All the creditors knew was that they had one contract—which many times that contract was with "Adeptus" or "Adeptus Health"—and that they sent only one invoice and were paid with only one check or wire.   Similarly, the Debtors' assets, cash management system, accounting, taxes, and even the Debtors' Causes of Action (consisting of those Causes of Action assigned to the Litigation Trust under the Plan) are so intertwined that all of their creditors would benefit from the consolidation of their Estates for plan and distribution purposes.

---

[19]     11 U.S.C. § 105(a).

[20]     *See Law v. Siegel*, 134 S. Ct. 1188, 1198 (2014).

[21]     *Eastgroup Props. v. S. Motel Ass'n, Ltd.*, 935 F.2d 245, 250 (11th Cir. 1991); *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 518 (2d Cir. 1988).

[22]     *Id.* at 518.

32. The Eleventh Circuit uses a multi-factor test that looks at a myriad of factors to determine whether substantive consolidation is appropriate.[23] Addressing each element in turn:

(a) *The presence or absence of consolidated financial statements.* The Debtors have always maintained consolidated financial statements, and their auditors and tax advisors looks at the Debtors on a consolidated basis. Additionally, the Debtors file their taxes and their Monthly Operating Reports on a consolidated basis;

(b) *The unity of interests and ownership between the various corporate entities.* As set forth in the organizational chart and pages 9-10 of the Disclosure Statement (Dkt. No. 514), Adeptus Health Inc. owns the majority of Adeptus Health, LLC; which in turn wholly owns First Choice ER; which wholly owns Adeptus Health Ventures, all of the management entities, and the Debtors' wholly-owned IFSED; Adeptus Health Ventures wholly owns the Houston hospital and all of the HOPDs related thereto plus Adeptus Health Ventures owns the Debtors' interest in the JVs;

(c) *The existence of parent and intercorporate guaranties on loans.* Since the origination of the prepetition debt, various of the operating Debtors were obligors and various of the holding company Debtors were guarantors. When the March 2017 bridge loan was papered, more of the operating Debtors were added as obligors, and more of the holding companies were added as guarantors. The DIP obligates each and every one of Debtors;

(d) *The degree of difficulty in segregating and ascertaining individual assets and liabilities.* As is evidenced by the length of time it took the Debtors to file their Statements of Financial Affairs and their Schedules and the number of amendments to each, plus the Global Notes attached to both and the Monthly Operating Reports (which are filed on a consolidated basis), it has and continues to be a difficult, time-consuming, and arduous task to segregate the liabilities and even the contracts of the Debtors. To create their Statements of Financial Affairs and their Schedules, FTI Consulting, Inc. had to meticulously analyze the Debtors' books and records, including on an invoice-by-invoice basis, to attempt to untangle the Debtors' finances and assign assets and liabilities to the various Debtor entities, and the resulting allocations were largely based on best estimates as opposed to conclusive calculations. Additionally, and as evidenced by the various letters and pleadings filed by the Equity Committee, the statements made on the record at each of the hearings in these Cases, and the ultimate global settlement and 9019 Settlement reached in these Chapter 11 Cases, the Debtors believe that their assets, including their Estates' reserved litigation assets, are jointly owned by all the Debtors;

(e) *The transfer of assets without formal observance of corporate formalities.* The Debtors have three main bank accounts, and although the accounts were used to pay liabilities of every Debtor, the Debtors did book those transfers as payables or receivables of the various Debtor entities;

---

[23] *Eastgroup Props.*, 935 F.2d at 250.

(f)     ***The commingling of assets and business functions***. As stated above, the Debtors' assets are jointly owned. Additionally, since the Debtors only have one concentration account, all of the Debtors' cash is comingled into one bank account;

(g)     ***The profitability of consolidation at a single physical location***. The Debtors' primary physical location—their headquarters in Lewisville, Texas—is the nerve center for the Adeptus Enterprise and the profit center for the management services provided at the Debtors' health care facilities;

(h)     ***Whether the parent corporation owns all or a majority of the capital stock of the subsidiary.*** Adeptus Health Inc., the corporate parent and holding company, owns more than 70% of Adeptus Health, LLC, the only subsidiary to have stock or units;

(i)     ***Whether the parent and subsidiary have common officers and directors.*** Until December 2016, the Debtors all had the same officers and directors. In December of 2016, the Debtors needed to update their signatory authority and entered into that certain Joint Written Consent of the Sole Managers and Sole Members of Each of the Wholly Owned Subsidiaries of Adeptus Health Inc., wherein all of the Debtors except Adeptus Health Inc. have the same three signatory officers;

(j)     ***Whether the parent finances the subsidiary***. Prepetition, the Debtors financed each other through a consolidated financing, while post-petition financing was provided through a DIP Facility for which all Debtors are liable;

(k)     ***Whether the parent is responsible for incorporation of subsidiary***. NO subsidiaries are incorporated, this this factor is not applicable;

(l)     ***Whether the subsidiaries have no business except with parent or whether the parent has no business except with the subsidiaries***. Adeptus Health Inc. is a holding company with no business operations but for the rest of the Adeptus Enterprise; and

(m)     ***Whether the subsidiary has no assets except for those conveyed by parent***. The Debtors' main assets prepetition were A/R, physicians contracts, goodwill, interests in the JVs, and a piece of real estate. As shown in the organizational chart, for example, the Debtors are interdependent on each other for, *inter alia*, management services, employees, operations, and leases.

33.     Moreover, that the Litigation Trust Assets will consist solely of causes of action is an important consideration for the substantive consolidation analysis because virtually all of the claims and causes of action that the Litigation Trust Trustee will pursue are either jointly owned by all of the Debtors' Estates or are difficult to allocate between the Debtors' Estates.

Specifically, as set forth in the Plan Supplement, the Litigation Trust Causes of Action will include the following claims:

- Actions against officers and directors of the Debtors – Because all of the Debtors have the same officers and directors, it would be difficult to allocate these claims between estates and determine how to distribute any recoveries.

- Claims against the Sterling Parties and claims relating to the IPO and the Secondary Offerings – Because these causes of action impact the entire Adeptus Enterprise, all of the Debtors' could arguably pursue claims against these parties.

- Professional malpractice claims – Professionals that provided services for the Debtors generally provided services for all of the Debtors and would therefore be liable to all of the Debtors.

- Preferences – Because many vendors submitted consolidated invoices (or directed their invoices to specific Debtors), even though services were being provided to multiple debtors, it would be difficult to allocate any payments that are avoided.

Therefore, if the Debtors are not substantively consolidated, 140 different trustees would be appointed to 140 different trusts, and these trustees would spend substantial time and money contesting the ownership of these causes of action.

34. Accordingly, the Debtors meet both the *Augie/Restivo* Test and the Eleventh Circuit's factor test. Perhaps most importantly, the Debtors submit, and the Debtors and the Creditors' Committee have always maintained, that the Debtors' Causes of Action (consisting of those Causes of Action assigned to the Litigation Trust under the Plan) belong to each and every Debtor. Consequently, the proceeds of such Causes of Action must be distributed on a substantively consolidated basis to all of the Debtors' stakeholders on the basis set forth in the Plan. Substantive consolidation for plan voting and distribution purposes is appropriate for these Chapter 11 Debtors.

C. **The Plan Satisfies Each Requirement for Confirmation Under 11 U.S.C. § 1129.**

35. To confirm the Plan, the Court must find by a preponderance of the evidence that the Debtors have satisfied the provisions of 11 U.S.C. § 1129.[24] As described in detail below, and as will be shown through evidence and testimony at the Confirmation Hearing, the Plan complies with all relevant provisions of the Bankruptcy Code and other applicable law. The Debtors thus respectfully request that the Court confirm the Plan.

> ***1.** **The Plan Complies Fully with the Applicable Provisions of the Bankruptcy Code (§ 1129(a)(1)).***

36. Section 1129(a)(1) of the Bankruptcy Code requires that a plan of reorganization comply with the applicable provisions of the Bankruptcy Code.[25] The principal aim of this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a plan of reorganization.[26] Accordingly, the determination of whether the Plan complies with § 1129(a)(1) requires an analysis of §§ 1122 and 1123. As explained below, the Plan complies with §§ 1122 and 1123 in all respects.

> i. **The Plan Satisfies the Classification Requirements 11 U.S.C. § 1122.**

37. The Plan properly classifies Claims and Interests in accordance with 11 U.S.C. § 1122. Section 1122 provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."[27] Because claims and interests only need to be "substantially" similar to be placed in the same class, plan proponents have broad discretion in determining how to classify claims and

---

[24] *In re Couture Hotel*, 536 B.R. at 733 (citing *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 801 (5th Cir. 1997)).

[25] 11 U.S.C. § 1129(a)(1).

[26] *See* S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368.

[27] 11 U.S.C. § 1122(a).

---

interests together.[28] The Fifth Circuit has recognized that plan proponents may place similar claims and interests into different classes so long as there is a proper basis for the classification.[29]

38. The Plan satisfies these requirements because each of the Claims and Interests in each particular Class is substantially similar to the other Claims and Interests in such Class against each individual Debtor. The Plan's classification of creditor Classes rests firmly on the different legal business relationships with the Debtors giving rise to each Class of Claims or Interests.[30] Interests (Classes 8 and 9) are classified separately from debt claims. Subordinated Claims (Class 7) are separately classified based on the application of 11 U.S.C. § 510, whether pursuant to contractual or statutory subordination. Likewise, other aspects of the classification scheme are related to the different legal or factual nature of each Class. Priority Non-Tax Claims (Class 1), Other Secured Claims (Class 2), and Deerfield Secured Claims (Class 3) are classified separately due to their required treatment under the Bankruptcy Code.[31] Claims against the Debtors arising from medical malpractice or personal injury allegations are classified as Medical Malpractice Claims (Class 4), while general claims against the Debtors arising from litigation or trade-related activities in an amount equal to or in excess of $150,000 are classified as General Unsecured Claims (Class 5). Consistent with the Fifth Circuit's decision in *Greystone*, the

---

[28]  *In re Couture Hotel*, 536 B.R. at 733 ("Section 1122 requires that all claims placed in the same class be substantially similar to one another, but does not require that all substantially similar claims be placed in the same class.").

[29]  *Phx. Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279 (5th Cir. 1991) (noting that § 1122(a) permits classification of "substantially similar" claims in different classes if undertaken for reasons other than to secure the vote of an impaired accepting class of claims); *In re Sentry Operating Co. of Tex., Inc.*, 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (recognizing that § 1122 is broadly permissive of any classification scheme that is not specifically proscribed, and that substantially similar claims may be separately classified).

[30]  Plan §§ 4.1-4.9.

[31]  *See In re Riggel*, 142 B.R. 199, 203 (Bankr. S.D. Ohio 1992) (approving classification based on special treatment of certain claims under the Bankruptcy Code).

Deerfield Deficiency Claims are also included with General Unsecured Claims (Class 5).[32] General Unsecured Claims against the Debtors arising from litigation or trade-related activities in an amount less than $150,000 are separately classified as Convenience Class Claims (Class 6).[33]

39.     Accordingly, because each Class is composed of substantially similar Claims or Interests, and each instance of separate classification of similar Claims and Interests reflects valid business, factual, and legal reasons, the Plan's classification of Claims and Interests fully complies with and satisfies 11 U.S.C. § 1122.

**ii.     The Plan Satisfies the Mandatory Requirements of § 1123(a)(1)-(7).**

40.     The seven applicable requirements of 11 U.S.C. § 1123(a) generally relate to the specification of classification and treatment of claims and interests, the equal treatment of claims and interests within classes, and the mechanics of implementing the plan. The Plan satisfies each of these requirements.

41.     ***Specification of Classes, Impairment, Treatment, and Equal Treatment.*** Article III of the Plan satisfies the first four requirements of 11 U.S.C. § 1123(a) by (a) properly designating Claims and Interests, as required by § 1123(a)(1); (b) specifying the Classes of Claims and Interests that are Unimpaired under the Plan, as required by § 1123(a)(2); (c) specifying the treatment of each Class of Claims and Interests that is Impaired, as required by § 1123(a)(3); and (d) specifying that the treatment of each Claim or Interest within a Class is the

---

[32]     *See In re Greystone*, 995 F.2d at 1281.

[33]     *See, e.g., In re CHC Grp. Ltd.*, No. 16-31854, 2017 Bankr. LEXIS 1016, at *46 (Bankr. N.D. Tex. Mar. 3, 2017) (approving convenience class of $100,000 as reasonable and necessary for administrative convenience); *In re Mirant Corp.*, No. 03-46590 (Bankr. N.D. Tex. Dec. 9, 2005), ECF No. 12,569 (approving payments to convenience class up to $140,000 in cash in full upon the effective date).

same, unless the Holder of a Claim or Interest consents to less favorable treatment on account of its Claim or Interest, as required by § 1123(a)(4).[34]

42. ***Adequate Means for Implementation.*** Article V and various other provisions of the Plan provide adequate means for the Plan's implementation, thus satisfying the fifth requirement of § 1123(a). Section 1123(a)(5) specifies that adequate means for implementation of a plan may include (a) retention by the debtor of all or part of its property; (b) the transfer of property of the estate to one or more entities; (c) cancelation or modification of any indenture; (d) curing or waiving of any default; (e) amendment of the debtor's charter; or (f) issuance of securities for cash, for property, for existing securities, in exchange for claims or interests or for any other appropriate purpose.[35] Among other things, Article V and various other provisions of the Plan provide for:

- the substantive consolidation of the Debtors solely for purposes of voting and distributions under the Plan, Plan § 5.1;

- the establishment and funding of the Litigation Trust, *id.* § 5.2;

- the assumption of all executory contracts and unexpired leases not listed on the Schedule of Rejected Contracts, *id.* § 5.3;

- the assumption, rejection, or termination of the Tax Receivable Agreement, to the extent it is an executory contract, *id.* § 5.4;

- the sources of consideration for Plan Distributions, *id.* § 5.5;

- the cancellation of agreements, instruments, and other existing securities, *id.* §§ 5.6 and 5.7;

- the appointment and selection of officers and directors of each Reorganized Debtor, *id.* § 5.8;

- the dissolution of the Creditors' Committee and Equity Committee and the discharge of the Patient Care Ombudsman, *id.* § 5.9;

---

[34] 11 U.S.C. § 1123(a)(1)-(4).

[35] *Id.* § 1123(a)(5).

- the capitalization of the Reorganized Debtors by the Deerfield parties through equity investments or, if determined by the Deerfield Parties in their sole discretion, debt investments, *id*. § 5.10;

- the authorization, issuance, and delivery of New Equity Interests in the Designated Debtors for distribution in accordance with the terms of the Plan, *id*. § 5.11;

- the authorization for the Debtors or the Reorganized Debtors, as applicable, to take corporate actions necessary to effectuate the Plan, including filing any new organizational documents of the Reorganized Debtors, *id*. § 5.12; and

- the authorization for the Reorganized Debtors to undertake certain Restructuring Transactions, including those contemplated by or necessary to effectuate the Plan, *id*. § 5.13.

43.    The precise terms governing the execution of these transactions are set forth in greater detail in the applicable definitive documents or forms of agreements included in the Plan Supplement.  Thus, the Plan satisfies § 1123(a)(5).

44.    ***Non-Voting Stock.***  The sixth requirement of § 1123(a) is that the plan must contemplate a provision in the reorganized debtor's corporate charter that prohibits the issuance of non-voting equity securities or, with respect to preferred stock, adequate provisions for the election of directors upon an event of default.[36]  Here, Adeptus Health Inc., the only public Debtor, will be dissolved upon confirmation of the Plan, and the Plan does not contemplate the issuance of non-voting stock to the Deerfield Parties.  Thus, § 1123(a)(6) is inapplicable to these Chapter 11 Cases.[37]

45.    ***Selection of Officers and Directors.***  Finally, § 1123(a)(7) requires that the Plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or

---

[36]    *See id*. § 1123(a)(6).

