

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 29, 2017**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| ADPT DFW HOLDINGS, LLC, *et al.*,[1] | § | CASE NO. 17-31432-SGJ-11 |
| | § | |
| Debtors. | § | (Jointly Administered Under |
| | § | Case No. 17-31432-SGJ-11) |

## MEMORANDUM OPINION REGARDING SUBSTANTIVE CONSOLIDATION

On September 26-27, 2017, this court held a hearing to consider confirmation of the above-referenced Chapter 11 Debtors' Third Amended Joint Plan of Reorganization, as modified by certain Plan Supplements and modifications in the record (the "Plan"). After hearing numerous witnesses and considering hundreds of documents submitted into evidence, the court decided to confirm the Plan. Separate Findings of Fact, Conclusions of Law, and an Order Confirming Plan are being issued separately by the court. This Memorandum Opinion pertains

---

[1] The Debtors include all of the affiliated entities that are listed on the Appendix attached to the Order Regarding Filing of Pleadings and Directing Joint Administration of Cases [DE # 47] entered April 21, 2017.

solely to the substantive consolidation proposed in the Plan, to which an objection was lodged and overruled.  This Memorandum Opinion is issued pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014 in support of the court's ruling that the substantive consolidation proposed in the Debtors' Plan was legally proper.

## I.    Introduction.

The above-referenced Debtors (the "Debtors" or "Adeptus"—as the Debtors are collectively known), together with certain non-debtor affiliates, constitute the oldest and largest network of freestanding emergency rooms ("FSERs") in the United States.  The Debtors are headquartered in Lewisville, Texas.  Since the Debtors' founding in the year 2002, the Debtors have described themselves as being a patient-centered healthcare organization dedicated to providing quality emergency care through its FSERs, which are open to the public 24 hours a day, seven days a week.  As of April 19, 2017 (the "Petition Date"), the Debtors' business operations consisted of five fully-operational hospitals and 99 FSERs, that are either wholly-owned by the Debtors or by the Debtors' joint ventures with leading healthcare systems in Arizona, Colorado, and Texas.  There are 140 Debtors in this jointly-administered case.  In the year 2017 to date, approximately 400,000 patients have visited facilities within the Adeptus network.  Approximately 3,800 physicians, nurses, radiology technicians, laboratory professionals, and other administrative staff are either employed by or are independent contractors with the Adeptus organization.  At the top of the Adeptus organizational structure is a public company called Adeptus Health Inc. ("PubCo"), which was incorporated in the year 2014 and conducted an initial public offering and subsequent offerings.  Next in the organizational structure is Adeptus Health LLC (the holding company for the organization before PubCo was created to take the enterprise public).  Next in the organizational structure is First Choice ER,

LLC—the original company created when the first FSER was opened. Then, lower in the organizational structure are the various companies that own, manage, or perform other functions with regard to the various health care locations.

As far as the Debtors' capital structure, the Debtors' creditors in these cases consisted of the holders of secured debt (the "Deerfield Parties") on a Prepetition Credit Agreement (herein so called), on which more than $228 million was due and owing as of the Petition Date, and with regard to which 80 of the 140 Debtors were obligated. Postpetition, the Deerfield Parties extended secured debtor-in-possession financing of more than $70 million, and all 140 Debtors were obligated on it. The Debtors also have collectively perhaps $20-$50 million in unsecured trade debt—although the exact number is not yet known and could be higher. The Debtors also have medical malpractice claims (which there should be insurance to fully cover) and subordinated debt—most of which is held by insiders, but some of which is asserted by former shareholders of PubCo in certain contested securities litigation that is not very far along (the "Section 510(b) Claims"). The Debtors also have preferred shareholders (many of whom are defendants in litigation). And finally, the Debtor PubCo has a large number of public shareholders.

The Debtors' Plan proposes that the Deerfield Parties will exchange their secured debt for all of the equity of the reorganized Debtors. The Debtors' business enterprise was valued by the financial advisory firm Houlihan Lokey at between $115 million and $137 million (no party contested this valuation). The Deerfield Parties' unsecured deficiency claim was valued at $191.8 million (uncontested) and this unsecured deficiency claim and all other claims of the 140 Debtors will be pooled and shared in a Litigation Trust (herein so called), that will receive initial funding of $3 million cash and will likely receive another $3 million dollars of debt financing.

The Litigation Trust will receive all of the Debtors-estates' causes of action (of which there are many)—especially against former insiders—as well as certain "contingent value rights" (*i.e.,* cash flow in the future if the reorganized Debtors perform at certain levels in the future).

As noted, the Plan contemplates substantive consolidation of all 140 Debtors for Plan treatment and voting purposes. The following classes exist under the Plan:

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |
| Class 3 | Deerfield Secured Claims | Impaired | Yes |
| Class 4 | Medical Malpractice Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | Convenience Class Claims | Impaired | Yes |
| Class 7 | Subordinated Claims – <br>     Subclass 7(a) – TRA Claims <br>     Subclass 7(b) – Other Subordinated <br>         Claims | Impaired | Yes |
| Class 8 | Existing Preferred Equity Interests | Impaired | Yes |
| Class 9 | Existing Common Equity Interests | Impaired | Yes |

A large but disputed unsecured creditor ("PST"), with an alleged claim of about $5 million, has objected to the substantive consolidation. PST formerly collected the Debtors' medical accounts receivable (for about a two-year period). The Debtors have argued that PST did a poor job and the Debtors have terminated PST's contract. The Debtors have indicated that they have their own claims against PST and they intend to bring litigation against PST.

## II. The Substantive Consolidation Provisions of the Plan.

Both Article 3.2 and 5.1 of the Plan contain a "Substantive Consolidation"

4

provision. Specifically, these provisions provide that:

> Except as otherwise provided in this Plan, each Debtor shall continue to maintain its separate corporate existence after the Effective Date for all purposes other than the treatment of Claims under this Plan. Except as expressly provided in this Plan (or as otherwise ordered by the Bankruptcy Court), on the Effective Date: (a) all assets (and all proceeds thereof) and liabilities of the Debtors shall be deemed merged or treated as though they were merged into and with the assets and liabilities of each other, (b) no distributions shall be made under this Plan on account of Intercompany Claims among the Debtors and all such Claims shall be eliminated and extinguished, (c) all guaranties of the Debtors of the obligations of any other Debtor shall be deemed eliminated and extinguished so that any Claim against any Debtor, and any guarantee thereof executed by any Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors, (d) each and every Claim filed or to be filed in any of the Chapter 11 Cases shall be treated filed against the consolidated Debtors and shall be treated one Claim against and obligation of the consolidated Debtors, and (e) for purposes of determining the availability of the right of set off under section 553 of the Bankruptcy Code, the Debtors shall be treated as one entity so that, subject to the other provisions of section 553 of the Bankruptcy Code, debts due to any of the Debtors may be set off against the debts of any of the other Debtors. Such substantive consolidation shall not (other than for purposes relating to this Plan) affect the legal and corporate structures of the Reorganized Debtors. Moreover, such substantive consolidation shall not affect any subordination provisions set forth in any agreement relating to any Claim or Interest or the ability of the Reorganized Debtors or the Litigation Trust Trustee, as applicable, to seek to have any Claim or Interest subordinated in accordance with any contractual rights or equitable principles. Notwithstanding anything in this section to the contrary, all post-Effective Date fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930, if any, shall be calculated on a separate legal entity basis for each Reorganized Debtor.