[37]    *See Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 787 F.2d 1352, 1361 (9th Cir. 1986) (noting that § 1123(a)(6) "only prohibits the issuance of *new* nonvoting securities") (emphasis in original).

trustee under the [P]lan."[38] The composition of the boards of directors of each Reorganized Debtor has been disclosed in the Plan Supplement and, to the extent necessary, will be supplemented through evidence and testimony presented at the Confirmation Hearing. Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor.[39] These provisions are consistent with the interests of creditors and with public policy, and thus, the Plan satisfies the requirements of § 1123(a)(7). The identity of the Litigation Trust Trustee will be disclosed prior to the conclusion of the Confirmation Hearing.

### iii. The Plan Contains Discretionary Provisions Allowed under § 1123.

46. The Plan's discretionary provisions are in accord with § 1123(b) and (d). In addition to the provisions required by § 1123(a), § 1123(b) sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.[40] Among other things, § 1123(b) provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption or rejection of executory contracts and unexpired leases; (c) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates or provide for the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appoint for such purposes of any such claim or interest; and (d) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11.[41] Section 1123(d) also sets forth the requirements for the payment of cure amounts for executory contracts and unexpired leases which the debtors may elect to assume.[42]

---

[38] 11 U.S.C. § 1123(a)(7).

[39] Plan § 5.8; Plan Suppl., Dkt. No. 589 ¶¶ 8-9.

[40] 11 U.S.C. § 1123(b).

[41] *Id*. § 1123(b)(1)-(3), (6).

[42] *Id*. § 1123(d).

47.     The Plan provides for the preservation and retention of Causes of Action by the Debtors and the assignment of such Causes of Action to the Litigation Trust,[43] and the assumption and rejection of Executory Contracts and Unexpired Leases not previously assumed or rejected.[44]   In addition, the Plan provides for certain release, injunction, and exculpation provisions, as more detailed in Section III.E herein.[45]   Accordingly, the discretionary provisions of the Plan are consistent with and permissible under § 1123(b).

48.     Article IX of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease assumed pursuant to the Plan in accordance with 11 U.S.C. § 365.   The Plan Supplement, filed with the Bankruptcy Court and served on all counterparties to the Executory Contracts and Unexpired Leases that are identified therein on August 21, 2017,[46] includes both the Schedule of Rejected Contracts and the Schedule of Cure Amounts.   The Debtors subsequently filed notices of modifications to the Plan Supplement to disclose changes in the Schedule of Rejected Contracts and the Schedule of Cure Amounts.[47] The Schedule of Cure Amounts sets forth the proposed Cure Amount for each Executory Contract or Unexpired Lease to be assumed under the Plan.   The Plan further sets forth procedures for objecting to (a) any Cure Amount; (b) the ability of the Debtors to provide adequate assurance of future performance under the contract or lease to be assumed; (c) whether a nonmonetary default is required to be cured; and (d) any other matter pertaining to the proposed assumption of the Executory Contracts or Unexpired Leases, including but not limited

---

[43]   Plan § 11.12.
[44]   *Id.* §§ 9.1-9.5.
[45]   *Id.* §§ 11.4-11.10; *see infra* ¶¶ 106-124.
[46]   Dkt. No. 589.
[47]   Dkt. Nos. 632, 678, 771.

to a process for resolving any disputes concerning the foregoing with the Court.[48]    Accordingly, the Debtors submit that the Plan complies with § 1123(d).

### 2. The Debtors Have Complied with the Applicable Provisions § 1129(a)(2).

49.     The Debtors have satisfied § 1129(a)(2), which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[49]    The cases and legislative history discussing § 1129(a)(2) indicate that this section primarily embodies the disclosure and solicitation requirements of § 1125 and the plan acceptance requirements of § 1126.[50]

50.     As set forth below, the Debtors have compiled with these provisions, including §§ 1125 and 1126, as well as Bankruptcy Rules 3017 and 3018, by distributing the Plan, the Disclosure Statement, and the Plan Supplement and related modifications and by soliciting acceptances of the Plan through their Notice and Claims Agent in accordance with the Disclosure Statement Order and other orders of the Court.

### i.    The Debtors Have Disclosed and Solicited Pursuant to § 1125.

51.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.[51]

---

[48]    *Supra* ¶ 17 n.10.

[49]    *See* 11 U.S.C. § 1129(a)(2).

[50]    *In re Cypresswood Land Partners, I*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125."); *see also In re Worldcom, Inc.*, No. 02-13533 (AJG), 2003 WL 23861928, at *49 (Bankr. S.D.N.Y. Oct. 31, 2003) (stating that § 1129(a)(2) requires plan proponents to comply with applicable provisions of the Bankruptcy Code, including "disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code").

[51]    11 U.S.C. § 1125(b).

Section 1125 ensures that parties may make an informed decision whether to approve or reject the plan based upon "adequate information" regarding the Debtors' financial condition.[52]

52.     Here, the Debtors have satisfied § 1125. Before the Debtors solicited votes on the Plan, the Court approved the Disclosure Statement as containing adequate information and entered the Disclosure Statement Order.[53] The Court also approved the contents of the Creditor Solicitation Package provided to holders of Claims and Interests entitled to vote on the Plan and the relevant dates for voting and objection to the Plan. The Debtors, through their Notice and Claims Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying § 1125(a) and (b) of the Bankruptcy Code.[54] The Debtors also satisfied § 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular Class. Here, the Debtors caused the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan.

53.     Discussions to improve the Plan continued following the initial circulation of the Disclosure Statement and solicitation of the Plan. As discussed earlier with respect to the Plan modification process, the Debtors implemented changes to the Plan with Bankruptcy Court approval and provided notice to those creditors potentially impacted by the Plan's amended terms.[55] Accordingly, the Debtors have complied with the requirements of § 1125 and, therefore, have satisfied the requirements of § 1129(a)(2).

### ii.     The Debtors Have Satisfied § 1126's Plan Acceptance Requirements.

54.     Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on

---

[52]    *Id.* § 1125(a)(1); *see Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1156 (5th Cir. 1988).

[53]    Dkt. No. 515.

[54]    *See Aff. of Service of Solicitation Materials* (Dkt. No. 542).

[55]    *See* Dkt. No. 728.

account of such claims or equity interests may vote to accept or reject a plan.[56] Holders of Administrative Expense Claims, Fee Claims, DIP Facility Claims, Priority Tax Claims, and Claims in Classes 1 (Priority Non-Tax Claims) and 2 (Other Secured Claims) are Unimpaired under the Plan and therefore were deemed to accept the Plan. While the Debtors did not solicit votes from the holders of Claims in such Classes, the Debtors, where applicable, served the Confirmation Hearing Notice in accordance with the Disclosure Statement Order.

55.     The Voting Report reflects the results of the voting process in accordance with § 1126 of the Bankruptcy Code.[57] With respect to Classes 3, 4, 5, 6, 7, 8, and 9 (collectively, the "Voting Classes"), § 1126(c) and (d) require two-thirds in amount of the claims or interests and more than one-half in number of the allowed claims voting on the Plan.[58] As set forth in the Voting Report, each of Classes 4, 5, and 6 voted to accept the Plan in accordance with § 1126(c). Classes 4 and 7(a) voted to reject the Plan, and Classes 7(b), 8, and 9 did not vote to accept the Plan pursuant to § 1126(d). Notwithstanding the rejection of the Plan by Classes 7, 8, and 9, the Debtors submit that the Court may confirm the Plan over the objections of Claims and Interest Holders in Classes 7, 8, or 9 pursuant to the "cramdown" provisions of § 1129(b)(1), as discussed more fully herein. Thus, the requirements of § 1129(a)(2) have been satisfied.

### 3.     The Debtors Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law, Thereby Satisfying § 1129(a)(3).

56.     The Debtors negotiated, developed, and proposed the Plan in good faith in accordance with § 1129(a)(3). Section 1129(a)(3) requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[59] In the context of § 1129(a)(3), good faith

---

[56]   See 11 U.S.C. § 1126.
[57]   Dkt. No. 745.
[58]   11 U.S.C. § 1126(c)-(d).
[59]   Id. § 1129(a)(3).

is not an amorphous concept of ethics or morality, but rather has a specific meaning: that the plan was proposed with "the legitimate and honest purpose to reorganize and has a reasonable hope of success."[60] Whether a plan is proposed in good faith must be determined in light of the totality of the circumstances of the case.[61]

57.     The fundamental purpose of chapter 11 is to enable a distressed business operation to reorganize its affairs and avoid the adverse economic effects associated with disposing of assets at their liquidation value.[62] To determine whether the plan seeks relief consistent with the Bankruptcy Code, courts look to the reorganization plan itself.[63]

58.     Here, the Debtors have proposed the Plan in good faith with the legitimate and honest purpose of reorganizing their ongoing business and maximizing the value of the Debtors' estates and the recovery to Creditors. The Plan will enable the Debtors to deleverage their balance sheet and position their business for long-term success. Moreover, the estimated recoveries for the Debtors' stakeholders under the Plan are significantly greater than any value that would be distributed upon a liquidation of the Debtors' assets. Finally, as set forth herein, the Plan complies with bankruptcy and applicable non-bankruptcy law. Thus, the Plan has been proposed in good faith and satisfies § 1129(a)(3).

### 4.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval, Satisfying § 1129(a)(4).

59.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property

---

[60]     *See Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985).

[61]     *Id.*; *Pub. Fin. Corp. v. Freeman*, 712 F.2d 219, 221 (5th Cir. 1983).

[62]     *See Bank of Am. Nat'l Tr. & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (noting the "two recognized policies underlying Chapter 11" are "preserving going concerns and maximizing property available to satisfy creditors") (citing *Toibb v. Radloff*, 501 U.S. 157, 163 (1991)).

[63]     *See In re Granite Broad. Corp.*, 369 B.R. 120, 137 (Bankr. S.D.N.Y. 2007) (looking at the plan itself to determine whether such plan "will fairly receive a result consistent with the objections and purposes of the Bankruptcy Code") (internal citations omitted).

under the plan, be approved by the Court as reasonable or remain subject to approval by the Court as reasonable. The Fifth Circuit has held that this is a "relatively open-ended standard" that involves a case-by-case inquiry and, under appropriate circumstances, does not necessarily require that a bankruptcy court review the amount charged.[64] As to routine legal fees and expenses that have been approved as reasonable in the first instance, "the court will ordinarily have little reason to inquire further with respect to the amount charged."[65]

60.     The Debtors are not aware of any objections to the Plan's compliance with § 1129(a)(4). In general, the Plan provides that Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under 11 U.S.C. §§ 328 and 330. Section 2.2 of the Plan, moreover, provides that Professionals shall file all final requests for payment of Professional Claims no later than forty-five (45) days after the Effective Date, thereby providing an adequate period of time for interested parties to review such Professional Claims.[66] Accordingly, the Plan complies with the requirements of § 1129(a)(4).

### 5.     The Debtors Have Complied with the Bankruptcy Code's Governance Disclosure Requirement as Required by Section 1129(a)(5).

61.     The Bankruptcy Code requires the proponent of a plan to disclose the identity and affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[67] It further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and

---

[64]     *See Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 517 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

[65]     *Id.* at 517.

[66]     Plan § 2.2.

[67]     11 U.S.C. § 1129(a)(5)(A)(i).

---

with public policy.[68]  Lastly, it requires that the plan proponent disclose the identity of insiders to be retained by the reorganized debtor and the nature of any compensation for such insider.[69] Courts have held that these provisions are meant to ensure that the post-confirmation governance of a reorganized debtor is in "good hands."[70]

62.     The Plan satisfies § 1129(a)(5)(A)(i) because the Debtors have disclosed the identities and affiliations of all persons proposed to serve on each of the new boards of each of the Reorganized Debtors as of the Effective Date as part of the Plan Supplement.[71]  To the extent any additional disclosure is required, the Debtors may provide such disclosure and modification to the Plan Supplement by oral motion during the Confirmation Hearing.[72]  The Debtors believe control of the Reorganized Debtors by the individuals proposed to serve on the new boards will be beneficial, and no party in interest has objected to the Plan on these grounds.  Therefore, the requirements under § 1129(a)(5)(A)(ii) are satisfied.

63.     Additionally, § 1129(a)(5)(B) requires that a plan proponent disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[73]  The Debtors have provided disclosure in the Plan Supplement of insiders to be employed or retained by the Reorganized Debtor,[74] and the Debtors' evidence presented during the Confirmation Hearing

---

[68]   *Id.* § 1129(a)(5)(A)(ii).

[69]   *Id.* § 1129(a)(5)(B).

[70]   *See In re Landing Assocs., Ltd.*, 157 B.R. 791, 817 (Bankr. W.D. Tex. 1993) ("[T]o lodge a valid objection under § 1129(a)(5), a creditor must show that a debtor's management is unfit or that the continuance of this management post-confirmation will prejudice the creditors.").

[71]   Plan § 5.8(a) ("The composition of the boards of directors of each Reorganized Debtor shall be disclosed in the Plan Supplement."); Dkt. No. 719 at 26.

[72]   *See In re Couture Hotel*, 536 B.R. at 733 (approving oral modification of plan during confirmation hearing to supplement disclosures concerning post-emergence officers and directors and the nature of their compensation).

[73]   11 U.S.C. § 1129(a)(5)(B).

[74]   Dkt. No. 589 ¶¶ 8-9.

will provide supplemental disclosure as necessary.[75]   Accordingly, the Debtors submit that the Plan fully complies with and satisfies the requirements of § 1129(a)(5).

**6.     *The Plan Does Not Require Any Government Regulatory Approval of Rate Changes, So § 1129(a)(6) Does Not Apply.***

64.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.[76]   The Plan does not provide for any such rate changes, and therefore, § 1129(a)(6) does not apply.

**7.     *The Plan Satisfies the Best Interests Test for Holders of Claims and Interests, Complying with the Requirements of § 1129(a)(7).***

65.     The Plan is in the best interests of creditors and satisfies § 1129(a)(7).  Section 1129(a)(7)—the "best interests of creditors" test—requires that with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.[77]

66.     The best interests test only applies to creditors and interest holders that are impaired by a chapter 11 plan.[78]   Further, the best interests test applies if a class of claims or interests entitled to vote does not vote unanimously to accept a plan, even if the class as a whole

---

[75]   *See In re Couture Hotel*, 536 B.R. at 733.

[76]   11 U.S.C. § 1129(a)(6).

[77]   *Id.* § 1129(a)(7); *see Cantu v. Schmidt (In re Cantu)*, 784 F.3d 253, 262 (5th Cir. 2015) ("A reorganization plan must either be accepted by each creditor or satisfy the Code's 'best interests of the creditor' rule, which requires that the holder of a claim receive under the reorganization plan at least as much as the holder would receive in the event of chapter 7 liquidation."); *In re Star Ambulance Serv., LLC*, 540 B.R. 251, 264 (Bankr. S.D. Tex. 2015) (noting that the "best interests" test ensures that reorganization is in the best interest of individual claimholders who have not voted in favor of the plan) (citing *In re Cypresswood Land Partners*, 409 B.R. at 428).

[78]   *In re Mirant Corp.*, No. 03-46590, 2007 WL 1258932, at *10 (Bankr. N.D. Tex. Apr. 27, 2007) ("[I]if the members of a class are unimpaired, the 'best interests' test does not apply to them.") (internal citations omitted).

votes to accept the plan.[79]  Generally, the best interests test is satisfied by a liquidation analysis demonstrating that an impaired class will receive no less under the plan than under a chapter 7 liquidation.[80]  The Fifth Circuit has recognized the inherent value that is added through chapter 11 for creditors where a debtor is reorganized rather than liquidated.[81]

67.    To demonstrate compliance with § 1129(a)(7), the Debtors, with the assistance of their financial advisor, FTI Consulting, Inc., have analyzed the probable result of a hypothetical chapter 7 liquidation, as set forth in the Liquidation Analysis attached as Exhibit E to the Disclosure Statement.  According to the Liquidation Analysis, if all assets were sold in an orderly liquidation, after taking into account liquidation costs, the aggregate proceeds available for distribution would be $55.6 million to $73 million.[82]  Under any scenario, the Debtors' secured and unsecured creditors—with the exception of holders of the Deerfield Secured Claims—are left without any meaningful recovery following a liquidation and all creditors and interest holders will receive a lower recovery in a liquidation than under the Plan.  As set forth in the Liquidation Analysis, in the event of a liquidation, there would be no funds left for distribution to holders of Claims or Interests in the remaining classes: Classes 4, 5, 6, 7, 8, and 9. Because holders of Claims and Interests in these Classes could do no better under a liquidation, the Plan satisfies § 1129(a)(7) with respect to these Classes.