The Debtors and others in the case have described this substantive consolidation as "deemed" substantive consolidation or substantive consolidation "light." Why? Because it is substantive consolidation that is being implemented ***for plan-purposes only*** (*i.e.,* voting and treatment purposes). Post-reorganization, the reorganized Debtors may or may not keep their existing structure of 140 separate legal entities.

### III. The Law of Substantive Consolidation.

As a general matter, substantive consolidation in a bankruptcy case results in the combination of two or more debtors into a single pool from which the claims of creditors are paid ratably.[2] A bankruptcy court's ability to order substantive consolidation has its roots in the Supreme Court decision of *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219 (1941), where the Supreme Court recognized that the consolidation of different but related estates was a vital tool in fulfilling a fundamental purpose of bankruptcy proceedings. Various courts of appeal eventually expounded upon this remedy of substantive consolidation over the next few decades.[3]

### A. From What Statute Does a Bankruptcy Court's Authority to Order Substantive Consolidation Derive?

While there is no specific Bankruptcy Code provision that uses the term "substantive consolidation," there are two statutes upon which courts have primarily relied (since enactment

---

[2] *See Power Int'l, Inc. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.)*, 250 F.3d 955, 959 ns. 5 & 6 (5th Cir. 2001) (noting in dicta that "it usually results in, inter alia, pooling the assets of, and claims against, the two entities; satisfying liabilities from the resultant common fund; eliminating intercompany claims; and combining the creditors of the two companies for purposes of voting on reorganization plans" and because it "affects the substantive rights of the parties . . . is subject to heightened judicial scrutiny"). Note that the *Babcock* case did not involve substantive consolidation pursuant to a chapter 11 plan. Rather, it involved an argument that certain debtor-in-possession financing resulted in an improper de facto substantive consolidation, and the Fifth Circuit ultimately held that no such de facto substantive consolidation occurred by virtue of the postpetition financing.

[3] Listed in the approximate sequence in which the "substantive consolidation" Circuit-level authority developed: *Stone v. Eacho (In re Tip Top Tailors, Inc.)*, 127 F.2d 284 (4th Cir.1942), *cert. denied*, 317 U.S. 635 (1942); *Soviero v. Nat'l Bank of Long Island*, 328 F.2d 446 (2d Cir. 1964); *Chemical Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir. 1966); *Flora Mir Candy Corp. v. R.S. Dickson & Co. (In re Flora Mir Candy Corp.)*, 432 F.2d 1060 (2d Cir. 1970); *James Talcott, Inc. v. Wharton (In re Cont'l Vending Machine Corp.)*, 517 F.2d 997 (2d Cir.1975); *FDIC v. Hogan (In re Gulfco Inv. Corp.)*, 593 F.2d 921, 927-28 (10th Cir. 1979); *Pension Benefit Guar. Corp. v. Ouimet Corp.*, 711 F.2d 1085, 1092-93 (1st Cir. 1983), *cert. denied*, 464 U.S. 961 (1983); *Drabkin v. Midland–Ross Corp. (In re Auto–Train Corp.)*, 810 F.2d 270, 276 (D.C. Cir. 1987); *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2d Cir. 1988); *Eastgroup Props. v. S. Motel Ass'n*, 935 F.2d 245, 248 (11th Cir. 1991); *First Nat'l Bank of El Dorado v. Giller (In re Giller )*, 962 F.2d 796, 797-98 (8th Cir. 1992); *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 974 F.2d 712, 720 (6th Cir. 1992); *Reider v. FDIC (In re Reider )*, 31 F.3d 1102, 1105-07 (11th Cir. 1994); *Alexander v. Compton (In re Bonham )*, 229 F.3d 750, 771 (9th Cir. 2000); *Power Int'l, Inc. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.)*, 250 F.3d 955 (5th Cir. 2001); *In re Owens Corning*, 419 F.3d 195, 200-201 (3d Cir.2005); *Wells Fargo Bank of Tex. N.A. v. Sommers (In re Amco Ins.)*, 444 F.3d 690, 692-93, 97, n. 5 (5th Cir. 2006).

of the current Bankruptcy Code) when ordering substantive consolidation: section 1123(a)(5)(C) and section 105 of the Bankruptcy Code.

First, section 1123(a)(5)(C) permits a consolidation or merger in a plan context.[4] Specifically, section 1123(a)(5)(C) of the Bankruptcy Code provides that a chapter 11 plan shall provide adequate means for the plan's implementation, such as "merger or consolidation of the debtor with one or more persons." Section 101(41) of the Bankruptcy Code states that "person" includes "individual, partnership, and corporation." When courts have exercised their authority to order substantive consolidation pursuant to section 1123(a)(5)(C) of the Bankruptcy Code, most have tended to look to some of the many equitable or balancing factors described in more detail below (many of which were applied *outside* of the context of a chapter 11 plan) to determine whether or not substantive consolidation is appropriate.[5] However, arguably, to the

---

[4] *Yaquinto v. Ward (In re Ward)*, 558 B.R. 771, n. 24 (Bankr. N.D. Tex. 2016) (while not applicable to the case, the bankruptcy court noted that the Bankruptcy Code clearly permits consolidation within a plan context). *See also In re Stone & Webster*, 286 B.R. 532, 546 (Bankr. D. Del. 2002) (in ruling on summary judgment motion requesting pre-confirmation determination that substantive consolidation provision in the creditors' committee's plan was proper, court held that section 1123(a)(5)(C) of the Bankruptcy Code clearly authorizes a bankruptcy court to confirm a chapter 11 plan provision which provides for substantive consolidation).

[5] *See, e.g., In re Republic Airways Holdings, Inc.*, 565 B.R. 710, 716 (Bankr. S.D.N.Y. 2017) (holding that debtors satisfied *Augie/Restivo* test with regards to substantive consolidation provision in chapter 11 plan); *In re Affiliated Foods, Inc.*, 249 B.R. 770, 775-784 (Bankr. W.D. Mo. 2000) (chapter 11 estates of corporate debtor and its wholly owned subsidiaries would be substantively consolidated under unsecured creditors' committee proposed plan applying the Eighth Circuit's *Giller* standard); *In re Cello Energy*, Nos. 10–04877–MAM–11, 2012 WL 1192784, at *11 (Bankr. S.D. Ala. April 10, 2012) (applying *Snider* standard when evaluating substantive consolidation provision in joint chapter 11 plan); *In re Introgen Therapeutics, Inc.*, 429 B.R. 570 (Bankr. W.D. Tex. 2010) (applying *Augie/Restivo* standard in evaluating substantive consolidation in debtors' proposed chapter 11 plan); *In re Source Enters., Inc.*, No. 06–11707, 2007 WL 2903954, at *5 (Bankr. S.D.N.Y. Oct. 1, 2007) (holding that debtors should be substantively consolidated under the plan in recognition of the economic reality that the debtors' books and records were incapable of being "untangled" from one another, and creditors, as well as the debtors themselves, had dealt as though the debtors were a single entity. Moreover, the court held that there had been no showing that the rights or interests of any creditors would be unduly harmed or affected by such substantive consolidation); *In re Lionel L.L.C.*, No. 04–17324, 2008 WL 905928, at *11 (Bankr. S.D.N.Y. March 31, 2008) (ordering partial substantive consolidation as a result of the debtors' integrated and interdependent operations, substantial intercompany guaranties, common officers and directors, common control and decision making, reliance on a consolidated cash management system, and dissemination of principally consolidated financial information to third parties, and the debtors belief that they operated, and creditors dealt with the debtors, as a single, integrated economic unit. In view of the foregoing, creditors would not be prejudiced to any significant degree by the debtors' partial substantive consolidation treatment, and partial substantive consolidation would best utilize the debtors' assets and potential of all of the debtors to pay to the creditors of each entity the distributions provided for under the

extent the court is determining whether substantive consolidation in a ***plan*** is appropriate, pursuant to section 1123(a)(5)(C), the only "real requirement" for exercising such authority should be that section 1129 of the Bankruptcy Code is complied with in that: (1) classes of impaired creditors have accepted the plan's proposed consolidation, or (2) the "best interest test" and "absolute priority rule" protection granted to dissenting creditors has been met by the plan proponent.[6]