---

[79]    *See 203 N. LaSalle*, 526 U.S. at 441 n.13 ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan."); *In re Star Ambulance*, 540 B.R. at 264 (noting that the "best interests" test requires that all holders of claims and interests in impaired classes must either vote to accept the plan or receive at least as much as they would receive in a chapter 7 liquidation).

[80]    *See ACC Bondholders Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 366-67 (S.D.N.Y. 2007) (citing *In re Smith*, 357 B.R. 60, 67 (Bankr. M.D.N.C. 2006) ("In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions.")).

[81]    *In re Cantu*, 784 F.3d at 262 ("Although creditors being 'at least as well off' is the statutory requirement for plan confirmation, ordinarily creditors are better off when the debtor is reorganized into a going concern than when a liquidation occurs.").

[82]    *See* Liquidation Analysis at 3.  The Liquidation Analysis allocates no value to the unliquidated Causes of Action given the uncertainty of recovery on such Causes of Action in a chapter 7 liquidation scenario.

---

68. As confirmed by the Liquidation Analysis, under the terms of the Plan, all holders of Impaired Claims and Interests will receive property with a value not less than the value such holders would receive in a chapter 7 liquidation of the Debtors' assets. The ultimate proceeds available for distribution to holders of Impaired Claims and Interests would be decreased in a chapter 7 liquidation due to: (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee and professional advisors to the trustee; (ii) foreclosure by the DIP Lender on the DIP Loans provided under the DIP Order; (iii) the erosion in value of assets in a chapter 7 case in the context of the rapid liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, ultimately for Deerfield's benefit; (iii) the adverse and immediate effects on the Debtors' business as a result of the departure of key employees, doctors, and professional staff; (iv) the substantial increases in claims; (v) the reduction of value associated with a chapter 7 trustee's operation of the Debtors' businesses, if any operations even continue; (vi) the substantial delay in Distributions to the holders of Impaired Claims and Interests that would likely ensue in a chapter 7 liquidation; and (vii) and impairment to the value of the Debtors' Causes of Action due to increased difficulty in procuring funds to pursue such Claims.

69. Furthermore, the creditors would receive more under the Plan that they would in a chapter 7 liquidation because:

- Deerfield would be entitled to superpriority claims and liens pursuant to the terms of the DIP Order on account of the DIP Loan advances, including superpriority claims against the Debtors' Causes of Action. Therefore, to the extent that any assets are not encumbered under the Prepetition Creditor Agreement in liquidation, Deerfield would have priority to such assets on account of its superpriority claims and liens.

- Although the Litigation Trust Initial Funding under the Plan would enable the Litigation Trust Trustee to satisfy litigation expenses that will be incurred in prosecuting Causes of Action, such funding would not be readily available to a

chapter 7 trustee, which would therefore make it more difficult for a chapter 7 trustee to recover as much as would be recovered under the Plan.

- The amount of claims in a chapter 7 liquidation would be more than the amount of claims that are paid under the Plan, because the Deerfield Deficiency Claims and Rejection Claims would be higher in a chapter 7 liquidation. The greater amount of claims in a chapter 7 liquidation would therefore cause creditor recoveries to be increasingly diluted.

- Absent the Plan, the Deerfield Deficiency Claims would overwhelm the General Unsecured Creditor Claims (Class 5), likely in excess of eighty percent (80%) of Class 5 Claims. But, under the Litigation Trust Waterfall in section 4.5 of the Plan, Deerfield has agreed to deviate from a strict Pro Rata allocation and accelerate the full recovery of General Unsecured Creditors at a relatively low aggregate litigation recovery level.

70. Classes 3 (Deerfield Secured Claims), 4 (Medical Malpractice Claims), 5 (General Unsecured Claims), 6 (Convenience Class Claims), 7 (Subordinated Claims), 8 (Existing Preferred Equity Interests) and 9 (Existing Common Equity Interests) are Impaired under the Plan. Holders of Claims in Class 3 are receiving a 100% recovery under the Plan.[83] Because such holders could not receive more than a 100% recovery under a chapter 7 liquidation, the Plan satisfies § 1129(a)(7) with respect to Class 3.

71. The Plan provides for: (a) all holders of Allowed Administrative Expense Claims, Fee Claims, DIP Facility Claims, Priority Tax Claims, Priority Non-Tax Claims, Other Secured Claims, and Deerfield Secured Claims to be paid in full; (b) holders of Medical Malpractice Claims are provided leave to pursue claims against applicable insurance;[84] (c) holders of Convenience Claims to recover 20% of the value of their claims in cash; (d) holders of General Unsecured Claims to recover up to 100% of the value of their claims through Cumulative

---

[83] Plan § 4.3(a).

[84] Holders of Medical Malpractice Claims may seek to recover the amount of a liquidated Claim in excess of applicable insurance coverage as a General Unsecured Claim under Class 5. Plan § 4.4(a). As the liquidated value of Medical Malpractice Claims are difficult to forecast and will vary by the applicable insurance policies at issue, the Debtors do not provide a separate estimate for recoveries for Holders of Medical Malpractice Claims.

Litigation Trust Recoveries (net of litigation and trust administrative costs)[85] of approximately $70 to $90 million; (e) holders of Class 7(a) TRA Claims to recover distributions through the Fourth Level Distributions from the Litigation Trust Waterfall; and (f) holders of Existing Preferred Equity Interests and holders Existing Common Equity Interests to recover through the remaining Cumulative Litigation Trust Recoveries under the Litigation Trust Waterfall, with holders of Existing Preferred Equity Interests being paid in full ahead of holders of Existing Common Equity Interests.[86] Furthermore, Defined Unsecured Claims also have the potential benefit of the Contingent Value Right, which potentially provides another source of recovery to pay Defined Unsecured Claims in full outside the Litigation Trust Waterfall based on the Reorganized Debtor achieving certain financial thresholds upon the fifth anniversary of the Effective Date.[87]

72.       Accordingly, because the recoveries provided under the Plan are equal to or exceed the recoveries available in a chapter 7 liquidation, the Plan satisfies § 1129(a)(7).

### 8.       *The Plan Can Be Confirmed Notwithstanding § 1129(a)(8).*

73.       Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept the plan or be unimpaired under the plan.[88] As discussed above, impaired classes under the Plan have not voted to accept the plan, meaning § 1129(a)(8) is not satisfied.[89] Nonetheless, the Plan may still be confirmed because, as discussed below, the Debtors satisfy the requirements of § 1129(a)(10) and (b).

---

[85]   Plan §§ 4.5(a), 5.15. Although not a defined term, "Cumulative Litigation Trust Recoveries" is referenced in the discussion of the 9019 Settlement Consideration and the treatment of Class 5 Claims. *Id.*

[86]   *Id.* § 5.9.

[87]   *Id.* at 4.

[88]   11 U.S.C. § 1129(a)(8); *see also id.* § 1126(c), (f), (g).

[89]   *Supra* ¶¶ 14-16.

---

**9. The Plan Complies With Statutorily Mandated Treatment of Administrative and Priority Tax Claims Required under § 1129(a)(9).**

74. Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.[90] In particular, holders of claims of a kind specified in § 507(a)(2)—administrative expenses allowed under § 503(b)—must receive on the effective date cash equal to the allowed amount of such claims.

75. In accordance therewith, the Plan provides that each holder of an Allowed Administrative Expense Claim will be repaid in full in cash or receive other treatment rendering them unimpaired.[91] In addition, Allowed Priority Tax Claims will be repaid in full in cash or receive other treatment rendering them unimpaired and will be paid in accordance with the terms set forth in § 1129(a)(9)(C).[92] Therefore, the Debtors submit that the Plan complies with § 1129(a)(9).

**10. At Least One Impaired Class of Claims Has Accepted the Plan, Excluding the Acceptances of Insiders, Thereby Satisfying § 1129(a)(10).**

76. The Plan satisfies the voting requirements of § 1129(a)(10). Section 1129(a)(10) requires that, "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."[93] Courts have also observed that "section 1129(a)(10) is a technical requirement for confirmation rather than a substantive right of objecting creditors."[94]

---

[90]  11 U.S.C. § 1129(a)(9).

[91]  Plan § 2.1.

[92]  *Id.* § 2.4.

[93]  11 U.S.C. § 1129(a)(10).

[94]  *See JPMCC 2007-C1 Grasslawn Lodging, LLC v. Transwest Resort Props., Inc. (In re Transwest Resort Props., Inc.)*, 554 B.R. 894, 901 (D. Ariz. 2016); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009); *In re Rhead*, 179 B.R. 169, 177 (Bankr.

77.     Situations involving multiple debtors in joint plans or substantive consolidation vary the § 1129(a)(10) analysis.[95]   Courts that have addressed § 1129(a)(10) in the context of substantively consolidated debtors have ruled that § 1129(a)(10) contemplates a "per-plan" requirement.[96]   In contrast, a "per-debtor" requirement would require at least one impaired accepting class for each debtor involved.

78.     As substantive consolidation collapses the assets and claims for voting and plan purposes, the better-reasoned cases have held that the "per-plan" analysis applies and that § 1129(a)(10) is satisfied by the acceptance of one impaired class for each plan being submitted for confirmation.   The District Court in *Transwest Resort Properties* reached this conclusion after analyzing the plain language of § 1129(a)(10), stating:

> [U]nlike the *Tribune* court, this Court finds the plain language of the statute to be dispositive.   The statute states that "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired ***under the plan*** has accepted the plan" then the court shall confirm the plan if additional requirements are met.   11 U.S.C.   § 1129(a)(10) (emphasis added). Thus, once an impaired class has accepted the plan, § 1129(a)(10) ***is satisfied as to all debtors*** because all debtors are being reorganized under a joint plan of reorganization.[97]

Moreover, in cases where the debtors were not substantively consolidated, the majority of courts have held that an impaired class is required in only one of several jointly administered cases.[98]

79.     Here, the Plan has been accepted by numerous impaired classes, specifically, Classes 3, 5, and 6.[99]   Under these circumstances, and consistent with *Transwest Resort*

---

D. Ariz. 1995); *see generally In re SPGA, Inc.*, No. 1-01-02609, 2001 WL 34750646 (Bankr. M.D. Pa. Sept. 28, 2001).

[95]     *E.g.*, *In re Transwest Resort Props.*, 554 B.R. at 901; *In re Charter Commc'ns*, 419 B.R. at 266.

[96]     *See In re Transwest Resort Props.*, 554 B.R. at 901; *Charter Commc'ns*, 419 B.R. at 266; *In re Enron Corp.*, No. 01-16034, 2004 WL 6075307, at *2 (Bankr. S.D.N.Y. July 15, 2004); *In re SPGA*, 2001 WL 34750646 (finding, despite the debtors not being substantively consolidated, that "in a joint plan of reorganization it is not necessary to have an impaired class of creditors of each Debtor vote to accept the Plan").

[97]     *In re Transwest Resort Props.*, 554 B.R. at 901 (citing *In re Tribune Co.*, 464 B.R. 126, 182-83 (Bankr. D. Del. 2011) (emphasis added).

[98]     *See In re Transwest Resort Props.*, 554 B.R. at 901; *In re Charter Commc'ns*, 419 B.R. at 266.

*Properties* and *Charter Communications*, the Plan satisfies the requirements of § 1129(a)(10).

Accordingly, the Debtors request the Court overrule the PST's Objection as to § 1129(a)(10).[100]

### 11. The Plan Satisfies the Feasibility Requirements under § 1129(a)(11).

80.    A plan of reorganization may be confirmed only if it "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor."[101]    The feasibility inquiry is fact intensive and requires a case by case analysis, but has a relatively low threshold of proof necessary to satisfy the feasibility requirement.[102]    "Where the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible. . . . Debtors are not required to view business and economic prospects in the worst possible light."[103]

81.    In the Fifth Circuit, courts have required a determination that the plan "offer a reasonable probability of success" and "a reasonable assurance of commercial viability."[104]    To demonstrate that a plan is feasible, a plan proponent need only show that there exists a reasonable assurance of commercial viability.[105]    Accordingly, when evaluating feasibility, courts typically consider, among other things: (a) the adequacy of the debtor's capital structure; (b) the earning power of the debtor's business; (c) economic conditions; (d) the ability of the

---

[99]    *Supra* ¶¶ 14-16.

[100]    *See* Dkt. No. 756 ¶¶ 21-24.

[101]    11 U.S.C. § 1129(a)(11).

[102]    *See Mercury Capital Corp. v. Milford Conn. Assocs., L.P.*, 354 B.R. 1, 9 (D. Conn. 2006) ("A 'relatively low threshold of proof' will satisfy the feasibility requirement.") (quoting *Computer Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191-92 (B.A.P. 9th Cir. 2003)), *remanded to In re Milford Conn. Assocs., L.P.*, No. 04-30511, 2008 WL 687266 (Bankr. D. Conn. Mar. 10, 2008).

[103]    *In re T-H New Orleans*, 116 F.3d at 801 (citing *In re Lakeside Global II, Ltd.*, 116 B.R. 499, 508 n.20 (Bankr. S.D. Tex. 1989)).

[104]    *See Heartland Fed. Sav. & Loan Assoc. v. Briscoe Enters., Ltd., II (In re Briscoe Enters., Ltd., II)*, 994 F.2d 1160, 1165-66 (5th Cir. 1993) ("[T]he court need not require a guarantee of success, which of course would be difficult . . . [o]nly a reasonable assurance of commercial viability is required [to prove feasibility].") (internal quotations and citations omitted).

[105]    *In re T-H New Orleans*, 116 F.3d at 801 ("All the bankruptcy court must find is that the plan offer 'a reasonably probability of success'") (quoting *In re Landing Assocs.*, 157 B.R. at 820).

---

debtor's management; (e) the probability of the continuation of the same management; and (f) any other related matter which determines the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.[106] Because a plan need only have "a reasonable likelihood of success, not an absolute certainty," uncertain claims must not prevent confirmation so long as "reasonable" projections demonstrate an ability to satisfy such claims.[107]

82. An analysis of these factors demonstrates that the Plan is feasible. The Plan separates the Debtors' going concern enterprise from the Litigation Trust, from which General Unsecured Claims, Subordinated Claims, and Interests will be satisfied. As to the Reorganized Debtors, the Plan restructures over $300 million of the Debtors' funded debt obligations by equitizing the secured portion of the Debtors' funded debt. The restructuring significantly reduces the Debtors' interest expense and dramatically improves financial flexibility. Moreover, post-Effective Date, the Debtors will benefit through their partnership with Deerfield, providing a financial backstop that is committed to providing future working capital needs upon emergence, even taking into account current economic conditions in the healthcare industry and the catastrophic impact Hurricane Harvey has had on one of the Debtors' key markets. Deerfield is also backstopping the Litigation Trust Waterfall Guarantee and Subrogation, which is an obligation of the Reorganized Debtors under the Plan. This support bolsters the "credit risk" of

---

[106] See Save Our Springs (S.O.S.) Alliance, Inc. v. WSI (II)-COS, L.L.C. (In re Save Our Springs (S.O.S.) Alliance, Inc.), 632 F.3d 168, 173 & n.6 (5th Cir. 2011) (internal quotations and citations omitted) ("There is no requirement, however, that the court consider all six factors."); see also In re Giejsel, 480 B.R. 238, 257 (Bankr. N.D. Tex. 2012) (noting that "[t]his is a loose test").