Outside of a plan context, the authority of the court to order substantive consolidation has been said to derive ***entirely*** from the equitable powers of the bankruptcy court under section 105 of the Bankruptcy Code.[7]

### B. Standards that Courts Typically Apply When Determining If Substantive Consolidation is Appropriate?

There seems to be no universally accepted legal standard for when substantive consolidation is appropriate (or not). It has been said to be a highly fact-specific analysis made

---

plan); *In re Lear Corp.*, No. 09–14326, 2009 WL 6677955, at *15 (Bankr. S.D.N.Y. Nov. 5, 2009) (finding that substantive consolidation provision in chapter 11 plan was in the best interests of the debtors and necessary and appropriate in the chapter 11 cases and did not adversely affect any creditor); *In re Worldcom, Inc.*, No. 02–13533, 2003 WL 23861928, at *6-*16 ( (Bankr. S.D.N.Y Oct. 31, 2003) (after thorough analysis of several facts and finding that substantive consolidation provided significant benefits to the creditor constituency as a whole, court ordered substantive consolidation of debtors in confirming chapter 11 plan); *In re Ltd. Gaming of Am., Inc.*, 228 B.R. 275, 287-88 (Bankr. N.D. Okla. 1998) (based upon findings that there was a "substantial identity" between the two debtors, the type of which is often found where cases are substantively consolidated and that there would be no harm to creditors, court confirmed chapter 11 plan with substantive consolidation provision); *In re Am. HomePatient, Inc.*, 298 B.R. 152 (Bankr. M.D. Tenn. 2003) (court confirmed joint chapter 11 plan finding that substantive consolidation was appropriate and applied the *Rafoth* standard); *Bruce Energy Ctr. Ltd. v. Orfa Corp of Am. (In re Orfa Corp. of Phila.)*, 129 B.R. 404, 412-416 (Bankr. E.D. Pa. 1991) (applying *Potts* standard which requires that the applicants must demonstrate that there is a necessity for substantive consolidation or a harm to be avoided by the use of the equitable remedy of substantive consolidation, and the benefits of substantive consolidation must outweigh the harm to be caused to objecting creditors in approving substantive consolidation provision in chapter 11 plan). *But see In re CRB Partners, LLC*, 2013 WL 796566, * 13-14 (Bankr. W.D. Tex. 2013) (plan cannot allow substantive consolidation of jointly administered estates where court has never ordered substantive consolidation of the estates in the first instance).

[6] J. Maxwell Tucker, *Groupo Mexicano and the Death of Substantive Consolidation*, 8 AM. BANKR. INST. L. REV. 427, 448-49 (2000) (an interesting and scholarly piece, but clearly there has been no death of substantive consolidation in the bankruptcy courts after *Groupo Mexicano*).

[7] *See In re Permian Producers Drilling, Inc.*, 263 B.R. 510, 517 (W.D. Tex. 2000).

on a case-by-case basis. Because it is a judicial creation, the contours of substantive consolidation are indefinite; it "usually results in, inter alia, pooling the assets of, and claims against, [multiple] entities; satisfying liabilities from the resultant common fund; eliminating inter-company claims; and combining the creditors of the [multiple] companies for purposes of voting on reorganization plans."[8] It has been noted that the increase in mega-bankruptcy cases in recent decades, involving numerous interrelated corporate structures and, in particular, subsidiary corporations operating under a parent entity, seems to have created a more "liberal" view that allows for consolidation more easily.[9] The Fifth Circuit has not adopted its own criteria for determining when substantive consolidation is appropriate.[10] However, the Fifth Circuit has acknowledged that bankruptcy courts do have authority to order substantive consolidation, while noting in dicta that substantive consolidation is "an extreme and unusual remedy" and should be used "sparingly."[11]

---

[8] *Babcock & Wilcox Co*, 250 F.3d at 959 n. 5 (citing *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir.1988), which was, in turn, citing 5 COLLIER ON BANKRUPTCY § 1100.06, at 1100–32 n. 1 (L. King ed., 15th ed. 1988)).

[9] *In re AHF Development*, 462 B.R. 186, 195 (Bankr. N.D. Tex. 2011) (citing to 1 COLLIER ON BANKRUPTCY ¶ 105.09[1][c] (16th ed. 2010)). In *AHF Development*, the United States Trustee, joined by unsecured creditors committee and creditors, moved to dismiss a chapter 11 case of a debtor-limited partnership. The unsecured creditors committee in an affiliated case of the debtor's general partner, along with the debtor-general partner, investor/creditors, and Chapter 11 trustee in affiliated case, opposed dismissal and sought substantive consolidation of both cases. Following a trial, Judge Jones held that cause existed to dismiss the case, and did not find substantive consolidation to be appropriate under the facts and circumstances.

[10] *Introgen Therapeutics*, 429 B.R. at 582 (Bankr. W.D. Tex. 2010) (citing *In re Coleman*, 417 B.R. 712, 726 (Bankr. S.D. Miss. 2009)).

[11] *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229, 249 (5th Cir. 2009) (citing *In re Gandy*, 299 F.3d 489, 499 (5th Cir.2002)) (while holding that plan of reorganization did not substantively consolidate debtor entities, the Fifth Circuit acknowledged the existence of substantive consolidation and did not question the authority of the bankruptcy court to order such remedy). *See also Wells Fargo Bank v. Sommers (In re Amco Ins.)*, 444 F.3d 690, 696 n. 5 (5th Cir. 2006) (noting in a non-plan context that substantive consolidation "is an extreme and unusual remedy"); *Permian Producers*, 263 B.R. at 516 (citing *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1145 n. 2 (5th Cir. 1987) ("The bankruptcy court has authority to order de facto disregard of the corporate form through [substantive] consolidation proceedings.") (noting that bankruptcy courts have authority to order substantive consolidation).

That being said, there appear to be two standards that have developed over the years in case law—(1) a more traditional, multi-factor test (which ultimately gets distilled down to two critical factors); and (2) a balancing of harm test.

      i.     *The Traditional Multi-Factor Test (Which Gets Distilled Down to Two Critical Factors).*

Under the traditional multi-factor test, courts look to a long list of factors in determining whether substantive consolidation is appropriate.[12] These factors include:

- the presence or absence of consolidated financial statements;

- the unity of interests and ownership between the various corporate entities;

- the existence of parent and intercorporate guaranties on loans;

- the degree of difficulty in segregating and ascertaining individual assets and liabilities;

- the transfer of assets without formal observance of corporate formalities;

- the commingling of assets and business functions;

- the profitability of consolidation at a single physical location;

- the parent corporation owns all or a majority of the capital stock of the subsidiary;

- the parent and subsidiary have common officers and directors;

- the parent finances the subsidiary;

- the parent is responsible for incorporation of the subsidiary;

- the subsidiary has grossly inadequate capital;

- the parent pays salaries, expenses, or losses of the subsidiary;

- the subsidiary has substantially no business except with the parent;

---

[12] *In re E'Lite Eyewear Holding, Inc.*, No. 08–41374, 2009 WL 349832, at *3 (Bankr. E.D. Tex. Feb. 5, 2009).