[107] In re Couture Hotel, 536 B.R. at 739-40 (finding a plan feasible where the debtor had sufficient projected earnings and equity to satisfy a potential balloon payment); see also In re W.R. Grace & Co., 729 F.3d 311, 349-50 (3d Cir. 2013) (finding a plan feasible where the debtor proposed to reserve only $38 million to fund up to $1.6 billion in uncertain litigation claims); In re Coastal Broad. Sys., Inc., No. CIV. 12-5682 (RMB), 2013 WL 3285936, at *3 (D.N.J. June 28, 2013) (finding a plan feasible where the debtor "had access to an escrow account that would cover any shortfall"), aff'd, 570 F. App'x 188 (3d Cir. 2014); In re G-I Holdings Inc., 420 B.R. 216, 251-52 (D.N.J. 2009) (finding a plan feasible where debtor had access to undrawn credit revolver to pay potential $500 million tax liability).

---

the Reorganized Debtors to make this payment when and if it should become due.[108] As to the Creditors and Interest Holders that are beneficiaries of the Litigation Trust, the Plan creates the Litigation Trust for the benefit of Creditors and Interest Holders, including providing initial and subsequent funding, ensuring governance and oversight, transferring Causes of Action, and apportioning recoveries through the Litigation Trust Waterfall.[109]

83.     Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11).

**12.      *The Plan Ensures Payment of All Bankruptcy Fees Per § 1129(a)(12).***

84.     Section 1129(a)(12) of the Bankruptcy Code requires the payment of all fees payable under 28 U.S.C. § 1930.[110]  All fees under 28 U.S.C. § 1930 are classified as Administrative Expense Claims that must be paid pursuant to section 2.1 of the Plan, and sections 3.2 and 5.1 of the Plan expressly require payment of all fees under 28 U.S.C. § 1930. The Plan, therefore, complies with § 1129(a)(12).

**13.      *Sections 1129(a)(13)-(16) Do Not Apply Here.***

85.     Section 1129(a)(13) of the Bankruptcy Code requires that chapter 11 plans continue all retiree benefits (as defined in 11 U.S.C. § 1114(a)).  The Debtors do not have any obligations to pay retiree benefits and, therefore, § 1129(a)(13) is inapplicable. Sections 1129(a)(14) and (15) of the Bankruptcy Code apply only to debtors who are individuals and therefore do not apply here.  Section 1129(a)(16) is inapplicable because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

---

[108]   Plan at 16 (definition of "Litigation Trust Waterfall Guarantee and Subrogation").

[109]   *Id.* § 6.1.

[110]   11 U.S.C. § 1129(a)(12).

### 14. The Plan Complies with the Requirements in § 1129(c)-(e).

86.     The Plan satisfies subsections (c), (d), and (e) of § 1129.  Section 1129(c), which prohibits confirmation of multiple plans, is not implicated because there is only one proposed plan of reorganization before the Court for each Debtor.[111]

87.     Section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principle purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[112]  The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act.  Moreover, no governmental unit or other party has objected to Plan confirmation on these grounds.  Accordingly, the Plan satisfies the requirements of § 1129(d).

88.     Lastly, § 1129(e) is inapplicable because none of these Chapter 11 Cases is a "small business case."[113]  A "small business debtor" cannot be a member "of a group of affiliated debtors that has aggregate noncontingent liquidated secured and unsecured debts in an amount greater than $2,566,050 (excluding debt owed to one or more affiliates or insiders)."[114]  Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

**D.     The Plan Is Fair and Equitable and Does Not Unfairly Discriminate Against Non-Accepting Impaired Classes, Thereby Satisfying the Requirements of § 1129(b)(1).**

89.     Although not all Classes have accepted the Plan in accordance with § 1129(a)(8), § 1129(b)(1) allows for confirmation of a plan in cases where all requirements of § 1129(a) are met other than § 1129(a)(8).  Where such conditions are satisfied, a plan may "cram down" the plan on the rejecting classes as long as the plan is "fair and equitable" and does not "discriminate

---

[111]   *Id.* § 1129(c).

[112]   *See id.* § 1129(d).

[113]   *Id.* § 1129(e).

[114]   *Id.* § 101(51D)(B).

unfairly" with respect to such classes.[115] Accordingly, "a Plan may be confirmed so long as it does not discriminate unfairly and it is fair and equitable with respect to each class of claims and equity interests that is impaired and has not accepted the Plan."[116] Here, the Debtors may confirm the Plan notwithstanding the votes of the non-accepting impaired classes pursuant to § 1129(b)(1) as all applicable requirements are met.

90. Section 1129(b) of the Bankruptcy Code "prohibits only *unfair* discrimination, not *all* discrimination."[117] The Bankruptcy Code does not set forth a standard for determining "unfair discrimination," and courts typically examine the facts and circumstances of the particular case to determine whether "unfair discrimination" exists.[118] Generally, courts have found that a plan unfairly discriminates in violation of § 1129(b) only if similarly situated claims are treated differently ***without a reasonable basis for the disparate treatment***.[119] Conversely, no unfair discrimination exists if, taking into account the facts and circumstances of the case, a reasonable basis exists for the disparate treatment of similar claims.[120]

91. The treatment of the dissenting creditor classes—Classes 7, 8, and 9 under the Plan—is entirely reasonable and consistent with applicable law. Class 7(a) includes subordinated TRA Claims. The TRA Claims are contractually subordinated to the Deerfield Deficiency Claims in Class 5 and can only receive a distribution once those Deerfield Deficiency

---

[115] *See id.* § 1129(b)(1).

[116] *In re Idearc Inc.*, 423 B.R. 138, 169 (Bankr. N.D. Tex. 2009).

[117] *In re Cypresswood Land Partners*, 409 B.R. at 434 (citing 11 U.S.C. § 1129(b)(1)).

[118] *See In re Idearc*, 423 B.R. at 171; *In re Kolton*, No. 89-53425-C, 1990 WL 87007, at *5 (Bankr. W.D. Tex. Apr. 4, 1990) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis . . . .") (citations omitted).

[119] *See, e.g., In re Idearc*, 423 B.R. at 171 ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so").

[120] *See In re Sentry Operating*, 264 B.R. at 864 (noting that "discrimination is justified in [treating trade claims differently than the deficiency claim of a non-recourse creditor] because outside of bankruptcy the non-recourse creditor has no expectations of recovery on its deficiency claim.").

---

Claims are satisfied in full. The Litigation Trust Waterfall thus creates a separate level after the Deerfield Deficiency Claims are satisfied in full, at which point the Class 7(a) TRA Claims will participate in Litigation Trust Recoveries.

92. Claims in Class 7(b) include Claims "for damages arising from the purchase or sale of such a security" and relate to prepetition securities litigation filed against, *inter alia*, certain of the Debtors. Pursuant to 11 U.S.C. § 510(b), Class 7(b) Claims are subordinated to other Claims or Interests "that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock."[121] Class 7(b) is, therefore, afforded the priority of the Holders' underlying securities, receiving pro rata distributions with Class 9 (Existing Common Equity Interests). As between Classes 8 and 9, the Litigation Trust Waterfall ensures the higher priority Interests (Preferred versus Common Equity) are paid in full before junior Interests receive a distribution.[122] Thus, the Plan does not discriminate unfairly with respect to the Rejecting Classes and satisfies the requirements of § 1129(b).

93. Furthermore, the distributions under the Plan are "fair and equitable" with respect to all impaired classes of unsecured claims or interests that rejected the Plan (or were deemed to reject the plan), because they follow the "absolute priority" rule and satisfy the requirements of § 1129(b)(2).[123] Generally, the absolute priority rule requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired rejecting class not receive any distribution under a plan on account of its junior claim or interest.[124] The corollary

---

[121] 11 U.S.C. § 510(b).

[122] Plan at 10 (definition of "Litigation Trust Waterfall").

[123] 11 U.S.C. § 1129(b)(2)(B)(ii), (C)(ii); *see 203 N. LaSalle*, 526 U.S. at 441-42.

[124] 11 U.S.C. § 1129(b)(2)(C)(ii); *203 N. LaSalle*, 526 U.S. at 459.

of the absolute priority rule is that senior classes cannot receive more than a 100% recovery for their claims or interests.[125]

94.     The Plan is "fair and equitable" and satisfies § 1129(b) because all classes of impaired unsecured claims or interests receive distributions under the Litigation Trust Waterfall consistent with their respective priority.[126]  No junior interests will receive or retain any property under the Litigation Trust Waterfall on account of their junior interests.  And no senior interest will receive more than full value on account of their senior interests.  Therefore, the Plan satisfies the absolute priority rule and is fair and equitable.

95.     While questions have been raised regarding the separate settlement among the Deerfield Parties and the Eligible Holders pursuant to Fed. R. Bankr. P. 9019 (the "9019 Settlement")—which is memorialized in Section 5.15 of the Plan—consideration distributed pursuant to the 9019 Settlement is a reallocation of Deerfield's recoveries from the Third Level Distributions under the Litigation Trust Waterfall to resolve disputes with the Eligible Holders. These transfers are distinct and independent from the recoveries under the Plan, and as such, the 9019 Settlement does not impact the analysis under § 1129(b).

96.     First and foremost, the 9019 Settlement does not fall under the purview of the absolute priority rule.  The plain language of the absolute priority rule delimits its applicability to only those distributions of estate property to holders of junior claims and interests that are made "**on account of**" such claims or interests.[127]   Courts have consistently recognized that the

---

[125]   *See In re Idearc*, 423 B.R. at 171; *see also In re Granite Broad.*, 369 B.R. at 140 ("There is no dispute that a class of creditors cannot receive more than full consideration for its claims, and that excess value must be allocated to junior classes of debt or equity, as the case may be.").

[126]   *See* Plan § 4.5.

[127]   11 U.S.C. § 1129(b)(2)(B)(ii)  (emphasis added).

absolute priority rule does not apply to bar a junior creditor or equity holder from receiving property *for a reason other than* their junior interest.[128]

97. First, as to Class 7(b), the absolute priority rule is not implicated. The absolute priority rule is tested on a vertical basis—no distributions to junior claims or interests until senior claims or interests are satisfied in full. The absolute priority rule does not address claims or interests of equal priority, that is, unless unfair discrimination comes into play. Additionally, as to other classes of Claims or Interests senior to the Eligible Holders, Class 9—Existing Common Equity Interests—are not participating in, and do not receive anything under, the 9019 Settlement "on account of" their Existing Common Equity Interests, *i.e.*, ownership of common stock in PubCo.[129] Rather, the 9019 Settlement represents a separate, distinct, and heavily-negotiated agreement between the Deerfield Parties and the Equity Committee, on behalf of Eligible Holders, to compromise discreet disputes that have arisen between them. Specifically, the 9019 Settlement contemplates that those "Eligible Holders that agree to release the Released Parties" will receive pro rata distributions *of Deerfield's General Deficiency Claim* from the Deerfield Parties (or their successors or assigns) in exchange for such releases.[130] Therefore, the terms of the 9019 Settlement establish that any amounts received by the Eligible Holders as a result of the 9019 Settlement is (i) because of or in exchange for their agreement to release the Released Parties, not because of or in exchange for their equity interest arising from their stock ownership in any of the Debtors, and (ii) derive from the assets properly allocated to

---

[128] *See In re Armstrong World Indus., Inc.*, 432 F.3d 507, 515 (3d Cir. 2005) (recognizing that the "on account of" language "confirms that there are some cases in which property can transfer to junior interests not on account of those interests but for other reasons") (internal citation and quotation marks omitted).

[129] *See* Plan § 4.9.

[130] *See id.* § 5.15.

one of those Released Parties under the Litigation Trust Waterfall.[131] As a result, the absolute priority rule is inapplicable to the 9019 Settlement.

98. Furthermore, the 9019 Settlement allows Eligible Holders to share in the recoveries outlined in Section 5.15 not through Plan distributions but rather only after the Effective Date from the Litigation Trust and only to the extent certain steps are completed. Specifically, these funds are not distributions under the Plan but are merely a recovery contingent upon a number of factors including: (1) an agreement by the Deerfield Parties and the Eligible Holders to be bound by the terms of the 9019 Settlement; (2) the confirmation of the Plan; (3) the Litigation Trust successfully pursuing the Causes of Actions at some future date after the Effective Date; and (4) recoveries realized by the Deerfield Parties which can then be remitted as 9019 Settlement consideration based solely on the consent of the Deerfield Parties and the post-Effective Date agreement of the Eligible Holders to release the Deerfield Parties.[132] As such, the 9019 Settlement does not run afoul of absolute priority.

99. The Securities Plaintiffs' position that the 9019 Settlement violates the absolute priority rule is also misplaced because there is no requirement that the plan be fair and equitable between the Class 7(b) Securities Plaintiffs and the Class 9 Equity Holders. The Securities Plaintiffs have attempted to misconstrue the fair and equitable test, which prohibits distribution to *junior* creditors and interest holders unless senior claims are paid in full, as a test which prohibits discrimination between creditors and interest holders which are *pari passu*.[133] The

---

[131] *See 203 N. LaSalle*, 526 U.S. at 449-52 (explaining that the "on account of" qualifier may mean "in exchange for" or, more likely, "because of").

[132] *See In re SPM Mfg. Corp.*, 984 F.2d 1305, 1312 (1st Cir. 1993) (explaining that an agreement to transfer funding to a junior priority creditor "*after* distribution of the estate property" had "no effect" for purposes of class distributions within the bankruptcy); *see also In re Idearc*, 423 B.R. at 172 (finding no violation when the distributed funds were not from the bankruptcy estate); *In re World Health Alts., Inc.*, 344 B.R. 291, 297 (Bankr. D. Del. 2006) ("Although the general unsecured creditors will receive money before the priority creditors, that money does not belong to the estate—it belongs to [the secured creditor].").

[133] *See* 11 U.S.C. § 1129(b)(2)(C)(ii).

Securities Plaintiffs have offered no case law to support this interpretation of the fair and equitable test. Because the Class 7(b) Securities Plaintiffs' claims are *pari passu* with the Class 9 equity holders, the fair and equitable test does not apply, and the absolute priority rule is not violated.

100. Some of the objectors cursorily and improperly characterize the 9019 Settlement Consideration as a "gift" by the Deerfield parties to a junior priority class.[134] To evaluate the 9019 Settlement Consideration as a "gift," the Court must first determine that there is no valid settlement between Deerfield and Eligible Holders. The 9019 Settlement Consideration is not a gift. But even if the Court were to consider the 9019 Settlement distributions a "gift" from the Deerfield Parties to the Eligible Holders for purposes of the absolute priority rule, the rule is still not violated. The absolute priority rule—which, again, is only applicable to the TRA Claims and Preferred Equity, neither one of which objected to Plan confirmation—does not expressly bar gifting.[135] This conclusion is logical because the gifted property or interest belongs to a more senior creditor, who is and should be free to determine how best to utilize it.[136] Indeed, even the Second Circuit has recognized that gifting can function as a "powerful tool in accelerating an efficient and non-adversarial . . . chapter 11 proceeding,"[137] while strict enforcement of the

---

[134] *See* Dkt. Nos. 750 ¶ 45 (U.S. Trustee); 763 ¶ 79 (Securities Plaintiffs).

[135] *See* 11 U.S.C. § 1129(b)(2)(B); *see also In re MCorp Fin., Inc.*, 160 B.R. 941, 960 (S.D. Tex. 1993) (stating that any creditor's status as senior to another creditor or equity class allowed that creditor "to share [its] proceeds with creditors junior to the juniors"); *In re Nuverra Envtl. Sols., Inc.*, No. 17-10949-KJC, 2017 WL 3326453, at *4 (D. Del. Aug. 3, 2017) (holding that the Bankruptcy Court did not err by confirming a plan under which secured creditors gifted a portion of their recovery to junior interests as consistent with existing precedent).