- the subsidiary has essentially no assets except for those conveyed by the parent;

- the parent refers to the subsidiary as a department or division of the parent;

- the directors or officers of the subsidiary do not act in interests of the subsidiary, but take directions from the parent;

- the formal legal requirements of the subsidiary as a separate and independent corporation are not observed; and

- the transfer of assets without formal observance of corporate formalities.[13]

No single element or group of elements is determinative in the court's inquiry, and the weight accorded to any given factor is unclear.[14] Often it appears some courts pick and choose elements out of this laundry list of factors, focusing on which factors they believe to be most important.[15]

The case cited most often for this multi-factor standard for applying substantive consolidation is *In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515 (2d Cir. 1988). The Second Circuit in the *Augie/Restivo* case ultimately distilled the many factors into ***two critical factors: (1) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit ...; or (2) whether the affairs of the debtors are so***

---

[13] *In re AHF Development*, 462 B.R. 186, 195-96 (Bankr. N.D. Tex. 2011) (citing to 1 COLLIER ON BANKRUPTCY ¶ 105.09[2][a] (16th ed. 2010)).

[14] *AHF Development,* 462 B.R. at 195-96.

[15] *See, e.g., Chemical Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966) (holding that where the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as to threaten the realization of any net assets for all the creditors, equity is not helpless to reach a rough approximation of justice to some rather than deny any at all); *In re Vecco Constr. Indus., Inc.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980) (ordered consolidation in part because of the absence of opposition and because consolidation would promote reorganization rather than liquidation where the debtors had a single operating account and consolidated financial statements, had made no attempt to segregate receivables, disbursements or income, had inaccurately allocated affiliate expenses through inter-company accounts, and had filed bankruptcy schedules on a consolidated basis).

*entangled that consolidation would benefit all creditors.*"[16]  The presence of either factor is

sufficient to order substantive consolidation.[17]

By way of background, *Augie/Restivo* dealt with a bankruptcy court's decision to

consolidate two bakery companies.  Augie's Baking Co. ("Augie's") and Restivo Brothers

Bakers, Inc. ("Restivo") were originally two separate bakeries.  Restivo was a debtor to

Manufacturers Hanover Trust Company ("MHTC") and Augie's was a debtor to Union Savings

Bank ("Union").  About a year before bankruptcy, Restivo and Augie's entered into a deal in

which Restivo purchased Augie's for half of Restivo's stock.  At the time of its purchase, Augie's

had $2.4 million in secured debts that it owed to Union.  After the sale, Augie's operations were

combined with Restivo's operations, but no move was made to dissolve Augie's.  Restivo then

adopted the name Augie/Restivo Baking Co. ("Augie/Restivo") and took over all of the

bookkeeping for both companies.  Prior to Augie/Restivo's bankruptcy, MHTC extended another

$2.7 million to Augie/Restivo, some of it secured by a subordinated mortgage on land owned by

Augie's.  Once in bankruptcy, both Augie/Restivo and Augie's were substantively consolidated

by the bankruptcy court in contemplation of a future sale of the debtors' assets to yet another

bakery and a plan of reorganization. Although Union was opposed to the consolidation, the court

found that the consolidation and sale were "in the interests of the creditors of both companies."

---

[16] *Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.)*, 860 F.2d 515, 519 (2d Cir.1988) (emphasis added).  Note that some commentators have characterized the *Augie/Restivo* test as a "balancing test" since the Second Circuit in *Augie/Restivo* stated that *"the sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors"* (emphasis added).  However, because it specifically looks at factors under the traditional test without requiring actual "balancing" of said factors, some authorities have categorized it not to be a balancing test.  *See In re Introgen Therapeutics, Inc.*, 429 B.R. 570, 583, n. 5 (Bankr. W.D. Tex. 2010) (Judge Gargotta did not view it as a balancing test).  *But see* 2 COLLIER ON BANKRUPTCY ¶ 105.09[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2017) & *In re Permian Producers Drilling, Inc.*, 263 B.R 510, 518 (W.D. Tex. 2000) (describing *Augie/Restivo* test as a "simplified balancing test").

[17] *Augie/Restivo Baking Co.*, 860 F.2d at 519.

However, the sale never occurred due to problems in obtaining financing. Union thereafter appealed the decision to substantively consolidate the estates. At the time, Augie's debt to Union was undersecured by $300,000. As a result of substantive consolidation, the sale of Augie's assets was poised to result in payouts to Augie/Restivo's creditors, whose debt had priority, rather than to Union for its general unsecured debt. After the Eastern District of New York affirmed the bankruptcy court's consolidation decision, the case was appealed to the Second Circuit.[18]

In analyzing whether the substantive consolidation order should be preserved, the Second Circuit first noted that "[t]he sole purpose of substantive consolidation is to ensure the equitable treatment of all creditors." The court then reviewed and distilled the previous substantive cases down to what the Second Circuit perceived as "mere[ ] variants on *two critical factors: (i) whether creditors dealt with the entities as a single economic unit and 'did not rely on their separate identity in extending credit,'. . . or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors."* The Second Circuit held that the first factor is "applied from the creditor's perspective" and the inquiry "is whether creditors treated the debtors as a single entity, not whether the managers of the debtors themselves, or consumers viewed the [debtors] as one enterprise."[19]

In analyzing whether the estates of Augie/Restivo and Augie's should be consolidated under the first factor, the Second Circuit focused on the fact that Augie's creditor, Union, had obviously extended credit relying on Augie's being its own separate entity. It also noted that MHTC had dealt with the pre-sale Restivo in much the same way. Given this information, the

---

[18] *Id.* at 515-17.

[19] *In re 599 Consumer Elecs., Inc.*, 195 B.R. 244, 249 (S.D.N.Y. 1996).

court found that Union should have a superior claim to that of MHTC regarding Augie's assets. The Second Circuit held that no cause existed for upholding substantive consolidation under the first factor.[20]  Under the second factor, the Second Circuit noted that "substantive consolidation should be used only after it has been determined that all creditors will benefit because untangling is either impossible or so costly as to consume the assets."[21]  Finding that the assets of Augie's were traceable even though the business functions had been consolidated, the Second Circuit determined that substantive consolidation was not justified under the second factor.[22]  As substantive consolidation was not justified under either factor, and the court recognized that Union's claims against Augie's assets were superior to those of MHTC, the Second Circuit reversed the order of substantive consolidation.

A newer case from the Third Circuit dealing with substantive consolidation is the *Owens Corning* case.  While this court puts it in the same category as the Augie/Restivo line of cases, it actually seems to take a slightly stricter view than did the Second Circuit in *Augie/Restivo*, in emphasizing that substantive consolidation is ***rarely*** appropriate.  In this case, Owens Corning owned multiple subsidiaries that operated individually and independently.  In 1997, Owens Corning pursued financing to purchase Fibreboard Corporation.  Due to growing potential legal troubles and a bad credit rating, obtaining the necessary funds to purchase Fibreboard Corporation was difficult.  However, Owens Corning was able to obtain $2 billion in requisite financing from a group of banks (the "Banks") by obtaining guarantees from its subsidiaries.

---

[20] *Augie/Restivo Baking Co.*, 860 F.2d. at 518-19.