[136] *See In re SPM Mfg.*, 984 F.2d at 1313 (stating that "creditors are generally free to do whatever they wish with the bankruptcy dividends they receive, including to share them with other creditors").

[137] *DISH Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am., Inc.)*, 634 F.3d 79, 100 (2d Cir. 2010) (quoting Leah M. Eisenberg, *Gifting and Asset Reallocation in Chapter 11 Proceedings: A Synthesized Approach*, 29 Am. Bankr. Inst. J. 50, 50 (2010)).

absolute priority rule "may encourage hold-out behavior by objecting creditors . . . even though the transfer has no direct effect on the value to be received by the objecting creditors."[138]

101.    The Fifth Circuit has not yet weighed in on this issue, but courts in the Fifth Circuit, including this District, have confirmed plans with similar sharing mechanisms between senior creditors and junior interests.[139]    However, although only in dicta in a decision regarding structured dismissals, the U.S. Supreme Court in *Czyzewski v. Jevic Holding Corp.*,[140] also recognized the benefits of payments to junior creditors prior to senior creditors in order to, among other things, "preserve the debtor as a going concern; . . . make the disfavored creditors better off; . . . promote the possibility of a confirmable plan . . . ."[141]   Nevertheless, the Supreme Court's decision in *Jevic*, as with the Second Circuit's decision in *DBSD North America*, is distinguishable on the grounds that the payments at issue here derive from recoveries which would otherwise be allocated to the Deerfield Parties and are directed by Deerfield to the Eligible Holders on the basis of, and as consideration for, the 9019 Settlement.

102.    Contrary to objections raised by the U.S. Trustee and the Securities Plaintiffs, the 9019 Settlement is properly included as part of the Plan.[142]   The Debtors are receiving substantial benefits under the 9019 Settlement because the Equity Funders are irrevocably committing to provide supplemental funding to the Litigation Trust in addition to the Litigation Trust Initial Funding.[143]   Likewise, after intense negotiations with all parties, the Equity Committee chose to

---

[138]   *Id.* (quoting Harvey R. Miller & Ronit J. Berkovich, *The Implications of the Third Circuit's* Armstrong *Decision on Creative Corporate Restructuring: Will Strict Construction of the Absolute Priority Rule Make Chapter 11 Consensus Less Likely?*, 55 Am. U. L. Rev. 1345, 1349 (2006)).

[139]   *See, e.g.*, *In re Idearc*, 423 B.R. at 172 (confirming a plan that included a distribution from a senior creditor to junior interests); *In re MCorp Fin.*, 160 B.R. at 960 (confirming a plan where secured creditor allocated a portion of its recovery to junior creditor in connection with settlement agreement).

[140]   580 U.S. __, 137 S. Ct. 973 (2017).

[141]   *Id.* at 986.

[142]   *See* Dkt. Nos. 750 ¶¶ 46-48 (U.S. Trustee); 763 ¶ 52 (Securities Plaintiffs).

[143]   Plan at 7 (definition of "Equity Funders"), 9 (definition of "Litigation Trust Initial Funding").

cooperate with the parties after reaching the 9019 Settlement. Therefore, the Equity Committee did not object to confirmation, withdrew any objection to the Valuation Motion, and abated the Trustee Motion, which will be withdrawn or mooted upon confirmation of the Plan. Removing the Equity Committee's opposition saves the Estates substantial administrative expense and provides more certainty regarding the Plan—two outcomes inuring directly to the benefit of Claims and Interest holders. Those outcomes are also the exact premise for which the U.S. Trustee cites *World Health* as a reason for ***supporting*** priority scheme deviations.[144]

103.   Because of the consideration provided by the Estates, the substantial benefits conferred, and the merits of the 9019 Settlement discussed in this section, the 9019 Settlement is not inconsistent with other applicable provisions of the Code and is sufficiently connected to the Plan so as to be another "appropriate provision" that may be included under the Plan pursuant to § 1123(b)(6). Therefore, the Plan does not violate the absolute priority rule and is "fair and equitable" with respect to all Impaired Classes of Claims and Interests and satisfies § 1129(b)(1).

104.   Even if the Court finds that the 9019 Settlement constitutes a "gift" from the Deerfield Parties, that "gift" does not violate § 1129(b)(1). Courts are clear that unfair discrimination does not exist if there is a reasonable basis for disparate treatment.[145] As the Securities Plaintiffs correctly note, a plan proponent may overcome the presumption of unfair discrimination by establishing that there is a sufficient factual or legal distinction between the

---

[144]   *See* Dkt. No. 750 ¶ 41 ("Courts approving gifting compromises justify the deviation from the priority scheme for a variety of reasons. Some courts find that the gifting compromise will halt expensive litigation, thus benefitting the entire estate.") (citing *In re World Health Alts.*, 344 B.R. at 298; *see also In re MCorp Fin.*, 160 B.R. at 944 (citing prolonged litigation as justification for permitting settlement agreement).

[145]   *See In re Sentry Operating*, 264 B.R. at 860.

claims of the dissenting class and any other similar class of claims to justify disparate treatment, such that discrimination is not unfair.[146]

105.    Such distinction is clearly present here.    Common equity holders have direct claims against Deerfield, as described in greater detail above.    These claims relate to Deerfield's conduct before and during these Chapter 11 Cases and are direct claims that can be brought by shareholders.    Such conduct is wholly unrelated to the Securities Plaintiffs and their litigation. The Securities Plaintiffs have brought actions for unrelated conduct by the defendants to those actions.    Those claims are unrelated to the actions released in the 9019 Settlement and are preserved under the Plan.    Therefore, there is a notable distinction between the claims of the common equity holders and the Securities Plaintiffs, and unfair discrimination is not present. The Equity Committee also made significant concessions to reach the Settlement, and, therefore, disparate treatment is valid.

**E.    The Other Discretionary Contents of the Plan Are Appropriate.**

106.    As set forth below, the Article XI of the Plan includes certain of these discretionary provisions, including releases by the Debtors and third parties of Claims and Causes of Action and exculpation and injunction provisions.[147]    The Debtors have determined, in the exercise of their reasonable business judgment as Estate fiduciaries, that the discretionary provisions of the Plan are appropriate given the circumstances of these Chapter 11 Cases.

*1.    The Debtor Releases in the Plan Are Appropriate.*

107.    The Plan includes global releases of various Causes of Action.    In particular, the Plan provides for releases by the Debtors and related parties of any and all Causes of Action, including any derivative claims, that the Debtors could assert against (a) the Debtors; (b) the

---

[146]    Dkt. No. 763 ¶ 44 (citing *In re Mangia Pizza*, 480 B.R. at 701; *In re Mortg. Inv. Co. of El Paso, Tex.*, 111 B.R. 604, 614 (Bankr. W.D. Tex. 1990)).

[147]    *See* Dkt. No. 750 ¶¶ 57-61 (U.S. Trustee Objection).

---

Deerfield Parties; (c) the DIP Facility Agent; (d) the DIP Facility Lenders, and (e) related parties (the "Debtor Releases"). A plan that proposes to release a debtor's claim is considered a "settlement" for purposes of satisfying § 1123(b)(3)(A), which provides that a plan of reorganization may provide for the "adjustment of an claim or interest belonging to the debtor or to the estate."[148] In reviewing a debtor's contemplated release of claims pursuant to § 1123, the Court should be guided by the standard governing Bankruptcy Rule 9019, which requires that such settlement be fair and equitable and in the best interests of the debtor's estate.[149]

108. The Debtor Releases are "fair and equitable"—that is, they comply with the absolute priority rule—and are "in the best interests of the estate"—that is, they are merited in light of the probability of success in litigation of the released claims given uncertainty in fact and law with respect to the claims and the complexity and likely duration and expense of litigation the released claims.[150]

109. The Plan, including the Debtor Releases, complies with the Bankruptcy Code's absolute priority rule.[151] With respect to those Classes that have rejected the Plan, no Class of creditors is receiving more than 100% of the value of their claim as a result of the Debtor Releases. Nor will the benefit of the Debtor Releases increase recoveries for any class junior to the Rejecting Classes as a result of the Debtor Releases. Because the Debtor Releases will not benefit any junior Class of creditors at the expense of more senior Rejecting Classes, the Debtor Releases satisfy absolutely priority,[152] thus the "fair and equitable" prong is also satisfied.[153]

---

[148] *See* 11 U.S.C. § 1123(b)(3)(A); *see also In re WCI Cable, Inc.*, 282 B.R. 457, 469 (Bankr. D. Ore. 2002) ("I find that the release and injunction provisions of . . . the WCI plan are submitted for approval by the court pursuant to § 1123(b)(3)(A) and [Bankruptcy Rule 9019(a)].").

[149] *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 758 (Bankr. S.D.N.Y. 1992).

[150] *See In re Cajun Elec. Power*, 119 F.3d at 355-56 (citing *Am. Can Co. v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980)).

[151] *See* 11 U.S.C. § 1129(b)(2)(B).

[152] *See 203 N. LaSalle*, 526 U.S. at 441.

110.    In addition to being fair and equitable, the Debtor Releases are in the best interests of the estates.  The Debtor Releases are necessary in order to maximize the probability of success in these Chapter 11 Cases and to allow professionals to perform their duties and tasks without the fear of being sued for acts of omissions in connection with these Chapter 11 Cases, thereby avoiding irreparable harm to the Estates.  Indeed, the parties being released in the Plan each have provided or have agreed to provide valuable services and/or financing to the Debtors during these Chapter 11 Cases, which benefit both the Debtors and their creditors.  Further, the Debtors believe they hold no meritorious Claims against any of the non-Debtor Released Parties—much less any Claims for which recovery is likely.  The Debtors have also already provided certain releases for the Deerfield Parties through the Final DIP Order, and therefore the Debtor Releases as to such parties only covers post-petition conduct while the Debtors were under Bankruptcy Court supervision.[154]  Moreover, the releases provided under section 11.7(a) of the Plan exclude releases "for any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, gross negligence, willful misconduct, or, in the case of Professional Persons, ethical violations."[155]

111.    As will be more fully developed through testimony at the Confirmation Hearing, the existence of any potential Causes of Actions held by the Debtors was thoroughly examined and found lacking by the Debtors and by the various creditor constituencies that have participated in these Chapter 11 Cases.  Ultimately, the Debtors are giving up very little through the Debtor Releases.  In return, the Debtors receive global closure and the ability to complete the Restructuring Transactions.  Accordingly, the Debtor Releases are fair, equitable, and in the best

---

[153]   *See In re Cajun Elec. Power*, 119 F.3d at 355-56.

[154]   *See* Dkt. No. 623 ¶ 21(a).

[155]   Plan § 11.7(a).

interest of the Debtors' estates, are justified under the controlling Fifth Circuit standard, and should be approved.

### 2. The Third-Party Releases in the Plan Are Appropriate.

112.     The Third-Party Releases included in the Plan comply with Fifth Circuit law.[156] While the non-consensual release of claims held by third parties pursuant to a plan of reorganization has been foreclosed by the Fifth Circuit's holding in *Pacific Lumber*,[157] subsequent courts have clarified that *Pacific Lumber*'s limited prohibition against third-party releases applies only to non-consensual third-party releases—that is, when a release purports to bind a party in interest who specifically objects to such release.[158]

113.     "Consensual nondebtor releases that are specific in language, integral to the plan, a condition of the settlement, and given for consideration do not violate" the Bankruptcy Code.[159]     Under the standard set forth in *Wool Growers*, the critical factor in determining whether a release is consensual is whether, after the Debtors' due process obligations have been satisfied, including the provision of appropriate notice, "the affected creditor timely objects to

---

[156]     The Plan releases certain claims held by "the (i) holders of all Claims and Interests who vote to accept this Plan, (ii) holders of Claims or Interests that are Unimpaired under this Plan, where the applicable Claims or Interests have been fully paid or otherwise satisfied in accordance with this Plan, (iii) holders of Claims or Interests whose vote to accept or reject this Plan was solicited but who did not vote either to accept or to reject this Plan, and (iv) holders of Claims or Interests who cast a ballot to reject this Plan but did not opt out of granting the releases set forth herein." Plan § 11.7(b).

[157]     *Bank of N.Y. Tr. Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

[158]     *See, e.g.*, *In re Pilgrim's Pride Corp.*, No. 08-45664, 2010 WL 200000, at *5 (Bankr. N.D. Tex. Jan 14, 2010) (stating that, under *Pacific Lumber*, "the court may not, ***over objection***, approve through confirmation of the Plan third-party protections") (emphasis added); *In re Bigler*, 442 B.R. 537, 546 (Bankr. S.D. Tex. 2010); *see also In re Camp Arrowhead, Ltd.*, 451 B.R. 678, 701-02 (Bankr. W.D. Tex. 2011) ("[T]he Fifth Circuit does allow permanent injunctions so long as there is consent . . . .").

[159]     *In re Wool Growers Cent. Storage, Co.*, 371 B.R. 768, 776 (Bankr. N.D. Tex. 2007) (citing *FOM Puerto Rico S.E. v. Dr. Barnes Eyecenter Inc.*, 255 F. App'x 909, 911-12 (5th Cir. 2007)); *see Rep. Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir. 1987) (holding that a third-party provision is not precluded by the Bankruptcy Code where "it has been accepted and confirmed as an integral part of a plan of reorganization" and the releasing party did not object).

---

the provision."[160]  Courts in this district and other districts within the Fifth Circuit have concurred with the approach articulated in *Wool Growers*.[161]

114.  The Plan provides for consensual Third-Party Releases that clearly meet the controlling standard.[162]  First, the Third Party Releases are fully consensual.  Each Holder of a Claim or Interest entitled to vote consented, by voting to accept the Plan, with full notice that by voting to accept the Plan they were providing a release under the Third Party Releases.  The consensual aspect of the Third Party Releases was conspicuously highlighted in the Plan, the Disclosure Statement, the *Notice of Confirmation Hearing and Deadline for Objecting to Confirmation*, and in each of the Ballots sent to voting creditors.[163]  The Disclosure Statement in particular informed voting creditors in bold typeface that they would be deemed to provide a release unless they took affirmative steps to opt out.[164]  Additionally, each Ballot contained a notice indicated by a separate item number bearing the heading "**Optional Release Election**" in which voters were informed that they must complete Item 3 if they "voted to reject the Plan and

---

[160]  *In re Wool Growers*, 371 B.R. at 776 (citing *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995)).

[161]  *See In re Hingham Campus, LLC*, No. 11-33912, 2011 WL 3679057, at *9 (Bankr. N.D. Tex. Aug. 23, 2011); *In re Lincolnshire Campus, LLC*, 441 B.R. 524, 533 (Bankr. N.D. Tex. 2010); *see also* Confirmation Hr'g Tr. at 47:7-15, *In re Energy & Expl. Partners, Inc.*, No. 15-44931 (RFN) (Bankr. N.D. Tex. Apr. 21, 2016), ECF No. 730 ("[I]f . . . notice has gone out, parties have actually gotten it, they've had the opportunity to look over it, the disclosure is adequate so that they can actually understand what they're being asked to do and the options that they're being given."); Confirmation Hr'g T. at 61:8-12, *In re RAAM Global Energy Co.*, No. 15-35615 (MI) (Bankr. S.D. Tex. Jan. 28, 2016), ECF No. 399 ("[A]s to the holders of claims, it's limited to parties that have accepted and not opted out, and having reviewed it and in the absence of objections I think it is within the range of authority I have under existing Fifth Circuit law . . . .").

[162]  Third Party Releases as to the Common Equity Interest holders are covered by the 9019 Settlement, not the initial balloting process.  All opt-outs of releases from ballots received from Common Equity Interest Holders are disregarded.

[163]  *See, e.g.*, Plan § 11.7(b); Disclosure Statement, Dkt. No. 514, Art. XIII.E; *Notice of Confirmation Hearing and Deadline for Objecting to Confirmation*, Dkt. No. 542, at 13; *Ballot for Voting to Accept or Reject Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, Dkt. No. 542, at 43-122 (Form Ballots for all Classes).