[21] *Id.* at 519.  *See also Introgen Therapeutics, Inc.*, 429 B.R. at 582 (citing to *Permian Producers*, 263 B.R. at 517) (holding the plan proponents had satisfied both factors of the *Augie/Restivo* test); *In re Bonham*, 229 F.3d 750, 766 (9th Cir. 2000) (adopting the *Augie/Restivo* test).

[22] *Augie/Restivo Baking Co.*, 860 F.2d. at 519.

The financing agreement also expressly required Owens Corning and its subsidiaries to limit their relationships in ways that would protect their separateness in governance, financial accounting, and record keeping.  The agreement also limited Owens Corning from conducting transactions with its subsidiaries that might "result in losses to that subsidiary."[23]

In the year 2000, Owens Corning, along with seventeen subsidiaries, filed for bankruptcy. About two years later, substantive consolidation was proposed by the debtors and several creditor groups.  This substantive consolidation was proposed to include all of the debtors, including Owens Corning, its subsidiaries which had filed for bankruptcy at the same time, and three subsidiaries which had ***not*** filed for bankruptcy.  Additionally, unlike other past substantive consolidations, proponents of the plan sought substantive consolidation merely for the purposes of paying off creditors and confirming the plan.  After the plan was confirmed, the "consolidated" entities were to resume operations as independent entities.  Despite objections from the Banks, the motion for consolidation pursuant to the plan was granted.[24]  Specifically, the district court (after withdrawing the reference) found that there existed "substantial identity" among the debtors and its subsidiaries, that "there [was] simply no basis for a finding that, in extending credit, the Banks relied upon the separate credit of any of the subsidiary guarantors," that it was clear that substantive consolidation would greatly simplify and expedite the successful completion of the bankruptcy, and that it would be exceedingly difficult to untangle the financial affairs of certain entities and, thus, ultimately found that substantive consolidation was

---

[23] *In re Owens Corning*, 419 F.3d 195, 200-201 (3d Cir. 2005).

[24] *Id.* at 202-207.

appropriate.[25]  The Third Circuit reversed the district court and stated the test for substantive

consolidation as follows:

> In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.[26]

It is interesting to note that the Third Circuit distills the traditional list of substantive

consolidation factors down to ***two critical either-or factors*** (as did the Second Circuit) but

phrases them slightly differently.  The Second Circuit suggests it all boils down to: ***(i) whether***

***creditors dealt with the entities as a single economic unit and 'did not rely on their separate***

***identity in extending credit,'. . . or (ii) whether the affairs of the debtors are so entangled that***

***consolidation will benefit all creditors."***  The Third Circuit phrased it as whether: ***(i)***

***prepetition the debtors disregarded separateness so significantly their creditors relied on the***

***breakdown of entity borders and treated them as one legal entity, or (ii) whether postpetition***

***their assets and liabilities are so scrambled that separating them is prohibitive and hurts all***

***creditors.***  Thus, the tests seem essentially the same—only the Third Circuit seems slightly more

stringent in its wording.  In any event, the Third Circuit in *Owens Corning* further indicated that

substantive consolidation proponents "have the burden of showing one or the other rationale for

consolidation."[27]  As to the first rationale, the Third Circuit noted that a "prima facie case for it

typically exists when, based on the parties' prepetition dealings, a proponent proves corporate

---

[25] *Id.* at 202-203.

[26] *Id.* at 211.

[27] *Id.* at 212.

disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity."[28]  Moreover, creditor opponents of consolidation can nonetheless defeat a prima facie showing under the first rationale if they can prove they are adversely affected and actually relied on debtors' separate existence.[29]  The Third Circuit noted that the second rationale did not need an explanation, but provided in a footnote that

> This rationale is at bottom one of practicality when the entities' assets and liabilities have been "***hopelessly commingled***." *In re Gulfco Inv. Corp.*, 593 F.2d at 929; *In re Vecco Constr. Indus.*, 4 B.R. at 410. Without substantive consolidation all creditors will be worse off (as Humpty Dumpty cannot be reassembled or, even if so, the effort will threaten to reprise Jarndyce and Jarndyce, the fictional suit in Dickens' Bleak House where only the professionals profited). With substantive consolidation the lot of all creditors will be improved, as consolidation "advance[s] one of the primary goals of bankruptcy—enhancing the value of the assets available to creditors ...—often in a very material respect." *Kors*, supra, at 417 (citation omitted).[30]

In applying its view of substantive consolidation, the Third Circuit found that the Owens Corning consolidation failed right from the start.  The Third Circuit found that no corporate disregard had existed prior to the consolidation.  It found that no "substantial identity" existed between the entities, and, therefore, the consolidation under the first option was unjustified.  Furthermore, the court found that substantive consolidation under the second option was completely unjustified as consolidation would not result in every creditor receiving more than they would have without consolidation.  In finding that substantive consolidation was wholly inappropriate, the court concluded that substantive consolidation is about equity and therefore should only be used to accomplish an equitable result.[31]

---

[28] *Id.*

[29] *Id.*

[30] *Id.* at n. 20.

[31] *Id.* at 212-216.

It is worth noting that the Fifth Circuit, albeit in dicta and in a non-plan context, cited to both *Owens Corning* and *Augie/Restivo* in *In re Amco Ins.*, 444 F.3d 690 (5th Cir. 2006) and emphasized that this "rough justice" remedy should be rare. However, it is also noteworthy that the *Amco* case did not involve a chapter 11 plan, but rather a chapter 7 trustee seeking to consolidate a corporate debtor with an individual ***non-debtor*** on a ***nunc pro tunc*** basis, dating back to the petition date of the corporate debtor.[32] The substantive consolidation was ruled to be improper as, among other things, it would have significantly prejudiced a particular large creditor who had been pursuing collection against the non-debtor for months.

 *ii.) The Harm-Balancing Test.*

Other courts have applied somewhat more of a true harm-balancing test, which tends to identify certain elements from the traditional multi-factor test, but ultimately ***balances the harms or prejudice along with considering how many of the traditional factors exist***. One example is

---

[32] In *Amco*, an individual named Peerbhai controlled two entities that were involved in the insurance business, AIG and AIA. Peerbhai and AIG obtained financing from Wells Fargo in 2000. By 2001, the parties breached the loan agreement with Wells Fargo and were sued in state court. Shortly thereafter, AIG and AIA filed bankruptcy, but Peerbhai did not. Wells Fargo was able to continue its collection efforts against Peerbhai individually since he had not filed. An agreed lift stay order was entered in the bankruptcy cases (apparently with the agreement of the trustee) so that Wells Fargo could continue the state court litigation—and for practical purposes, negotiate a settlement agreement with all three entities. This settlement agreement was ultimately reached in April 2002, leaving Peerbhai indebted to Wells Fargo for $3,398,956.16. In July of that year, the trustee for AIA filed a motion for substantive consolidation, seeking to consolidate AIA and Peerbhai (a nondebtor) as a single debtor in bankruptcy on a *nunc pro tunc* basis—seeking to make it effective several months back. After two days of evidence, the bankruptcy court was convinced Peerbhai concealed assets from his creditors, commingled funds, that there was a substantial identity between the entities, creditors relied on them as a single unit, and they did not observe corporate formalities. The bankruptcy court ordered consolidation on a *nunc pro tunc* basis. That is, the entities (the non-debtor individual and the debtor) were to be considered consolidated from the date of the AIA petition "because at all relevant times, Peerbhai and AIA operated as one financial entity." The Fifth Circuit reviewed the bankruptcy court's order granting the trustee's motion for substantive consolidation and ultimately vacated the order as an abuse of discretion. The Fifth Circuit was concerned that the bankruptcy court gave a "green light" to Wells Fargo when it lifted the stay. Wells Fargo "expended its time and money to pursue the state court litigation" in reliance on this supposed nod from the bankruptcy court. It was unfair that Wells Fargo had negotiated a settlement only to have it undone by the bankruptcy court. The court noted that though the bankruptcy court is a court of equity, its equitable powers are not limitless and that it went too far by leading Wells Fargo down a path it later effectively revoked. Since the court held the bankruptcy court erred by allowing substantive consolidation *nunc pro tunc*, it declined to address Wells Fargo's argument regarding the bankruptcy court's power under section 105 to grant substantive consolidation and, if such power exists, the proper standard to use in applying substantive consolidation. *See Wells Fargo Bank of Tex. N.A. v. Sommers (In re Amco Ins.)*, 444 F.3d 690, 692-93, 97, n. 5 (5th Cir. 2006).