[164]  Disclosure Statement, Dkt. No. 514, at 77-79.

---

wish to opt out of granting the releases."[165]  Critically, this notice was provided in the same section in which each creditor would cast their vote—in fact, the notice immediately followed the item for a creditor's vote.  Claims held directly against the Released Parties by voters which elected to "opt out" of the Third Party Releases are unaffected by the Third Party Releases.

115.    Second, the Third Party Releases are sufficiently specific as to put the Releasing Parties on notice of the nature of the released Claims.  The Plan's description of the Third Party Releases sets forth the nature and type of claims released and effectively limits the Third Party Releases to those claims arising out of or necessary to commence, effect, and conclude the Debtors' Chapter 11 Cases and certain other specified causes of action.[166]  In particular, in addition to describing in detail the nature and type of claims released, the Plan incorporates by reference the specific Causes of Action against the Debtors set forth in the Debtors' Plan Supplement, Schedules, and Statements of Financial Affairs.[167]

116.    Third, the Third Party Releases are integral to the Plan.  As described above, the provisions of the Plan were vigorously negotiated prepetition and the Third Party Releases were a core negotiation point.  Put simply, the Debtors' key stakeholders are unwilling to support the Plan without the Third Party Releases.    Fourth, the Third Party Releases were given for substantial consideration.    All of the Released Parties provided substantial benefits to these Chapter 11 Cases by providing, or agreeing to provide, valuable services or financing to the Debtors during these Chapter 11 Cases and upon emergence.

---

[165]    *See Ballot for Voting to Accept or Reject Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, Dkt. No. 542, at 44.

[166]    *See Dr. Barnes Eyecenter*, 255 F. App'x at 912 (holding as sufficiently specific a release of any claims "based in whole or in part on any action or omission, transaction, or occurrence from the beginning of time through the Effective Date in any way relating to [the debtor], its Bankruptcy Case, or the Plan").

[167]    Plan §§ 6.4 (Litigation Trust Causes of Action), 11.12 (Retention of Causes of Action); *id.* at 9 (definition of "Litigation Trust Causes of Action"); Plan Supplement, Dkt. No. 589, at 4-6.

117. Finally, for the avoidance of doubt, ***certain parties are not being released***. As set forth in the definition of "Released Parties" in the Plan, "none of the Debtors' past or current officers, directors nor any of the Sterling Parties shall constitute Released Parties or shall deemed to be released . . . ."[168] Likewise, the Plan Supplement makes clear that the following Causes of Action are being retained for the benefit of the Litigation Trust and not being released:

> All Causes of Action which may be asserted by the Estates against the Sterling Parties, including, but not limited to, the D&O Claims; all avoidance actions which may be asserted under sections 544, 547, 548, or 550 of the Bankruptcy Code; and all other claims which may be asserted with respect to the IPO, the Secondary Offerings, the TRA and any other tax agreements, or relating to the Sterling Parties' influence or control over Debtors, including, but not limited to, all claims based on breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, negligent misrepresentation, unjust enrichment, breach of contract, tortious interference, and fraud.[169]

None of the parties listed in this provision of the Plan Supplement are receiving exculpations, with the exception of Norton Rose Fulbright US LLP; FTI Consulting, Inc.; and Houlihan Lokey Capital, Inc.[170] The Plan also ensures that any governmental regulatory agency preserves its police or regulatory powers to pursue causes of action, proceedings, or investigations against any non-debtor person or entity.[171] Finally, holders of Claims or Interests who are not entitled to vote on the Plan, including, without limitation, holders of Administrative Expense Claims, Fee Claims, DIP Facility Claims, Priority Tax Claims, Priority Non-Tax Claims, and Other Secured Claims, are not providing Third Party Releases. Accordingly, the Debtors submit that the Third-Party Releases included in the Plan are consensual releases in accord with Fifth Circuit law and should be approved as part of Plan confirmation.

---

[168] Plan at 13 (definition of "Released Parties").

[169] Plan Supplement, Dkt. No. 589, ¶ 3(d).

[170] Plan at 7 (definition of "Exculpated Parties"). The Debtors note that the inclusion of Norton Rose Fulbright US LLP; FTI Consulting, Inc.; and Houlihan Lokey Capital, Inc. as Exculpated Parties was at the insistence of the Creditors' Committee and the Equity Committee.

[171] Plan at 13 (definition of "Released Parties").

### *3.*    **The Plan's Exculpation Provisions Are Appropriate.**

118.    The exculpations of the Exculpated Parties (the "<u>Exculpations</u>") are appropriate in these circumstances and are also in accord with Fifth Circuit law.  The Exculpations provide that the Debtors, the Creditors' Committee, the Equity Committee, the Patient Care Ombudsman, and various related parties are exculpated from any claims and causes of action arising out of the administration of these Chapter 11 Cases and certain related transactions, except for actions resulting from intentional fraud, gross negligence or willful misconduct.[172]

119.    The Exculpations also provide that the Patient Care Ombudsman and any Professional Person retained by the Patient Care Ombudsman shall not have any liability with respect to any act, omission, statement, or representative arising out of, relating to, or involving, in any way, the Patient Care Ombudsman's evaluations, reports, pleadings, or other writings in or in connection with the Chapter 11 Cases, except for acts or omissions that are found to have been the product of gross negligence, willful misconduct, attorney malpractice, or a violation of applicable disciplinary or ethical rules.[173]

120.    It is important to underscore the difference between the consensual Third Party Releases provided for in section 11.7 and the Plan's Exculpations in section 11.9.  Unlike the Third Party Releases, the Exculpations do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or actual fraud in hypothetical future litigation against an exculpated party for acts arising out of the Debtors' restructuring.[174]  A bankruptcy court has

---

[172]   *Id.* § 11.9(a).

[173]   *Id.* § 11.9(b).

[174]   *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

the power to approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[175]

121. As such, an exculpation provision represents a legal conclusion that flows inevitably from several different findings a bankruptcy court must reach in confirming a plan—undeniably core matters—as well as the statutory exculpation in § 1125(e) of the Bankruptcy Code.[176] Once the court makes its good faith finding, it is appropriate to set the standard of care of the fiduciaries involved in the formulation of that chapter 11 plan.[177] Here, the Exculpations are appropriate and vital because they provide protection to those parties who served as fiduciaries during the restructuring process or made substantial and critical contributions to the negotiation of the Plan. The Exculpations, therefore, appropriately prevent future collateral attacks against those who have worked to maximize the Debtors' estates.

122. There can be no doubt that the Debtors themselves are entitled to the relief embodied in the Exculpations. Having acted in "good faith" within the meaning of § 1125(e), the Debtors are entitled to the protections afforded by § 1125(e) and the Exculpations.[178] Courts in the Fifth Circuit that have approached plan exculpation provisions with skepticism have done so *only* where the provision at issue exculpates *non-debtor-affiliated* parties.[179] In *Pacific Lumber*, the Fifth Circuit also carved out an exception in favor of exculpatory relief for non-debtor parties where such parties owe duties in favor of the debtors or their estates and act within the scope of those duties (*i.e.*, excluding acts of fraud or gross negligence).[180]

---

[175] *See* 11 U.S.C. § 1129(a)(3).

[176] 28 U.S.C. § 157(b)(2)(L); *see* 11 U.S.C. § 1125(e).

[177] *See In re PWS Holding*, 228 F.3d at 246 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

[178] *See In re Sears Methodist Ret. Sys., Inc.*, No. 14-32821-11, 2015 WL 1066882, at *9 (Bankr. N.D. Tex. Mar. 6, 2015).

[179] *See, e.g., In re Pac. Lumber*, 584 F.3d at 251-52.

[180] *Id.* at 253.

123.     Here, in addition to the Debtors, the Exculpated Parties owe duties in favor of the Debtors' estates.  The Committees owe fiduciary duties to the Debtors, as well as to their respective constituents, who are part of the Debtors' estates, and fit squarely within the exception carved out in *Pacific Lumber*.  The directors, officers, and advisors that have acted on the Debtors' behalf in these Chapter 11 Cases owe similar duties.  Accordingly, the Exculpations comply with the Bankruptcy Code and fall within the spirit of *Pacific Lumber* and its progeny.

### 4.     The Plan Injunction Sought Is Necessary to Enforce the Releases and Exculpations Contained in the Plan.

124.     The Plan includes an injunction that merely implements the Plan's discharge, release, and exculpation provisions, in part, by permanently enjoining all entities from commencing or maintaining any action against the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties on account of or in connection with or with respect to any such Claims or Interests that are being discharged, released, exculpated, or settled under the Plan (the "Plan Injunction").[181]  The Plan Injunction is narrowly tailored to achieve this purpose. Moreover, the Plan Injunction is a key provision of the Plan because it enforces the discharge, release, and exculpation provisions that are centrally important to the Plan.[182]  As such, to the extent the Court finds that the Plan's exculpation and release provisions are appropriate, the Court should approve the Plan Injunction.[183]

---

[181]  Plan § 11.6.

[182]  *See Sec. & Exchange Comm'n v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) (court may approve injunction provision in plan which such provision "plays an important part in the Debtors' reorganization plan.").

[183]  *See, e.g., In re Camp Arrowhead*, 451 B.R. at 701-02 ("[T]he Fifth Circuit does allow permanent injunctions so long as there is consent … [w]ithout an objection, this court was entitled to rely on … silence to infer consent at the confirmation hearing") (*citing In re Pac. Lumber*, 584 F.3d at 253; *In re Pilgrim's Pride Corp.*, 2010 WL 200000, at *5).

## IV. OMNIBUS RESPONSE

125. The three remaining Plan Objections are asserted by the U.S. Trustee, the Securities Plaintiffs, and PST Services, Inc. The Debtors have addressed the Plan Objections with regard to the 9019 Settlement and the proposed Releases and Exculpations provided in the Plan.[184] Accordingly, the Debtors will address three remaining Objections asserted by PST: (1) determining an impaired accepting class on a "per-plan" versus "per-debtor" basis; (2) the substantive consolidation of the Estates for Plan voting and distributions; and (3) the blatantly incorrect assertions about voting manipulation.

### A. Section 1129(a)(10) Should Be Determined by Plan, not by Debtor.

126. PST asserts that the Plan is "fundamentally flawed" and cannot be confirmed because there are some sixty (60) cases in which the relevant Debtor allegedly does not have an impaired accepting class. PST's assertions are unavailing as the Debtors' seek approval of the Plan's provision for the substantive consolidation of the Debtors' Estates, and the Debtors easily meet the requirements for substantive consolidation.

127. In cases with substantively consolidated Debtors, courts have held that § 1129(a) is satisfied by the acceptance of one impaired class for any debtor involved in the proceedings.[185] Even in the leading "per-debtor" case, cited by PST, the court stated that the "per-debtor" rule applies "[i]n the absence of substantive consolidation" and was not faced with substantively consolidated debtors.[186] Thus, here, the Debtors need not have an impaired accepting class in each of the Debtors' 140 cases if the Court approves substantively consolidated cases; rather, the Debtors need only one impaired class in any one of these Chapter 11 Cases. Moreover, in cases

---

[184] *See supra* ¶¶ 94-103 (9019 Settlement), 106-124 (Releases and Exculpations).

[185] *See, e.g., In re Enron Corp.*, 2004 WL 6075307, at *2.

[186] *See In re Tribune*, 464 B.R. at 182-83.

where the debtors were not substantively consolidated, the majority of courts have held that an impaired class is required in only one of several jointly administered cases.[187]

128. PST's objection wholly ignores these cases and instead focuses on the absence of a separate motion filed by the Debtors seeking to substantively consolidate the cases. Yet, PST offers no authority for its assertion that such a motion is required.[188] To the contrary, the Fifth Circuit and other courts have recognized that discretionary plan provisions included pursuant to § 1123(b) are procedurally proper if included only in the plan, rather than by separate motion, so long as the sufficient notice is provided.[189]

129. Next, PST misinterprets the Fifth Circuit's holding in *Pacific Lumber* to argue the Fifth Circuit has adopted the "per-plan" approach to § 1129(a)(10). In PST's view, the plan in *Pacific Lumber* "effectuated substantive consolidation[.]"[190] In reality, the Fifth Circuit *rejected this argument* and held that "[t]he Indenture Trustee's argument fails, however, *to prove that substantive consolidation occurred here*."[191] Accordingly, PST's assertions about the Fifth Circuit's adoption of the "per-debtor" rule fall flat and, instead, align the decision in *Pacific Lumber* as to § 1129(a) with the decision in *Tribune*—requiring a per-debtor impaired accepting class in cases not involving substantive consolidation.[192]

---

[187] *See In re Transwest Resort Props.*, 554 B.R. at 901; *In re Charter Commc'ns*, 419 B.R. at 266; *In re SPGA*, 2001 WL 34750646.

[188] *See* Dkt. No. 756 ¶ 25.

[189] *E.g.*, *Cent. Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 511-15 (5th Cir. 2000) (addressing assumption and rejection of contracts pursuant to § 1123(b)(2); "In sum, the phrase 'other than as part of a plan' was intended only to obviate the need to file a separate motion expressing the intent to assume or reject."); *In re Best Prods. Co., Inc.*, 168 B.R. 38, 50 (Bankr. S.D.N.Y. 1994) (addressing settlement or compromise pursuant to § 1123(b)(3)(A); "[W]hether the claim is compromised as part of the plan or pursuant to a separate motion, the standards for approval of the compromise are the same.").

[190] Dkt. No. 756 ¶ 23.

[191] *In re Pac. Lumber*, 584 F.3d at 250-51 (emphasis added).

[192] Indeed, PST's own section header in its brief hints at its reluctant agreement with the majority rule. Dkt. No. 756 at 19 ("Absent Substantive Consolidation, Each Debtor Must Independently Satisfy All Confirmation Requirements.").

---

130. Accordingly, the Debtors request that the Court apply the "per-plan" rule, requiring in only one case an accepting impaired class of creditors, and overrule PST's objection.

## B. PST's Has Admitted Substantive Consolidation Is Appropriate.

131. Unable to overcome this developing majority rule, PST takes aim at the proposed substantive consolidation of the Debtors' Estates based on the factor of "creditor expectations" and argues that the Debtors cannot put forth sufficient evidence to satisfy the relevant tests for substantive consolidation.[193] *But PST's own corporate representatives have admitted the key proposed findings of fact for substantive consolidation of the Debtors' estates.* The chart below compares, side by side, the Debtors' proposed findings of fact involving substantive consolidation with PST corporate representatives' testimony:

| Proposed Findings of Fact | PST Corporate Representatives' Testimony |
|---|---|
| "Substantive consolidation under the Plan is appropriate because – . . . | |
| (d) Segregating and ascertaining assets and liabilities of the individual Debtors would be difficult. . . . | Q. Ms. Roberts, do you agree with – with Mr. Garfinkle that, given that this was done on an aggregate billing number, and that PST only received patient encounters on an aggregate basis, given that fact, under the contract, as Mr. Garfinkle said, that it would be very difficult to separate out the liabilities owed by each individual debtor? Do you agree with that? A. Yes.[194] |
| (h) All salaries and expenses of all of the Debtors were paid from a consolidated cash management system. | Q. [Y]ou performed services which would result in the calculation of a fee, right? A. Correct. Q. And then that would result in an invoice that was sent to Adeptus, right? A. Correct. Q. A single invoice. And then you were paid out of a single account, right? A. Correct. Q. So as far as those interactions as to performing services, billing and collecting, PST did not rely on the separate identity of all these debtors? A. I'm not entirely sure how to answer the question. I -- we -- we sent out a single invoice and expected a single payment.[195] |
| (i) Creditors did not rely on the Debtors' separate identities but | [Witness: Roberts] Q. When you signed this proof of claim, June 27, did you have a basis for claiming that Adeptus Health LLC owed PST approximately $340,000 at that time? |

---

[193] *See id.* ¶¶ 26-42.
[194] Debtors Ex. 79B at 84:12-20 (Roberts).
[195] Debtors Ex. 79C at 27:5-22 (Edmonson).

| Proposed Findings of Fact | PST Corporate Representatives' Testimony |
|---|---|
| dealt with the Debtors as a single economic unit. | A. Yes. <br><br> Q. What was that basis? <br><br> A. Same as -- as before. We referred to them as Adeptus. It's on their building. It's on their e-mails. <br><br> . . . <br><br> Q. Okay. They were -- is it fair to say that, to you, they were indistinguishable? You didn't -- you didn't make a difference in your mind between Adeptus Health Inc., Adeptus Health LLC, or any of the other entities with the name Adeptus in them; is that right? <br><br> A. Correct.[196] <br><br> [Witness: Edmonson] Q. But as far as invoicing Adeptus and getting paid by Adeptus, would you agree that PST dealt with all these debtors just as one single economic unit? <br><br> A. Yes.[197] |

132. The Debtors intend to offer the deposition transcripts of Mr. Jon Christopher Edmonson and Ms. Deborah Roberts as the corporate representatives of PST Services, Inc. pursuant to Fed. R. Civ. P. 30(b)(6) and 32(a)(3), as made applicable by Fed. R. Bankr. P. 7030 and 7032. Based upon this testimony and the other evidence and testimony the Debtors will present during the Confirmation Hearing, PST's objection to substantive consolidation should be overruled.