*In re Snider Bros., Inc.*, 18 B.R. 230, 234 (Bankr. D. Mass. 1982), where the court held that substantive consolidation analysis boils down to weighing the economic prejudice of separateness versus economic prejudice of consolidation.[33] In *Snider Bros.*, the creditors' committees for six corporate debtors sought the consolidation of all of the assets and liabilities of the six debtors, as well as the elimination of all intercorporate debts, which they argued would benefit creditors generally. The Commerce Bank & Trust Co., a large secured creditor, objected to consolidation on the grounds that its secured position would be impaired thereby. The bankruptcy court ultimately held that consolidation of the debtors' estates was not warranted under circumstances which, though there had been frequency of intercorporate transactions, loans, direct sales and guarantees, each debtor had kept separate records, and the creditors' committee only generally alleged that they would be harmed by continued separation of estates. Moreover, the court noted that use of a single bookkeeping staff was not shown to have prejudiced creditors, the debtors had ceased doing business, and the possibility of consolidated sale of all of debtors' assets was remote. Accordingly, the bankruptcy court held that the parties seeking consolidation had failed to show sufficient cause to order substantive consolidation.[34]

Another example is *Eastgroup Props. v. S. Motel Ass'n, Ltd.*, 935 F.2d 245 (11th Cir. 1991). In that case the court balanced "whether consolidation is necessary to avoid some harm or realize some benefit." In *Eastgroup*, a chapter 7 trustee for two debtors (SMA and GPH) had

---

[33] *See also Drabkin v. Midland–Ross Corp. (In re Auto-Train Corp.)*, 810 F.2d 270, 276-77 (D.C. Cir. 1987) ("adopting the balancing test articulated in *Snider* but requiring a showing that the benefits of consolidation heavily outweigh the harms"); *In First Nat'l Bank of El Dorado v. Giller (In re Giller)*, 962 F.2d 796 (8th Cir. 1992) (the court held that the factors to consider when deciding whether substantive consolidation is appropriate include 1) the necessity of consolidation due to the interrelationship among the debtors; 2) whether the benefits of consolidation outweigh the harm to creditors; and 3) prejudice resulting from not consolidating the debtors." Furthermore, the court specifically encouraged a weighing of the benefits of consolidation versus the prejudice of not consolidating the debtors).

[34] *In re Snider Bros., Inc.*, 18 B.R. 230, 238-239 (Bankr. D. Mass. 1982).

moved to substantively consolidate the two bankruptcy estates. SMA was a limited partnership that was formed for the purpose of acquiring and holding fee simple title to, and leasehold interests in, motel properties. GPH was a corporation whose sole business was the operation of the motel businesses owned or leased by SMA. The bankruptcy court ultimately granted the requested consolidation by the chapter 7 trustee. 0Certain objecting creditors appealed the ruling and the Eleventh Circuit ultimately affirmed the bankruptcy court. Specifically, the Eleventh Circuit first held that the proponent of substantive consolidation must show that (1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit.[35] When this showing is made, a presumption arises "that creditors have not relied solely on the credit of one of the entities involved." Once the proponent has made this prima facie case for consolidation, the burden shifts to an objecting creditor to show that (1) it had relied on the separate credit of one of the entities to be consolidated; and (2) it would be prejudiced by substantive consolidation. Finally, if an objecting creditor has made this showing, "the court may order consolidation only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm." With this standard in mind, the Eleventh Circuit held that: (1) the chapter 7 trustee presented sufficient evidence on common identity of debtor entities and on harm to be avoided or benefit to be

---

[35] In *Eastgroup*, the Eleventh Circuit noted that the proponent of consolidation may want to frame its argument using the seven factors outlined in *In re Vecco Construction*, which included: (1) the presence or absence of consolidated financial statements; (2) the unity of interests and ownership between various corporate entities; (3) the existence of parent and intercorporate guarantees on loans; (4) the degree of difficulty in segregating and ascertaining individual assets and liabilities; (5) the existence of transfers of assets without formal observance of corporate formalities; (6) the commingling of assets and business functions; and (7) the profitability of consolidation at a single physical location. Additional factors that could be further presented in some cases by the proponent include (1) the parent owning the majority of the subsidiary's stock; (2) the entities having common officers or directors; (3) the subsidiary being grossly undercapitalized; (4) the subsidiary transacting business solely with the parent; and (5) both entities disregarding the legal requirements of the subsidiary as a separate organization. However, the Eleventh Circuit in *Eastgroup* stressed that these were only examples of information that may be useful to courts charged with deciding whether there is a substantial identity between the entities to be consolidated and whether consolidation is necessary to avoid some harm or to realize some benefit. *Eastgroup Props. v. S. Motel Ass'n, Ltd.*, 935 F.2d 245, 249-50 (11th Cir. 1991).

realized from consolidation to establish a prima facie case for consolidation, and (2) the objecting creditors failed to prove that they relied on the separate credit of one debtor entity in deciding to deal with it so as to constitute a defense to consolidation. Because the objecting creditors failed to prove that they relied on the separate credit of SMA in deciding to deal with it, they had failed to carry their burden of proof and their appeal failed.[36]

This balancing test approach has been adopted by numerous courts either explicitly or implicitly.[37]

### C. Determining Whether Substantive Consolidation is Appropriate for the Adeptus Debtors.

In determining whether substantive consolidation is appropriate for the Adeptus Debtors, the court starts with two hugely significant observations.

First, the case at bar involves **140 Debtors**. *Augie/Restivo* involved a mere two debtors. *Owens Corning* involved 18 debtors (a parent and 17 subsidiaries) plus three non-debtor subsidiaries that would be subject to the proposed substantive consolidation. *Eastgroup Props.* involved just two debtors. While there is no magic number that should necessarily change the legal analysis, surely all reasonable minds must recognize that having 140 related debtors in bankruptcy together is **rare** and creates unique challenges in order to both: (a) protect stakeholders' legal rights, but at the same time (b) preserve limited resources and not unnecessarily drive up administrative expenses.

The second hugely significant observation is that no party challenged that the Adeptus Debtors' assets (not including litigation claims and causes of action) are worth between $113

---

[36] *Id.* at 248-52.

[37] *See, e.g.*, 2 COLLIER ON BANKRUPTCY ¶ 105.09[2][a], ns. 59 & 60 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2017).

million and $137 million. All 140 Debtors are liable on the Deerfield Parties' $70 million debtor-in-possession loan. And 80 of the Debtors are liable on the $228 million secured indebtedness owed to the Deerfield Parties. What about the remaining 60 Debtors that are not liable on the $228 million prepetition secured facility? Do some of them have value beyond the $70 million debtor-in-possession loan? Are any of them "cash cows" that might benefit creditors of those specific entities? The answer is no, according to the credible evidence. The credible evidence indicated that 49 of those 60 Debtors were inactive or had no assets. The remaining eleven were not shown to have any material value.