## C. PST Asserts Incorrect Facts to Allege Voting Manipulation.

133. Finally, PST alleges the Debtors improperly manipulated the vote of Class 5 by ignoring this Court's orders and misstating facts. In paragraph 5 of its Objection, PST asserts that "without Court permission and after the September 11, 2017 voting deadline passed, the Debtors unilaterally agreed" to extend the voting deadline.[198] Such an allegation is incorrect because Debtors had authority to extend this deadline. Specifically, paragraph 10 of the Disclosure Statement Order provides that "*[u]nless waived by the Debtors in their discretion* or

---

[196] Debtors Ex. 79B at 69:24-70:7, 73:4-10 (Roberts).

[197] Debtors Ex. 79C at 26:21-25 (Edmonson).

[198] Dkt. No. 756 ¶ 5.

otherwise ordered by this Court, any ballot that is not received by the Voting Agent prior to the Voting Deadline shall not be counted in order to determine whether the Plan has been accepted."[199]  Therefore, the Debtors had the right and authority to extend this deadline and allow additional ballots to be included after the September 11 deadline.

134.  In accordance with this authority, prior to the original September 11 deadline, the Debtors granted the request of certain creditors to allow them to submit ballots after this deadline (so that the parties could attempt to reach a global resolution of all outstanding issues). Furthermore, there is nothing insidious in a Debtors' reopening of a voting deadline in a fair and equitable manner to receive additional acceptances *and rejections* to its plan.  Likewise, allowing late ballots for some (but not all) creditors would be inappropriate.  Accordingly, the Debtors opted to allow late ballots from all creditors to be counted and directed its Voting Agent to prepare a supplemental voting tabulation report to reflect these last-cast ballots.  Specifically, the Voting Agent was instructed to accept all ballots that were received via hand delivery prior to 8:00 p.m (Eastern Time) on September 20, 2017 and all ballots that were received via email prior to noon (Eastern Time) on September 21, 2017 (the "Extended Voting Deadline").[200]

135.  PST further misstates that the Extended Voting Deadline was "self-created" so that the Debtors could "procure[]" a "changed accepting ballot now containing an original signature from Evercore Group, LLC" ("Evercore").[201]  PST then continues that "[u]sing this one additional but changed vote, Epiq indicated that 18 Class 5 unsecured creditors voted in favor of the Plan, while 17 Class 5 creditors rejected the Plan."[202]  *PST is wrong; Evercore rejected the Plan.*  After the Extended Voting Deadline, the Voting Agent received a ballot from

---

[199]  Dkt. No. 515 ¶ 10 (emphasis added).
[200]  *See id.* ¶ 11(h) (allowing the Debtors, in their "sole discretion," to count ballots submitted via electronic means).
[201]  Dkt. No. 756 ¶ 5.
[202]  *Id.*

Evercore to reject the Plan, and the Debtors agreed to allow this ballot to be counted. PST's contention (in paragraph 5 of its objection) that the Debtors improperly procured this accepting ballot is completely false. Accordingly, PST's remaining objections should be overruled.

## V. WAIVER OF BANKRUPTCY RULE 3023(e)

136. Bankruptcy Rule 3023(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise."[203] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under 11 U.S.C. § 365(f).[204] Each of these Bankruptcy Rules also permit modification of the imposed stay upon court order.

137. To implement the Plan, the Debtors seek a waiver of the fourteen-day stay of an order confirming a chapter 11 plan under Bankruptcy Rule 3023(e). Given the complexity of substantially consummating the Restructuring Transactions, requiring the Debtors to pause before Consummation of the Plan at this juncture would be prejudicial to all parties in interest that continue to incur the cost and expense of the Debtors' chapter 11 cases. Also, as the Confirmation Hearing was previously continued to September 26, 2017, the Debtors do not have sufficient financing or authority to use cash collateral to continue to operate during a fourteen-day stay. As a result, the Debtors require financial support critical to funding Plan distributions that is available upon consummation of the Plan. Therefore, the Debtors submit that good cause exists to waive any stay imposed by the applicable Bankruptcy Rules so that the proposed Confirmation Order may become effective immediately upon its entry.

---

[203] Fed. R. Bankr. P. 3023(e).

[204] Fed. R. Bankr. P. 6004(h), 6006(d).

## VI.   CONCLUSION

For the reasons set forth herein, the Debtors respectfully request that the Court overrule the outstanding Objections, confirm the Plan, and enter the Confirmation Order.

Dated: September 25, 2017
Dallas, Texas

**NORTON ROSE FULBRIGHT US LLP**

By: */s/ Louis R. Strubeck, Jr.*
Louis R. Strubeck, Jr. (SBT 19425600)
louis.strubeck@nortonrosefulbright.com
Scott P. Drake (SBT 24026812)
scott.drake@nortonrosefulbright.com
John N. Schwartz (SBT 00797397)
john.schwartz@nortonrosefulbright.com
Liz Boydston (SBT 24053684)
liz.boydston@nortonrosefulbright.com
Timothy S. Springer (SBT 24088460)
tim.springer@nortonrosefulbright.com
Norton Rose Fulbright US LLP
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7932
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

*Attorneys for the Debtors*
*and Debtors in Possession*

## Appendix
### (Sorted Alphabetically)

| # | Debtor Name | Case No. | EIN |
|---|---|---|---|
| 1. | Adeptus Health Colorado Holdings LLC | 17-31448 | 30-0857912 |
| 2. | Adeptus Health Inc. | 17-31434 | 46-5037387 |
| 3. | Adeptus Health LLC | 17-31435 | 32-0432716 |
| 4. | Adeptus Health Management LLC | 17-31455 | 32-0448472 |
| 5. | Adeptus Health Phoenix Holdings LLC | 17-31461 | 35-2487075 |
| 6. | Adeptus Health Ventures LLC | 17-31466 | 36-4802997 |
| 7. | ADPT Columbus Holdings LLC | 17-31471 | 36-4835265 |
| 8. | ADPT DFW Holdings LLC | 17-31432 | 30-0857947 |
| 9. | ADPT Houston Holdings LLC | 17-31479 | 30-0857977 |
| 10. | ADPT New Orleans Holdings LLC | 17-31486 | 32-0479313 |
| 11. | ADPT New Orleans Management LLC | 17-31493 | Pending |
| 12. | ADPT-AZ MPT Holdings LLC | 17-31497 | 61-1772047 |
| 13. | ADPT-AZ RE Holdings LLC | 17-31502 | 47-5241979 |
| 14. | ADPT-CO MPT Holdings LLC | 17-31508 | 47-3512571 |
| 15. | ADPT-CO RE Holdings LLC | 17-31512 | 47-3565144 |
| 16. | ADPT-Columbus MPT Holdings LLC | 17-31519 | Pending |
| 17. | ADPT-Columbus RE Holdings LLC | 17-31523 | Pending |
| 18. | ADPT-DFW MPT Holdings LLC | 17-31527 | 81-0772445 |
| 19. | ADPT-DFW RE Holdings LLC | 17-31532 | 81-0785981 |
| 20. | ADPT-Houston MPT Holdings LLC | 17-31533 | 30-0914017 |
| 21. | ADPT-Houston RE Holdings LLC | 17-31536 | 61-1781468 |
| 22. | ADPT-LA MPT Holdings LLC | 17-31542 | 81-0752643 |
| 23. | ADPT-LA RE Holdings LLC | 17-31545 | 81-0758384 |
| 24. | AJNH Medical Center LLC | 17-31548 | 36-4729524 |
| 25. | Alamo Heights SA Medical Center LLC | 17-31553 | 35-2547715 |
| 26. | Algiers Medical Center LLC | 17-31556 | 32-0455775 |
| 27. | Alvin Medical Center LLC | 17-31561 | 90-1008817 |
| 28. | Anthem Medical Center LLC | 17-31564 | 37-1740119 |
| 29. | Antoine Medical Center LLC | 17-31440 | 35-2537322 |
| 30. | Arizona General ER LLC | 17-31444 | 90-1025598 |
| 31. | Atascocita 1960 Medical Center LLC | 17-31449 | 36-4780687 |
| 32. | Austin Brodie Medical Center LLC | 17-31454 | 61-1713294 |
| 33. | Baytown Medical Center LLC | 17-31456 | 30-0840445 |
| 34. | Bella Terra Medical Center LLC | 17-31459 | 80-0957867 |
| 35. | Bender's Landing Medical Center LLC | 17-31468 | 37-1752156 |
| 36. | Blacklick Woods Medical Center LLC | 17-31475 | 30-0805532 |
| 37. | Briar Forest-Eldridge Medical Center LLC | 17-31482 | 35-2481862 |
| 38. | Broad Wagoner Medical Center LLC | 17-31488 | 35-2492252 |
| 39. | Brushy Creek Medical Center LLC | 17-31494 | 38-3923792 |
| 40. | Camelback 83rd Medical Center LLC | 17-31498 | 38-3945993 |
| 41. | Cedar Park Lakeline Medical Center LLC | 17-31505 | 35-2493773 |
| 42. | Centennial Medical Center LLC | 17-31509 | 32-0436930 |
| 43. | Center Street DP Medical Center LLC | 17-31516 | 35-2453223 |
| 44. | Chandler Germann Medical Center LLC | 17-31521 | 80-0938469 |
| 45. | Chandler Heights Medical Center LLC | 17-31525 | 32-0456525 |
| 46. | Cinco Ranch Medical Center LLC | 17-31529 | 61-1744313 |
| 47. | Colonial Lakes Medical Center LLC | 17-31535 | 90-1004044 |

| # | Debtor Name | Case No. | EIN |
|---|---|---|---|
| 48. | Colorado General Hospital LLC | 17-31539 | 35-2506314 |
| 49. | Conroe Medical Center LLC | 17-31544 | 37-1743660 |
| 50. | Converse Medical Center LLC | 17-31551 | 30-0820305 |
| 51. | Copperwood Medical Center LLC | 17-31554 | 84-1697403 |
| 52. | Creekside Forest Medical Center LLC | 17-31557 | 36-4781064 |
| 53. | Culebra-Tezel Medical Center LLC | 17-31559 | 90-1020838 |
| 54. | De Zavala Medical Center LLC | 17-31560 | 30-0879734 |
| 55. | Dublin Medical Center LLC | 17-31563 | 80-0965351 |
| 56. | Eagles Nest Medical Center LLC | 17-31565 | 04-3847518 |
| 57. | East Mesa Medical Center LLC | 17-31437 | 90-1033851 |
| 58. | East Pflugerville Medical Center LLC | 17-31439 | 90-1023315 |
| 59. | East Riverside Medical Center LLC | 17-31442 | 38-3973259 |
| 60. | ECC Management, LLC | 17-31443 | 16-1711879 |
| 61. | FCER Management, LLC | 17-31447 | 11-3798239 |
| 62. | First Choice ER, LLC | 17-31436 | 27-5348156 |
| 63. | First Texas Hospital Cy-Fair LLC | 17-31451 | 47-3480091 |
| 64. | Four Points Medical Center LLC | 17-31464 | 38-3938637 |
| 65. | Friendswood Medical Center LLC | 17-31469 | 38-3916132 |
| 66. | FTH Houston Partners LLC | 17-31474 | 47-3466871 |
| 67. | Garland Centerville Medical Center LLC | 17-31477 | 35-2537960 |
| 68. | Gilbert Medical Center LLC | 17-31481 | 80-0940827 |
| 69. | Gleannloch Farms Medical Center LLC | 17-31485 | 35-2481256 |
| 70. | Glendale Medical Center LLC | 17-31489 | 90-1012820 |
| 71. | Goodyear Medical Center LLC | 17-31490 | 90-1007336 |
| 72. | Greenville Stacy Medical Center LLC | 17-31492 | 38-3926926 |
| 73. | Guadalupe River Medical Center LLC | 17-31496 | 35-2514826 |
| 74. | Hampden Tower Medical Center LLC | 17-31499 | 38-3928757 |
| 75. | Helotes Medical Center LLC | 17-31501 | 36-4782313 |
| 76. | Hilliard Medical Center LLC | 17-31504 | 35-2491198 |
| 77. | Houston 9520 Jones Medical Center LLC | 17-31507 | 32-0432459 |
| 78. | Houston FM 1960 Medical Center LLC | 17-31511 | 37-1783329 |
| 79. | Katy ER Center LLC | 17-31514 | 45-2583773 |
| 80. | Keller Medical Center LLC | 17-31517 | 61-1736669 |
| 81. | Kingwood Medical Center LLC | 17-31520 | 80-0684495 |
| 82. | Kuykendahl Medical Center LLC | 17-31524 | 34-2028269 |
| 83. | La Porte Medical Center LLC | 17-31526 | 80-0927953 |
| 84. | Lakewood Forest Medical Center LLC | 17-31530 | 90-1013791 |
| 85. | League City Medical Center LLC | 17-31438 | 36-4766358 |
| 86. | Legacy Trails Medical Center LLC | 17-31441 | 61-1744649 |
| 87. | Lewis Center Medical Center LLC | 17-31445 | 32-0431791 |
| 88. | Litchfield Park Medical Center LLC | 17-31446 | 36-4801379 |
| 89. | Louetta Medical Center LLC | 17-31450 | 74-3178584 |
| 90. | Marrero Medical Center LLC | 17-31453 | 61-1753468 |
| 91. | Meadowbrook Heights Medical Center LLC | 17-31457 | 32-0448039 |
| 92. | Medical Center of Crosby Lynchburg LLC | 17-31458 | 38-3922039 |
| 93. | Medical Center of Spring Rayford Richards LLC | 17-31462 | 37-1747613 |
| 94. | Mesa Tierra Medical Center LLC | 17-31465 | 35-2523890 |
| 95. | Midlothian Medical Center LLC | 17-31470 | 30-0802928 |
| 96. | Mountain Park Ranch Medical Center LLC | 17-31473 | 38-3939092 |