What was the other evidence? The Debtors (supported by their secured lenders the Deerfield Parties, the Official Committee of Unsecured Creditors, and the Official Committee of Equity Security Holders) made the following arguments and provided credible evidence in support of substantive consolidation as set forth below:

- The Debtors' nerve center at which all policy and management decisions are made on behalf of all Debtors is in Lewisville, Texas at the corporate enterprise's headquarters—not at the five hospitals and 99 FSERs that are spread out over three states.
- All payroll for the more than 3,000 employees of the Debtor-enterprise is effectuated out of Lewisville, Texas.
- All cash for the corporate enterprise is swept and managed out of three central accounts: a concentration account and two other accounts (one for wires and one for checks).
- As noted above, pursuant to the Prepetition Credit Agreement (under which approximately $228 million is still due and owing), 80 of the 140 Debtors were jointly and severally liable and substantially all of the assets of most of these Debtors were encumbered by liens of the vastly undersecured Deerfield Parties.
- As noted above, pursuant to the DIP Facility Loan Agreement (under which approximately $70 million more was lent by the Deerfield Parties) *all* of the Debtors (in other words, the remaining 60 Debtors that were not liable in connection with the Prepetition Credit Agreement) are jointly liable for the $70 million.
- The Debtors maintain consolidated books and records and a centralized cash management system, pursuant to which all debts of the Adeptus Enterprise are paid, thereby resulting in substantial intercompany claims between the Debtors. (In fact, many of the Debtors (including PubCo) did not have bank accounts in

22

their own names and required their obligations to be paid from the accounts of other affiliates.)

- There was very credible testimony that, it is difficult for the Debtors to segregate and ascertain individual assets and liabilities (particularly payables) on an entity-by-entity basis.[38]   There was credible evidence that the Debtors' accounts payable are kept on a consolidated basis and accruals were all at a consolidated level.  There was credible evidence that preparing separate Schedules and SOFAs was very difficult for the Debtors' financial advisors.  One financial advisor from FTI Consulting used the words ***"tangled mess"*** to describe trying to sort through intercompany receivables and payables.  There was credible testimony that preparing a list of executory contracts, on a debtor-by-debtor basis, was extremely difficult for the Debtors' financial advisors.

- The Debtors file tax returns on a consolidated basis.  As a public company, the Debtors do their financial reporting as a single entity.

- In addition to the secured lenders, there was credible evidence that significant creditors of the Debtors view the Debtors as a single economic unit and did not rely on their separate identity in extending credit.  There was evidence that numerous creditors have filed duplicative claims against multiple Debtors and did not know which Debtors were liable to them.  Even two representatives of the creditor-objector PST testified as such in pre-hearing depositions—notably and understandably, the objecting creditor PST did not put his client representatives on the witness stand at the confirmation trial.

- All of the Debtors are controlled by common directors and officers. Specifically, the directors and officers of PubCo control, directly or indirectly, the affairs of all of the Debtors, and the individuals who are insiders of each of the subsidiary Debtors are also insiders of PubCo.

- Certain "D&O Claims" (*i.e.,* claims that have been asserted to exist against the Debtors' officers and directors for fraud and mismanagement and the like) have been determined by credible professionals, including counsel for the Official Unsecured Creditors Committee, to be jointly owned by all of the Debtors. The Debtors have director and officer insurance liability policies ("D&O Policies") that have $50.0 million in total limits and any recovery on account of the D&O Claims will be a significant asset of the Litigation Trust, which will be jointly owned by all of the Debtors' estates.

- The Debtors have further noted that, the fact that distributions for general unsecured creditors and equity interest holders will be ***based on recoveries from litigation claims*** is a significant reason why the Debtors decided to request that these estates be substantively consolidated. Specifically, as a result of the postpetition analysis and investigation of potential causes of action that the Debtors and Creditors' Committee conducted, the Debtors determined that a number of significant causes of action (a) were jointly owned by all of the Debtors, or (b) would be difficult to allocate between estates.

---

[38] Each of the Debtors were required to file separate Schedules and Statements of Financial Affairs; however, the Debtors noted therein that, because the books and records were maintained on a consolidated basis, it was difficult to allocate assets and liabilities on an entity-by-entity basis.

Because of the foregoing factors, the court believes that substantive consolidation will achieve a fair and equitable result for all creditors and equity interest holders of the Debtors and will enable the assets of the Debtors to be administered in an efficient manner.  If the estates are not substantively consolidated, the time and expense to allocate assets and liabilities between estates will be enormous.

Whether applying a traditional multi-factor test or the harm balancing test, the Debtors have demonstrated that substantive consolidation is appropriate.  The preponderance of the evidence reflected that ***creditors tended to deal with the Debtors as a single economic unit and did not rely on their separate identity in extending credit.***  The preponderance of the evidence reflected that ***the liabilities and contracts of the Debtors were a "tangled mess" to try to unsort.*** Rephrased, the preponderance of the evidence reflected that ***creditors usually treated the Debtors as one legal entity.***  The preponderance of the evidence reflected that ***separating the Debtors would be prohibitive and hurt all creditors.***    The court is left to conclude that consolidation will benefit all creditors.  There was no evidence of prejudice to any particular creditor.  None whatsoever.

Finally, does it matter at all that the Plan only contemplates substantive consolidation of all 140 Debtors ***for Plan treatment and voting purposes*** and not for all purposes post-confirmation (*i.e,* it proposes "deemed" consolidation or consolidation "light," as some have referred to it)?  This court thinks not.  No reported cases have singled this out as a special circumstance that would impact either negatively or positively the substantive consolidation analysis.  Thus, in summary, as a result of the Debtors' integrated and interdependent operations, substantial intercompany obligations and guaranties, common officers and directors, common control and decision making, reliance on a consolidated cash management system, and

dissemination of principally consolidated financial information to third parties, the Debtors operated, and creditors dealt with the Debtors, as a single, integrated economic unit. In view of the foregoing—and particularly since the causes of action that will produce most of the recovery to stakeholders have been determined to be owned by all Debtor estates—the court approves substantive consolidation. Substantive consolidation under the Plan will best utilize the Debtors' assets and potential of all of the Debtors to pay to the creditors of each entity the distributions to which they are entitled.

### D. Notwithstanding Substantive Consolidation, How Should Votes Be Counted, Per Plan or Per Debtor?

If substantive consolidation is ordered, then it appears appropriate for a bankruptcy court to combine the debtors for purposes of voting.[39] Interestingly, even in cases where substantive consolidation has not been implemented (rather joint administration of many debtors has been involved) there is certain authority that supports a notion that section 1129(a)(10) of the Bankruptcy Code is to be applied on a "per plan" basis rather than a "per debtor" basis.