| # | Debtor Name | Case No. | EIN |
|---|---|---|---|
| 97. | National Medical Professionals of Arizona LLC | 17-31478 | 37-1757007 |
| 98. | National Medical Professionals of Ohio LLC | 17-31483 | 30-0829176 |
| 99. | New Orleans East Medical Center LLC | 17-31510 | 61-1753435 |
| 100. | Northwest Harris County Medical Center LLC | 17-31538 | 36-4781722 |
| 101. | Ohio General ER LLC | 17-31540 | 38-3918055 |
| 102. | Ohio General Hospital LLC | 17-31547 | 80-0956267 |
| 103. | OpFree Licensing LP | 17-31549 | 01-0831027 |
| 104. | OpFree RE Investments, Ltd. | 17-31558 | 06-1740727 |
| 105. | OpFree, LLC | 17-31562 | 34-2028263 |
| 106. | Pearland 518 Medical Center LLC | 17-31566 | 90-1025398 |
| 107. | Pearland Parkway Medical Center LLC | 17-31567 | 51-0576704 |
| 108. | Pearland Sunrise Medical Center LLC | 17-31568 | 90-1001726 |
| 109. | Pflugerville Medical Center LLC | 17-31569 | 45-2552050 |
| 110. | Potranco Medical Center LLC | 17-31570 | 80-0966887 |
| 111. | Provinces Medical Center LLC | 17-31571 | 80-0967881 |
| 112. | Queen Creek Medical Center LLC | 17-31572 | 32-0457346 |
| 113. | Rosenberg Medical Center LLC | 17-31452 | 80-0964882 |
| 114. | Roy Richard Medical Center LLC | 17-31460 | 35-2491802 |
| 115. | San Antonio Nacogdoches Medical Center LLC | 17-31463 | 80-0937326 |
| 116. | San Tan Valley Medical Center LLC | 17-31467 | 36-4801184 |
| 117. | Seguin Foster Medical Center LLC | 17-31472 | 35-2532650 |
| 118. | Sienna Plantation  Medical Center LLC | 17-31476 | 90-1009094 |
| 119. | South Bend Medical Center LLC | 17-31480 | 61-1770288 |
| 120. | South Carrier Medical Center LLC | 17-31484 | 32-0429602 |
| 121. | South Green Oaks Medical Center LLC | 17-31487 | 90-1012518 |
| 122. | Spanish Oaks Medical Center LLC | 17-31491 | 90-1012951 |
| 123. | Spring 2920 Medical Center LLC | 17-31495 | 36-4776092 |
| 124. | Spring Green Medical Center LLC | 17-31500 | Pending |
| 125. | SSH Medical Center LLC | 17-31503 | 77-0666943 |
| 126. | Sterling Ridge Medical Center II LLC | 17-31506 | 32-0439505 |
| 127. | Sterling Ridge Medical Center LLC | 17-31513 | 16-1711883 |
| 128. | Summerwood Medical Center LLC | 17-31515 | 30-0802964 |
| 129. | Surprise Medical Center LLC | 17-31518 | 90-1012038 |
| 130. | SW Chandler Medical Center LLC | 17-31522 | 90-1032288 |
| 131. | Sycamore School Medical Center LLC | 17-31528 | 35-2494277 |
| 132. | Tempe McClintock Baseline Medical Center LLC | 17-31531 | 38-3923748 |
| 133. | Tempe Rural-Baseline Medical Center LLC | 17-31534 | 30-0852296 |
| 134. | Texas Regional Hospital LLC | 17-31537 | 37-1753820 |
| 135. | Victory Lakes Medical Center LLC | 17-31541 | 37-1751372 |
| 136. | Wadsworth-Belleview Medical Center LLC | 17-31543 | 35-2486458 |
| 137. | Waterside Medical Center LLC | 17-31546 | 36-4767886 |
| 138. | White Settlement Medical Center LLC | 17-31550 | 38-3970573 |
| 139. | Wilderness-Hardy Oak Medical Center LLC | 17-31552 | 80-0954867 |
| 140. | William Cannon Medical Center LLC | 17-31555 | 35-2493839 |

(Sorted Numerically By Case Number)

| # | Debtor Name | Case No. | EIN |
|---|---|---|---|
| 1. | ADPT DFW Holdings LLC | 17-31432 | 30-0857947 |
| 2. | Adeptus Health Inc. | 17-31434 | 46-5037387 |
| 3. | Adeptus Health LLC | 17-31435 | 32-0432716 |
| 4. | First Choice ER, LLC | 17-31436 | 27-5348156 |
| 5. | East Mesa Medical Center LLC | 17-31437 | 90-1033851 |
| 6. | League City Medical Center LLC | 17-31438 | 36-4766358 |
| 7. | East Pflugerville Medical Center LLC | 17-31439 | 90-1023315 |
| 8. | Antoine Medical Center LLC | 17-31440 | 35-2537322 |
| 9. | Legacy Trails Medical Center LLC | 17-31441 | 61-1744649 |
| 10. | East Riverside Medical Center LLC | 17-31442 | 38-3973259 |
| 11. | ECC Management, LLC | 17-31443 | 16-1711879 |
| 12. | Arizona General ER LLC | 17-31444 | 90-1025598 |
| 13. | Lewis Center Medical Center LLC | 17-31445 | 32-0431791 |
| 14. | Litchfield Park Medical Center LLC | 17-31446 | 36-4801379 |
| 15. | FCER Management, LLC | 17-31447 | 11-3798239 |
| 16. | Adeptus Health Colorado Holdings LLC | 17-31448 | 30-0857912 |
| 17. | Atascocita 1960 Medical Center LLC | 17-31449 | 36-4780687 |
| 18. | Louetta Medical Center LLC | 17-31450 | 74-3178584 |
| 19. | First Texas Hospital Cy-Fair LLC | 17-31451 | 47-3480091 |
| 20. | Rosenberg Medical Center LLC | 17-31452 | 80-0964882 |
| 21. | Marrero Medical Center LLC | 17-31453 | 61-1753468 |
| 22. | Austin Brodie Medical Center LLC | 17-31454 | 61-1713294 |
| 23. | Adeptus Health Management LLC | 17-31455 | 32-0448472 |
| 24. | Baytown Medical Center LLC | 17-31456 | 30-0840445 |
| 25. | Meadowbrook Heights Medical Center LLC | 17-31457 | 32-0448039 |
| 26. | Medical Center of Crosby Lynchburg LLC | 17-31458 | 38-3922039 |
| 27. | Bella Terra Medical Center LLC | 17-31459 | 80-0957867 |
| 28. | Roy Richard Medical Center LLC | 17-31460 | 35-2491802 |
| 29. | Adeptus Health Phoenix Holdings LLC | 17-31461 | 35-2487075 |
| 30. | Medical Center of Spring Rayford Richards LLC | 17-31462 | 37-1747613 |
| 31. | San Antonio Nacogdoches Medical Center LLC | 17-31463 | 80-0937326 |
| 32. | Four Points Medical Center LLC | 17-31464 | 38-3938637 |
| 33. | Mesa Tierra Medical Center LLC | 17-31465 | 35-2523890 |
| 34. | Adeptus Health Ventures LLC | 17-31466 | 36-4802997 |
| 35. | San Tan Valley Medical Center LLC | 17-31467 | 36-4801184 |
| 36. | Bender's Landing Medical Center LLC | 17-31468 | 37-1752156 |
| 37. | Friendswood Medical Center LLC | 17-31469 | 38-3916132 |
| 38. | Midlothian Medical Center LLC | 17-31470 | 30-0802928 |
| 39. | ADPT Columbus Holdings LLC | 17-31471 | 36-4835265 |
| 40. | Seguin Foster Medical Center LLC | 17-31472 | 35-2532650 |
| 41. | Mountain Park Ranch Medical Center LLC | 17-31473 | 38-3939092 |
| 42. | FTH Houston Partners LLC | 17-31474 | 47-3466871 |
| 43. | Blacklick Woods Medical Center LLC | 17-31475 | 30-0805532 |
| 44. | Sienna Plantation Medical Center LLC | 17-31476 | 90-1009094 |
| 45. | Garland Centerville Medical Center LLC | 17-31477 | 35-2537960 |
| 46. | National Medical Professionals of Arizona LLC | 17-31478 | 37-1757007 |
| 47. | ADPT Houston Holdings LLC | 17-31479 | 30-0857977 |
| 48. | South Bend Medical Center LLC | 17-31480 | 61-1770288 |

| # | Debtor Name | Case No. | EIN |
|---|---|---|---|
| 49. | Gilbert Medical Center LLC | 17-31481 | 80-0940827 |
| 50. | Briar Forest-Eldridge Medical Center LLC | 17-31482 | 35-2481862 |
| 51. | National Medical Professionals of Ohio LLC | 17-31483 | 30-0829176 |
| 52. | South Carrier Medical Center LLC | 17-31484 | 32-0429602 |
| 53. | Gleannloch Farms Medical Center LLC | 17-31485 | 35-2481256 |
| 54. | ADPT New Orleans Holdings LLC | 17-31486 | 32-0479313 |
| 55. | South Green Oaks Medical Center LLC | 17-31487 | 90-1012518 |
| 56. | Broad Wagoner Medical Center LLC | 17-31488 | 35-2492252 |
| 57. | Glendale Medical Center LLC | 17-31489 | 90-1012820 |
| 58. | Goodyear Medical Center LLC | 17-31490 | 90-1007336 |
| 59. | Spanish Oaks Medical Center LLC | 17-31491 | 90-1012951 |
| 60. | Greenville Stacy Medical Center LLC | 17-31492 | 38-3926926 |
| 61. | ADPT New Orleans Management LLC | 17-31493 | Pending |
| 62. | Brushy Creek Medical Center LLC | 17-31494 | 38-3923792 |
| 63. | Spring 2920 Medical Center LLC | 17-31495 | 36-4776092 |
| 64. | Guadalupe River Medical Center LLC | 17-31496 | 35-2514826 |
| 65. | ADPT-AZ MPT Holdings LLC | 17-31497 | 61-1772047 |
| 66. | Camelback 83rd Medical Center LLC | 17-31498 | 38-3945993 |
| 67. | Hampden Tower Medical Center LLC | 17-31499 | 38-3928757 |
| 68. | Spring Green Medical Center LLC | 17-31500 | Pending |
| 69. | Helotes Medical Center LLC | 17-31501 | 36-4782313 |
| 70. | ADPT-AZ RE Holdings LLC | 17-31502 | 47-5241979 |
| 71. | SSH Medical Center LLC | 17-31503 | 77-0666943 |
| 72. | Hilliard Medical Center LLC | 17-31504 | 35-2491198 |
| 73. | Cedar Park Lakeline Medical Center LLC | 17-31505 | 35-2493773 |
| 74. | Sterling Ridge Medical Center II LLC | 17-31506 | 32-0439505 |
| 75. | Houston 9520 Jones Medical Center LLC | 17-31507 | 32-0432459 |
| 76. | ADPT-CO MPT Holdings LLC | 17-31508 | 47-3512571 |
| 77. | Centennial Medical Center LLC | 17-31509 | 32-0436930 |
| 78. | New Orleans East Medical Center LLC | 17-31510 | 61-1753435 |
| 79. | Houston FM 1960 Medical Center LLC | 17-31511 | 37-1783329 |
| 80. | ADPT-CO RE Holdings LLC | 17-31512 | 47-3565144 |
| 81. | Sterling Ridge Medical Center LLC | 17-31513 | 16-1711883 |
| 82. | Katy ER Center LLC | 17-31514 | 45-2583773 |
| 83. | Summerwood Medical Center LLC | 17-31515 | 30-0802964 |
| 84. | Center Street DP Medical Center LLC | 17-31516 | 35-2453223 |
| 85. | Keller Medical Center LLC | 17-31517 | 61-1736669 |
| 86. | Surprise Medical Center LLC | 17-31518 | 90-1012038 |
| 87. | ADPT-Columbus MPT Holdings LLC | 17-31519 | Pending |
| 88. | Kingwood Medical Center LLC | 17-31520 | 80-0684495 |
| 89. | Chandler Germann Medical Center LLC | 17-31521 | 80-0938469 |
| 90. | SW Chandler Medical Center LLC | 17-31522 | 90-1032288 |
| 91. | ADPT-Columbus RE Holdings LLC | 17-31523 | Pending |
| 92. | Kuykendahl Medical Center LLC | 17-31524 | 34-2028269 |
| 93. | Chandler Heights Medical Center LLC | 17-31525 | 32-0456525 |
| 94. | La Porte Medical Center LLC | 17-31526 | 80-0927953 |
| 95. | ADPT-DFW MPT Holdings LLC | 17-31527 | 81-0772445 |
| 96. | Sycamore School Medical Center LLC | 17-31528 | 35-2494277 |
| 97. | Cinco Ranch Medical Center LLC | 17-31529 | 61-1744313 |

| # | Debtor Name | Case No. | EIN |
|---|---|---|---|
| 98. | Lakewood Forest Medical Center LLC | 17-31530 | 90-1013791 |
| 99. | Tempe McClintock Baseline Medical Center LLC | 17-31531 | 38-3923748 |
| 100. | ADPT-DFW RE Holdings LLC | 17-31532 | 81-0785981 |
| 101. | ADPT-Houston MPT Holdings LLC | 17-31533 | 30-0914017 |
| 102. | Tempe Rural-Baseline Medical Center LLC | 17-31534 | 30-0852296 |
| 103. | Colonial Lakes Medical Center LLC | 17-31535 | 90-1004044 |
| 104. | ADPT-Houston RE Holdings LLC | 17-31536 | 61-1781468 |
| 105. | Texas Regional Hospital LLC | 17-31537 | 37-1753820 |
| 106. | Northwest Harris County Medical Center LLC | 17-31538 | 36-4781722 |
| 107. | Colorado General Hospital LLC | 17-31539 | 35-2506314 |
| 108. | Ohio General ER LLC | 17-31540 | 38-3918055 |
| 109. | Victory Lakes Medical Center LLC | 17-31541 | 37-1751372 |
| 110. | ADPT-LA MPT Holdings LLC | 17-31542 | 81-0752643 |
| 111. | Wadsworth-Belleview Medical Center LLC | 17-31543 | 35-2486458 |
| 112. | Conroe Medical Center LLC | 17-31544 | 37-1743660 |
| 113. | ADPT-LA RE Holdings LLC | 17-31545 | 81-0758384 |
| 114. | Waterside Medical Center LLC | 17-31546 | 36-4767886 |
| 115. | Ohio General Hospital LLC | 17-31547 | 80-0956267 |
| 116. | AJNH Medical Center LLC | 17-31548 | 36-4729524 |
| 117. | OpFree Licensing LP | 17-31549 | 01-0831027 |
| 118. | White Settlement Medical Center LLC | 17-31550 | 38-3970573 |
| 119. | Converse Medical Center LLC | 17-31551 | 30-0820305 |
| 120. | Wilderness-Hardy Oak Medical Center LLC | 17-31552 | 80-0954867 |
| 121. | Alamo Heights SA Medical Center LLC | 17-31553 | 35-2547715 |
| 122. | Copperwood Medical Center LLC | 17-31554 | 84-1697403 |
| 123. | William Cannon Medical Center LLC | 17-31555 | 35-2493839 |
| 124. | Algiers Medical Center LLC | 17-31556 | 32-0455775 |
| 125. | Creekside Forest Medical Center LLC | 17-31557 | 36-4781064 |
| 126. | OpFree RE Investments, Ltd. | 17-31558 | 06-1740727 |
| 127. | Culebra-Tezel Medical Center LLC | 17-31559 | 90-1020838 |
| 128. | De Zavala Medical Center LLC | 17-31560 | 30-0879734 |
| 129. | Alvin Medical Center LLC | 17-31561 | 90-1008817 |
| 130. | OpFree, LLC | 17-31562 | 34-2028263 |
| 131. | Dublin Medical Center LLC | 17-31563 | 80-0965351 |
| 132. | Anthem Medical Center LLC | 17-31564 | 37-1740119 |
| 133. | Eagles Nest Medical Center LLC | 17-31565 | 04-3847518 |
| 134. | Pearland 518 Medical Center LLC | 17-31566 | 90-1025398 |
| 135. | Pearland Parkway Medical Center LLC | 17-31567 | 51-0576704 |
| 136. | Pearland Sunrise Medical Center LLC | 17-31568 | 90-1001726 |
| 137. | Pflugerville Medical Center LLC | 17-31569 | 45-2552050 |
| 138. | Potranco Medical Center LLC | 17-31570 | 80-0966887 |
| 139. | Provinces Medical Center LLC | 17-31571 | 80-0967881 |
| 140. | Queen Creek Medical Center LLC | 17-31572 | 32-0457346 |