The earliest case supportive of the "per plan" interpretation of § 1129(a)(10) is *In re SGPA*, Inc., Case No. 1-01-026092, 2001 Bankr. LEXIS 2291 (Bankr. M.D. Pa. September 28, 2001), in which the bankruptcy court overruled the objection of complaining creditors and confirmed a joint plan, holding that it was unnecessary "to have an impaired class of creditors of each Debtor to vote to accept the Plan." In *SPGA*, the debtors had a multi-million dollar syndicated secured credit facility with a certain "Bank Group" and senior unsecured debt held by a group of bondholders referred to as the "Subordinated Bondholders." The debtors negotiated a workout with the Bank Group, but not the Subordinated Bondholders. The debtors proposed a

---

[39] *See, e.g., In re Stone & Webster*, 286 B.R. 532, 545 (Bankr. D. Del. 2002).

joint plan based on the workout with Bank Group that contained fifty-seven classes of creditors. The Subordinated Bondholders objected, arguing that the debtors failed to establish an impaired accepting class as to each debtor. The Subordinated Bondholders also argued that the only way the debtors could have satisfied section 1129(a)(10) of the Bankruptcy Code was if the court had ordered substantive consolidation. The SPGA court, after explaining that it did not truly understand the corporate structure prepetition and post-confirmation, held that, in order to confirm the plan, the multi-debtor plan only needed one impaired accepting class to satisfy section 1129(a)(10) of the Bankruptcy Code. The SPGA court appears to have been swayed somewhat by the equities of the case. Specifically, the court noted that under a per-debtor reading, "ten of the 11 debtors cannot satisfy § 1129(a)(10)" because the impaired classes were to receive no distribution, each of those classes were deemed to reject the plan, and the deemed rejections eliminated the possibility of a consenting class for the ten debtors on a stand-alone basis. Furthermore, the court noted that whether the debtors "were substantively consolidated or jointly administered would have no adverse affect [sic] on the Subordinated Bondholders."[40]

Next, the bankruptcy court in *In re Enron*, Case No. 01-16034, 2004 Bankr. LEXIS 2549 (Bankr. S.D.N.Y. July 15, 2004), in an opinion marked "Not For Publication," also considered the section 1129(a)(10) issue and decided that both the plain statutory meaning and "the substantive consolidation component of the global compromise" allowed confirmation of a 177–debtor joint plan when at least one class of impaired claims voted to accept the plan. The *Enron* court relied, in part, on *SGPA*. However, in *Enron*, it is worth noting that there was, as part of a global compromise and settlement embodied in the plan, some form of substantive consolidation

---

[40] *In re SGPA, Inc.*, Case No. 1-01-026092, 2001 Bankr. LEXIS 2291, at *12-22 (Bankr. M.D. Pa. September 28, 2001).

utilized, so it is not entirely clear whether that impacted the court's decision to allow "per plan" voting rather than "per debtor" voting. Moreover, the bankruptcy court in *Enron* noted that

> It is quite common for debtors with a complex corporate structure to file a joint chapter 11 plan pursuant to which the corporate form is preserved, or in which a "deemed consolidation" is proposed and approved. In such circumstances, all debtors are treated as a single legal entity for voting and distribution purposes. *See, e.g., In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 619 (Bankr. D. Del. 2001).[41]

Finally, in *JPMorgan Chase Bank, N.A. v. Charter Commc'ns. Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009), the bankruptcy court overruled an objection that certain classes of creditors were "artificially" impaired to meet the section 1129(a)(10) requirement. Moreover, the bankruptcy court, in what is either an alternative ruling or dicta, went on to state that section 1129(a)(10) of the Bankruptcy Code is to be applied per plan, not per debtor, citing in support *Enron* and *SGPA*. The court observed that the debtors were managed on an integrated basis making it reasonable and administratively convenient to propose a joint plan and that the joint plan has been accepted by numerous other impaired accepting classes, thereby satisfying the requirement of section 1129(a)(10).[42]

---

[41] *In re Enron*, Case No. 01-16034, 2004 Bankr. LEXIS 2549, at *234-236 (Bankr. S.D.N.Y. July 15, 2004).

[42] *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns)*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009). *See also In re Transwest Props., Inc.*, 554 B.R. 894 (D. Az. 2016). *Transwest* involved two luxury resorts (the Westin La Paloma in Tucson, Arizona and the Westin Hilton Head Resort and Spa in Hilton Head, South Carolina), purchased by the debtors in 2008 with mortgage and mezzanine financing. To facilitate the financing of the resorts, the debtors' owners formed several special-purpose entities, including two entities that owned the resorts (the "operating debtors") and two entities that owned the operating debtors (the "mezz debtors"). Yet another debtor, the holding company debtor, was the sole owner of the mezz debtors. The mortgage loan was secured by a first-priority security interest in the resorts, while the mezzanine loan was secured by the mezz debtors' ownership interests in the operating debtors. Ultimately, the debtors each filed separate petitions for chapter 11 relief in the U.S. Bankruptcy Court for the District of Arizona, and their cases were jointly administered. After finding a new equity investor, the debtors filed a joint chapter 11 reorganization plan for all five of the debtors, even though the debtors did not seek—nor did the bankruptcy court authorize—substantive consolidation of the debtors' separate bankruptcy estates. The plan proposed transferring ownership of the operating debtors to the new investor in exchange for a multi-million-dollar investment in the operating debtors to finance extensive renovations to the resorts and fund distributions under the plan. The plan further proposed restructuring and extending the term of the mortgage loan, provided no distributions on account of the mezzanine loan, and extinguished the mezz debtors' existing ownership interests in the operating debtors. At the confirmation hearing, the lender, which held the mortgage loan and had, after the original chapter 11 plan was proposed, acquired the mezzanine loan claims, voted to reject the plan and argued that the plan could not be confirmed because, among other things, the mezz debtors

Other courts, however, have rejected this "per plan" interpretation of section 1129(a)(10) of the Bankruptcy Code, holding that it applies on a "per debtor" basis where the plan did not provide for substantive consolidation of the debtor.[43] For example, the bankruptcy court in *In re Tribune*, was tasked with evaluating how to tabulate voting in two competing plans that were proposed by 111 jointly administered debtors. The bankruptcy court first reasoned that the statutory language of section 1129(a)(10) was not dispositive because the Bankruptcy Code rules of construction state that "the singular includes the plural."[44] Second, the bankruptcy court relied on the doctrine of corporate separateness to conclude that section 1129(a)(10) applies on a per-debtor basis.[45]

This court, having approved the substantive consolidation proposed by the Debtors, concludes that it was appropriate for the Debtors to have tabulated ballots on a consolidated basis. The court makes no comment on whether it would have been proper in the absence of substantive consolidation.

### ###END OF MEMORANDUM OPINION###

---

lacked an accepting, impaired class as required for confirmation under section 1129(a)(10) of the Bankruptcy Code. The debtors argued that the plan satisfied section 1129(a)(10) because several classes of impaired claims against the operating debtors accepted the joint plan. The bankruptcy court confirmed the plan over the lender's objections, finding that the plain language of section 1129(a)(10) required only that "a plan" have one accepting, impaired class of creditors, even if the plan covered multiple debtors. On appeal, the district court affirmed the bankruptcy court's rulings, finding that the plain language of section 1129(a)(10) only required one accepting, impaired class of creditors per plan. *Transwest Props., Inc.*, 554 B.R. at 899-901. Note, this case is currently set for oral argument before the Ninth Circuit in October 2017.

[43] *In re Tribune Co.*, 464 B.R. 126, 180-183 (Bankr. D. Del. 2011). *See also In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 302-03 (Bankr. D. Del. 2011) (in ruling on a motion to dismiss, the court held in dicta that the debtors did not have a reasonable likelihood of reorganization because they could not confirm a joint plan where one of the debtors only had one, non-accepting class, citing to *Tribune* for support).

[44] *See* 11 U.S.C. § 102(7).

[45] *Tribune Co.*, 464 B.R. at 180-83.